EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Asociación de Maestros de Puerto Rico, et als.<br>    Peticionarios<br><br>v.<br><br>Sistema de Retiro para Maestros de Puerto Rico, et als.<br>    Recurridos<br>_____<br>Educadores/as por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc., por sí y en representación de sus miembros et als.<br>    Peticionarios<br><br>v.<br><br>Sistema de Retiro para Maestros de Puerto Rico, et als.<br>    Recurridos | 2014 TSPR 58<br><br>190 DPR ____ |

Número del Caso: CT-2014-2
               CT-2014-3


Fecha: 11 de abril de 2014


**CT-2014-2**

Abogados de la Parte Peticionaria:

        Lcdo. Rafael A. Nadal Arcelay
        Lcda. Melissa López Díaz
        Lcdo. Ramón Rosario Cortés
        Lcdo. Carlos Rivera Vicente

Abogados de la Parte Recurrida:

        Lcda. Alba L. Ortiz Morales
        Lcdo. Rafael Escalera Rodríguez
        Lcda. Alana M. Vizcarrondo Santana

Parte Interventora:

        Lcda. Vanessa Carballo Santiago
        Lcdo. Francisco González Magaz

Oficina de la Procuradora General:

        Lcda. Margarita Mercado Echegaray
        Procuradora General

        Lcda. Tanaira Padilla Rodríguez
        Subprocuradora General

Lcda. Amarilis Ramos Rodriguez
Procuradora General Auxiliar

Departamento de Justicia:

Lcda. Claudia Juan García

## CT-2014-3

Abogados de la Parte Peticionaria:

Lcdo. Rafael Ortiz Mendoza
Lcdo. Jorge Farinacci Fernós

Abogados de la Parte Recurrida:

Lcda. Alba Ortiz Morales
Lcdo. Rafael Escalera Rodríguez

Parte Interventora:

Lcda. Vanessa Carballo Santiago
Lcdo. Francisco González Magaz

Oficina de la Procuradora General:

Lcda. Margarita Mercado Echegaray
Procuradora General

Lcda. Tanaira Padilla Rodríguez
Subprocuradora General

Lcda. Amarilis Ramos Rodriguez
Procuradora General Auxiliar

Departamento de Justicia:

Lcda. Claudia Juan García

Materia: Certificación Intrajurisdiccional

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Asociación de Maestros de Puerto Rico, et als.<br><br>Peticionarios<br><br>v.<br><br>Sistema de Retiro para Maestros de Puerto Rico, et als.<br><br>Recurridos | CT-2014-2<br>CT-2014-3 | Certificación Intrajurisdiccional |
| Educadores/as por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc., por sí y en representación de sus miembros, et als.<br><br>Peticionarios<br><br>v.<br><br>Sistema de Retiro para Maestros de Puerto Rico, et als.<br><br>Recurridos | | |

Opinión del Tribunal emitida por el Juez Asociado señor MARTÍNEZ TORRES.

En San Juan, Puerto Rico, a 11 de abril de 2014.

> [La cláusula constitucional que prohíbe el menoscabo de obligaciones contractuales es un precepto] clásico en el derecho del estado liberal, reafirmando y consolidando la validez de los compromisos contractuales.
>
> 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico, Ed. de 1961, pág. 2567.

En esta ocasión nos corresponde evaluar la validez constitucional de la Ley Núm. 160-2013, conocida como "Ley de Retiro para Maestros del Estado Libre Asociado de Puerto Rico", que reformó al Sistema de Retiro de Maestros de Puerto Rico (SRM).

Somos conscientes del impacto que tiene la decisión que hoy tomamos. Los maestros son quienes moldean el conocimiento de los integrantes de nuestra sociedad. Son pieza fundamental del sistema educativo. Ante esa realidad, tenemos el deber de examinar cuidadosamente el asunto planteado a la luz del derecho vigente y tomando en cuenta no solo los intereses de la clase magisterial, sino también la situación fiscal precaria que enfrenta el Gobierno de Puerto Rico.

Por los fundamentos que exponemos a continuación, concluimos que para propósitos de la cláusula constitucional que prohíbe el menoscabo de obligaciones contractuales, Art. II, Sec. 7 de la Constitución de Puerto Rico, LPRA Tomo I, la Ley Núm. 160-2013 es irrazonable y por consiguiente inconstitucional, toda parte del estatuto que altera el derecho contractual que tienen los peticionarios-demandantes sobre su pensión de retiro, conforme la Ley Núm. 91-2004, 18 LPRA sec. 391 *et seq.*

Ahora bien, resolvemos que es constitucional la Sec. 2 de la Ley Núm. 160-2013 en cuanto derogó las leyes especiales que concedían unos beneficios adicionales que

no forman parte de la pensión y el Art. 4.9 de esa misma legislación que eliminó ciertos beneficios a los miembros del SRM que se retiren a partir del 1 de agosto de 2014.

Por último, determinamos que los participantes que entraron a cotizar al SRM con posterioridad a la aprobación de la Ley Núm. 160-2013, solo tienen derecho a la pensión que establece esa legislación. Ese grupo no sufrió un menoscabo de su derecho contractual que active la protección que confiere el Art. II, Sec. 7 de la Constitución de Puerto Rico, supra. Por lo tanto, esa parte de la ley no viola la Constitución.

I

En este caso contamos con el beneficio de un informe suministrado por el Comisionado Especial, Hon. Ángel Pagán Ocasio, Juez Superior, quien fue nombrado por este Tribunal para hacer unas determinaciones de hechos basadas en la prueba presentada por las partes. Luego de evaluar ese informe, acogemos las determinaciones de hechos del Comisionado Especial. Para facilitar la comprensión de los acontecimientos que dieron origen a la controversia que nos ocupa, resumimos los hechos pertinentes.

El 30 de junio de 2012, el Sr. Glenn D. Brown y la Sra. Katherine A. Warren (ambos de la compañía de estudios actuariales Milliman) prepararon un Informe de Valorización Actuarial para el SRM. La compañía Milliman

ha rendido informes de valoración actuarial para el SRM desde el 2007.

Según ese informe actuarial, el SRM contaba con $2,099,563,000 en activos y $12,350,836,000 en pasivos, y el valor de los beneficios sumaba a $15,416,000,000. Esos cálculos producían un déficit actuarial de $10,251,273,000 para el 30 de junio de 2012. A base de ello, las contribuciones periódicas requeridas para cubrir los desembolsos normales del plan y amortizar el déficit de las obligaciones actuariales se estimaron en $736.6 millones, fijados en un período de repago de veinticinco años y una tasa de interés de 5.95%. Por su parte, el flujo de dinero en efectivo presenta un déficit de $334.5 millones para el 30 de junio de 2013.

El informe actuarial también demostró que para el 2020 se agotarán todos los activos del SRM y no habrá fondos para pagar las pensiones si no se toman las medidas correctivas pertinentes. Ausentes los cambios necesarios, el Fondo General del Tesoro de Puerto Rico tendría que asumir la deficiencia del SRM. Se proyecta que para el año fiscal 2021-2022 esa deficiencia sería de $317,881,000, para el año fiscal 2022-2023 sería de $340,675,000, y para el año fiscal 2023-2024 sería de $363,168,000. Esas cantidades son adicionales a las aportaciones patronales para esos años y presumen un aumento en nómina de 3.5% anual desde el año fiscal 2013-2014.

Más aún, el informe actuarial demuestra que el porciento de miembros inactivos ha aumentado, por lo que el SRM se ha tornado más maduro. Eso significa que el porciento de miembros inactivos ha aumentado en comparación con los miembros activos. Es decir, para el año 1999, la cantidad de miembros activos en el sistema ascendía a 48,122, mientras que los miembros inactivos sumaban 22,969 (32%). Sin embargo, en el año 2012 la cantidad de miembros activos se redujo a 42,707 y los miembros inactivos aumentaron a 37,243 (47%).

Cuando los activos son iguales o superiores a los pasivos, el sistema de retiro se considera financieramente sustentable y viable. Por el contrario, cuando la cantidad de activos es menor a la de los pasivos, como demostró el informe actuarial en este caso, el plan se considera no sustentable y no viable. Se estimó que, si el SRM sigue la misma tendencia, los activos seguirán disminuyendo hasta que en el año 2020 se agoten por completo y no haya fondos para pagar las pensiones. A base de los datos anteriores fue que se decidió hacer un cambio al SRM y convertirlo en un sistema de aportación definida.

El 11 de octubre de 2013 se celebró una reunión entre el Gobernador de Puerto Rico y el Frente Amplio en Defensa del Retiro para Maestros (FADSRM), cuyos componentes incluyen a las partes demandantes en este caso —la ´´Asociación de Maestros de Puerto Rico (en

adelante "Asociación") y Educadores por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc. (en adelante "EDUCAMOS"), entidad compuesta por empleados y ex-empleados docentes del Departamento de Educación de Puerto Rico que cotizan o son pensionados del SRM. En noviembre de 2013 se celebraron tres reuniones adicionales, durante las cuales el FADSRM entregó al Gobernador diez propuestas para reformar el SRM, y el Gobernador entregó las suyas a los líderes magisteriales. Las propuestas que el FADSRM entregó al Gobernador son las siguientes:

(1) Reducir en un 10% los gastos administrativos del SRM. Se estima que esta medida producirá $2.5 millones anualmente.

(2) Reducir en un 10% los gastos administrativos en el Departamento de Educación, a excepción de gastos de nómina, pero incluyendo contratos innecesarios. Se estima que esta medida producirá $52 millones anualmente.

(3) Que el Departamento de Educación pague de inmediato los 24 millones de dólares que le adeuda al SRM y continúe haciendo la aportación correspondiente conforme la Ley Núm. 114-2011.

(4) Eliminar las "pensiones privilegiadas".

(5) Nombrar las plazas que se requieren en las escuelas para que más maestros aporten al SRM.

(6) Aumentar en 1% la contribución a las empresas foráneas y asignarlos al SRM.

(7) Asignar al SRM los fondos no reclamados de la Lotería Electrónica.

(8) Imponer un cargo adicional al consumo de cigarrillos, bebidas alcohólicas y comidas rápidas.

(9) Imponer un cargo de hasta un 10% a los premios mayores de $1,000 obtenidos por concepto de juegos al azar.

(10) Imponer un tope máximo de $3,500 mensuales a las pensiones. Ese tope deberá revisarse cada dos años.

El 18 de diciembre de 2013 el Gobernador convocó una Sesión Extraordinaria para considerar nueva legislación. El 19 de diciembre de 2013, a la 1:47 am, se envió a la Asamblea Legislativa un proyecto de ley, compuesto de 93 páginas, que se convirtió en el P. de la C. 1589. A su vez, se envió lo que pasó a ser el P. de la C. 1594, cuyo propósito era proveer un aumento de $25 mensuales al sueldo básico de los maestros. Ese mismo día se celebró una sesión legislativa. En ese momento, el informe actuarial de Milliman de 2012 era el más reciente con el que se contaba.

El 20 de diciembre de 2013 se celebró una vista pública para discutir el P. de la C. 1589. Al día siguiente, el 21 de diciembre de 2013, se aprobó ese proyecto en la Cámara de Representantes. El Senado, a su vez, aprobó el proyecto el 23 de diciembre de 2013. El

24 de diciembre de 2013, el Gobernador firmó el proyecto que pasó a ser la Ley Núm. 160-2013 y que tuvo vigencia inmediata. Firmó también el P. de la C. 1594, convirtiéndolo en la Ley Núm. 161-2013. El trámite legislativo de ambas leyes duró seis días.

La Ley Núm. 160-2013, introdujo las siguientes modificaciones al SRM:

(1) Aumenta la edad mínima de retiro para quienes se jubilen a partir del 1 de agosto de 2014. Se aumentó de 47 años de edad, con 25 años de servicio cotizados, a 55 años de edad, con 30 años de servicio cotizados o, en su alternativa, a 60 años de edad, con 5 años de servicios cotizados. Véase Art. 3.9 de la Ley Núm. 160-2013.

(2) Aumenta a 62 años la edad mínima de retiro para maestros de nuevo reclutamiento. Véase Art. 3.9 de la Ley Núm. 160-2013.

(3) Aumenta la aportación individual de los maestros de un 9% del salario bruto a un 10% en el 2014, 13.12% en el año fiscal 2017-2018 y 14.02% en el año fiscal 2020-2021. Véanse Arts. 5.5 y 4.3 de la Ley Núm. 160-2013.

(4) Elimina el bono de verano ($100 al año) a todos los participantes. Véase Sec. 2 de la Ley Núm. 160-2013.

(5) Elimina la aportación al plan de salud (hasta $100 al mes), el bono para medicamentos ($100 al año) y el aguinaldo de navidad ($600 al año) para quienes se jubilen a partir del 1 de agosto de 2014. Véase Art. 4.9 de la Ley Núm. 160-2013.

(6) Reduce el aguinaldo de navidad de $600 a $200 a quienes se hayan jubilado antes del 1 de agosto de 2014. Véase Art. 4.9 de la Ley Núm. 160-2013.

(7) Impone un tope de 33% del salario mensual promediado a cinco años a las pensiones por incapacidad para los participantes activos previo al 1 de agosto de 2014. Véase Art. 4.6 de la Ley Núm. 160-2013.

(8) Establece una pensión mínima de $1,625 para aquellos maestros activos al 31 de julio de 2014 que no se puedan retirar a esa fecha con una pensión cuyo beneficio sea igual o mayor al 65% del salario promedio según definido por ley, y luego soliciten el retiro al cumplir 30 años de servicio y 55 años de edad. Véase Art. 3.11 de la Ley Núm. 160-2013.

(9) Excluye a los maestros actualmente activos que se jubilen con menos de 30 años de servicio a partir del 1 de agosto de 2014 del derecho a una pensión mínima. Tampoco tendrán derecho a ella quienes, bajo la Ley Núm. 91-2004 hubiesen sido elegibles para retirarse con 30 años de servicio al 30 de junio de 2016 y no opten por retirarse antes de agosto de 2014. Véase Art. 3.11 de la Ley Núm. 160-2013.

(10) Impide a los participantes con cinco años o más de servicio y $10,000 o más de aportaciones al SRM solicitar el rembolso de sus aportaciones, a partir del 1 de agosto de 2014. Véase Art. 5.10 de la Ley Núm. 160-2013.

(11) Se crea una ventana de retiro incentivado para los participantes que cumplan 30 años de servicio entre el 1 de agosto de 2014 al 30 de junio de 2016. El participante que se acoja a esa ventana tendrá derecho a una pensión del 70% de su salario, siempre que se acogiese al 31 de marzo de 2014 y se retire al 31 de julio de 2014. Ahora bien, si la persona que se acoge no tiene 55 años de edad, está obligada a pagar su aportación individual correspondiente hasta que cumpla esa edad. Véase Art. 4.4(a) de la Ley Núm. 160-2013.

La siguiente tabla refleja otros cambios que introdujo la Ley Núm. 160-2013 con respecto a la Ley Núm. 91-2004:

| Ley Núm. 91-2004 | Ley Núm. 160-2013 |
|---|---|
| Si completó 30 o más años de servicio y cumplió 50 años de edad tiene derecho a una pensión anual vitalicia de 75% del promedio de los salarios más altos durante 3 años. | Si completó más de 30 años de servicio y cumplió al menos 50 años de edad tiene derecho a la pensión acumulada hasta el 31 de julio de 2014 equivalente al 75% del promedio de los salarios más altos durante 3 años hasta el 31 de julio de 2014, sumada a la pensión por el periodo trabajado a partir del 1 de agosto de 2014. |

| | |
|---|---|
| Si tiene más de 25 años de servicio pero menos de 30 años y cumplió los 50 años de edad tiene derecho a una pensión anual vitalicia igual al 1.8% del promedio de los salarios más altos durante 3 años multiplicados por el número de años de servicios prestados. | Si tiene más de 25 años de servicio pero menos de 30 años y cumplió los 50 años de edad tiene derecho a la pensión acumulada hasta el 31 de julio de 2014 igual a lo establecido en la Ley Núm. 91-2004, sumada a la pensión por el periodo trabajado a partir del 1 de agosto de 2014. |
| Si completó 30 años o más de servicio y no ha cumplido los 50 años de edad tiene derecho a la pensión anual vitalicia de 65% del promedio de los salarios más altos durante 3 años. | Si completó 30 años o más de servicio y no ha cumplido los 50 años de edad tiene derecho a la pensión acumulada hasta el 31 de julio de 2014 igual a lo establecido en la Ley Núm. 91-2004, sumada a la pensión por el periodo trabajado a partir del 1 de agosto de 2014. |
| Si cumplió 47 años de edad pero menos de 50 y tiene 25 pero menos de 30 años de servicio tiene derecho al 95% de la renta anual | Si cumplió 47 años de edad pero menos de 50 y tiene 25 pero menos de 30 años de servicio tiene derecho a la pensión acumulada hasta el |

| | |
|---|---|
| vitalicia que le correspondía de haber ocurrido el retiro del participante a la edad de 50 años. | 31 de julio de 2014 igual a lo establecido en la Ley Núm. 91-2004, sumada a la pensión por el periodo trabajado a partir del 1 de agosto de 2014. |
| Si se renuncia antes de cumplir 60 años de edad y hubiere terminado por lo menos de 10 a 25 años de servicios acreditables tendrá derecho a una renta anual vitalicia por retiro diferido que comenzará a recibir cuando haya cumplido los 60 años de edad. | Si se renuncia antes de cumplir 60 años de edad y hubiere terminado por lo menos de 10 a 25 años de servicios acreditables tendrá derecho a la pensión acumulada hasta el 31 de julio de 2014 igual a lo establecido en la Ley Núm. 91-2004, sumada a la pensión por el periodo trabajado a partir del 1 de agosto de 2014. |

El 8 de enero de 2014, la Asociación y varios maestros cobijados por la Ley Núm. 91, supra, presentaron una solicitud de injunction preliminar y sentencia declaratoria ante el Tribunal de Primera Instancia, Sala de San Juan, Caso Núm. K PE2014-0017 (907), para declarar inconstitucional y paralizar de inmediato los efectos de la Ley Núm. 160-2013.

Posteriormente, la Organización de Directores y Administradores Escolares de Puerto Rico (ODAE), Educadores Puertorriqueños en Acción, Inc. (EPA) y varios miembros afectados de esas organizaciones presentaron unas solicitudes de intervención.

Pendiente el trámite ante el Tribunal de Primera Instancia, la Asociación acudió ante nos y presentó una solicitud de certificación intrajurisdiccional. Mediante una Resolución de 14 de enero de 2014, acogimos la solicitud de certificación, paralizamos los efectos de la Ley Núm. 160-2013, y nombramos al Juez Superior Hon. Ángel R. Pagán Ocasio como Comisionado Especial para que emitiera las determinaciones de hechos correspondientes.

Por otra parte, el 21 de enero de 2014, EDUCAMOS y varios maestros cobijados por la Ley Núm. 91, supra, presentaron una demanda de la misma naturaleza ante el foro primario, Caso Núm. K PE2014-0059 (907). Al día siguiente, presentaron una petición de certificación y una moción de consolidación ante este Foro. El 27 de enero de 2014 consolidamos.

En síntesis, los peticionarios-demandantes aducen que la Ley Núm. 160-2013, menoscaba inconstitucionalmente la obligación contractual que asumió el Estado en cuanto al SRM. Además, aducen que esa ley viola el debido proceso de ley en su vertiente sustantiva, la igual protección de las leyes y la doctrina de delegación de poderes. Asimismo, alegan que

las acciones del gobierno son constitutivas de expropiación forzosa, enriquecimiento injusto y violación de derechos fundamentales.

A solicitud de las partes demandadas-recurridas, tomamos conocimiento judicial de los informes emitidos por las casas acreditadoras *Standard & Poor´s*, *Fitch* y *Moody´s* en los que se degradó el crédito de las obligaciones generales del Estado Libre Asociado de Puerto Rico, entre otros. Además, a solicitud de las partes demandantes, tomamos conocimiento judicial del Informe del Comité de Diálogo y Negociación compuesto por altos funcionarios de la Rama Ejecutiva, miembros del magisterio y otros profesionales.[1] En ese informe se analizaron varias medidas de recaudos que viabilizarían una pensión equivalente al 75% del sueldo promedio del maestro. Algunas de las medidas consideradas fueron las siguientes:

(1) impuesto de menos de uno por ciento (.75%) a las corporaciones foráneas a partir del 2017;

(2) impuesto de 10% a los premios devengados en las máquinas de entretenimiento de adultos;

---

[1] En particular, formaron parte de ese Comité: el Arzobispo Católico de San Juan Mon. Roberto González Nieves, el Secretario del Trabajo Hon. Vance Thomas Rider, la Alcaldesa de San Juan Hon. Carmen "Yulín" Cruz Soto, el Secretario de Estado Hon. David Bernier Rivera, la Profa. Aida Luz Díaz Rivera, el Lcdo. Alejandro Torres Rivera, el Prof. Jorge Soto Díaz, el alcalde de Toa Baja Hon. Aníbal Vega Borges, el Rvdo. Ángel Luis Rivera Agosto, la Profa. Justina Ocasio Landrón, el Prof. Emilio Nieves Torres, la Profa. María Elena Lara Fontánez, el Prof. Domingo Madera Ruiz y la Profa. Eva Ayala Reyes.

(3) incluir a los maestros de escuelas privadas como participantes del SRM;

(4) reducción de los gastos de operación del SRM de un 10% a un 20%;

(5) impuesto adicional a cigarrillos y bebidas alcohólicas;

(6) establecer una moratoria en los préstamos del SRM y;

(7) crear un incentivo a maestros activos que están por retirarse para que permanezcan trabajando por dos o tres años más.

Luego de varios trámites procesales, el 29 de enero de 2014 se celebró una vista evidenciaria en la que las partes presentaron sus estipulaciones de hechos. El 7 de febrero de 2014 el Comisionado Especial sometió un informe con sus determinaciones de hechos. Las partes tuvieron la oportunidad de presentar sus comentarios y objeciones sobre el informe del Comisionado Especial, así como para presentar sus alegatos respectivos.

El 26 de marzo de 2014 celebramos una vista oral en la que las partes presentaron sus posturas. Como se puede apreciar, aunque este caso ha tenido un trámite expedito, las partes han tenido una oportunidad amplia de litigar su causa.

## II

En primer lugar, por ser un asunto de umbral que podemos atender por iniciativa propia, atendemos el asunto de nuestra jurisdicción para resolver este

recurso de certificación. S.L.G. Solá-Moreno v. Bengoa Becerra, 182 DPR 675, 682 (2011).

La Ley Núm. 18-2013, enmendó el Art. 3.002 de la Ley Núm. 201-2003, conocida como la Ley de la Judicatura de 2003, 4 LPRA sec. 24s, con el propósito de limitar las instancias en que este Tribunal podía expedir autos de certificación intrajurisdiccional. En particular, la Ley Núm. 18-2013 exigía que para poder hacer efectiva nuestra jurisdicción en casos de certificación provenientes del Tribunal de Primera Instancia, "ambas partes" de un pleito tenían que dar su anuencia para que el auto pudiera expedirse. Esa Ley también limitó la jurisdicción de este Foro para emitir autos de certiorari con relación a decisiones interlocutorias del Tribunal de Apelaciones. En Alvarado Pacheco y Otros v. E.L.A., 188 DPR 598 (2013), resolvimos en una Resolución de este Foro que los Arts. 1 y 2 de la Ley Núm. 18-2013 eran inconstitucionales, en la medida en que alteran los incisos (d) y (e) del texto original del Art. 3.002 de la Ley de la Judicatura de 2003 y la Regla 52.2(d) de Procedimiento Civil, 32 LPRA Ap. V.

En Alvarado Pacheco y Otros v. E.L.A., supra, emitimos nuestro dictamen en una Resolución porque al examinar la petición de certificación en sus méritos, declinamos emitir el auto. Por su parte, en Brau, Linares v. ELA, res. el 31 de diciembre de 2013, 2013 TSPR 156, 2014 JTS 9, 189 DPR __ (2013), emitimos un

auto de certificación mediante Resolución para atender en primera instancia la controversia allí planteada y citamos con aprobación a Alvarado Pacheco y Otros v. E.L.A., supra. Sin embargo, este caso nos permite pautar mediante Opinión lo resuelto en Alvarado Pacheco y Otros v. E.L.A., supra. Acogemos todos los fundamentos esbozados en la Resolución que emitimos en ese caso y reafirmamos que los Arts. 1 y 2 de la Ley Núm. 18-2013 son inconstitucionales, en la medida en que alteran los incisos (d) y (e) del texto original del Art. 3.002 de la Ley de la Judicatura de 2003 y la Regla 52.2(d) de Procedimiento Civil, supra. Por consiguiente, contamos con jurisdicción para atender este caso.

III

La Constitución de Puerto Rico dispone que "[n]o se aprobarán leyes que menoscaben las obligaciones contractuales". Art. II., Sec. 7, Const. ELA, LPRA, Tomo I. Lo mismo dispone la Constitución de Estados Unidos en su Art. 1, Sec. 10, Const. EE UU, LPRA, Tomo I. Esa garantía limita la intervención del gobierno con obligaciones contractuales entre partes privadas y aquellas contraídas por el Estado. Domínguez Castro et al. v. E.L.A. I, 178 DPR 1, 80 (2010), certiorari denegado, Domínguez Castro v. Puerto Rico, 131 S. Ct. 152, 562 US __ (2010). Véanse, además, Energy Reserves Group v. Kansas Power & Light, 459 US 400 (1983); United States Trust Co. v. New Jersey, 431 US 1 (1977). Su

propósito es asegurar la estabilidad de las relaciones contractuales. Trinidad Hernández et al. v. E.L.A. et al., 188 DPR 828, 834 (2013).

Sin embargo, esa protección no es absoluta. Ello se debe a que esa garantía constitucional "debe ser armonizada con el poder de reglamentación del Estado en beneficio del interés público". Íd.; United States Trust Co. v. New Jersey, supra, pág. 21; Warner Lambert Co. v. Tribunal Superior, 101 DPR 378, 395 (1973). Por eso, en reiteradas ocasiones hemos expresado que no todo menoscabo de una obligación contractual es inconstitucional. Trinidad Hernández et al. v. E.L.A. et al., supra, pág. 834; Bayrón Toro v. Serra, 119 DPR 605, 619 (1987). Veáse, además, United States Trust Co. v. New Jersey, supra, pág. 16. Ahora bien, la jurisprudencia ha dejado claro que la cláusula que prohíbe el menoscabo de obligaciones contractuales es una **limitación sustantiva** al ámbito de acción del Estado. Allied Structural Steel Co. v. Spannaus, 438 US 234, 242 (1978); P.M. Secunda, Constitutional Contracts Clause Challenges in Public Pension Litigation, 28 Hofstra Lab. & Emp. L. J., 263, 287 (2011).

El análisis al amparo de esta cláusula es distinto dependiendo de si se modifica un contrato en el que el Estado es parte, o uno entre partes privadas. Domínguez Castro v. E.L.A., supra, pág. 80. En materia de contratos privados, el primer paso consiste en

determinar la existencia de una relación contractual y si su modificación representa un menoscabo sustancial o severo. *Trinidad Hernández et al. v. E.L.A. et al.*, *supra*, pág. 834; *Domínguez Castro v. E.L.A.*, *supra*, pág. 80; *Warner Lambert Co. v. Tribunal Superior*, *supra*, pág. 395. Si se determina que existe un menoscabo severo, es necesario evaluar "si la interferencia gubernamental responde a un interés legítimo y si está racionalmente relacionada con la consecución de dicho objetivo". *Trinidad Hernández et al. v. E.L.A. et al.*, *supra*, págs. 834-835; *Domínguez Castro v. E.L.A.*, *supra*, pág. 81; *Warner Lambert Co. v. Tribunal Superior*, *supra*. Se trata de un escrutinio de razonabilidad en el que se toma en cuenta cuán sustancial es el interés público promovido y la extensión del menoscabo contractual. *Domínguez Castro v. E.L.A.*, *supra*, pág. 81; *Home Bldg. & L. Assn. v. Blaisdell*, 290 US 398 (1934).

Por otra parte, cuando se menoscaba una obligación del Estado, se aplica un escrutinio más cuidadoso en vista de que el Estado, por ser parte en el contrato, podría actuar para beneficio propio. *Trinidad Hernández et al. v. E.L.A. et al.*, *supra*, pág. 835; *Domínguez Castro v. E.L.A.*, *supra*, pág. 81; *Bayrón Toro v. Serra*, *supra*, pág. 620; *Warner Lambert Co. v. Tribunal Superior*, *supra*. Por eso, el menoscabo contractual, "además de ser razonable, debe ser necesari[o] para adelantar un propósito gubernamental importante".

Trinidad Hernández et al. v. E.L.A. et al., supra, pág. 835. Véanse, además, Bayrón Toro v. Serra, supra, pág. 619; United States Trust Co. v. New Jersey, supra, pág. 29.

Hemos indicado que al evaluar la necesidad y razonabilidad de una ley para efectos de la cláusula que prohíbe el menoscabo de obligaciones contractuales, procede conferir alguna deferencia al criterio de la Asamblea Legislativa. Trinidad Hernández et al. v. E.L.A. et al., supra, pág. 835; Domínguez Castro v. E.L.A., supra, pág. 84. En esa tarea, no nos corresponde realizar una determinación "de novo sobre la existencia de otras alternativas para la solución del problema". Domínguez Castro v. E.L.A., supra, pág. 89.

Conviene destacar que según la jurisprudencia del Tribunal Supremo de la Nación, a mayor severidad del menoscabo, mayor rigor debe tener el foro judicial en el análisis de la legislación impugnada. Allied Structural Steel Co. v. Spannaus, supra, pág. 245.

En Bayrón Toro v. Serra, supra, págs. 607-608, expresamos que "un participante en un plan de retiro tiene un interés propietario de naturaleza contractual protegido por la garantía constitucional contra el menoscabo de obligaciones contractuales".[2] En ese caso,

---

[2] Por el contrario, en la jurisdicción federal se presume que no existe una obligación contractual del Estado en cuanto a los planes de pensiones. Nat´l R.R. Passenger Corp. v. Archison Topeka & Santa Fe R.R. Co., 470 US

el interés de salvaguardar el derecho de los participantes del plan de retiro colisionaba con el interés de permitir al Estado adoptar cambios para promover la estabilidad y solvencia del sistema. Íd., pág. 618. Entendimos entonces que ambos intereses debían ser armonizados y, por consiguiente, "que el Estado puede, antes de que un empleado se jubile, enmendar los términos del sistema de retiro siempre y cuando las enmiendas sean razonables y adelanten la solvencia actuarial del mismo". Trinidad Hernández et al. v. E.L.A. et al., supra, pág. 836, haciendo referencia a Bayrón Toro v. Serra, supra, pág. 618.

Por su parte, en Trinidad Hernández et al. v. E.L.A. et al., supra, reiteramos lo resuelto en Bayrón Toro v. Serra, supra, en el contexto de la Ley Núm. 3-2013 que reformó el Sistema de Retiro de los Empleados del Gobierno de Puerto Rico y sus Instrumentalidades. Es decir, insistimos en ese caso que una reforma a un sistema de retiro gubernamental será constitucional si es razonable y necesaria **para adelantar su solvencia actuarial**, y no existen medidas menos onerosas para lograr ese fin. Trinidad Hernández et al. v. E.L.A. et al., supra.

Por último, en Trinidad Hernández et al. v. E.L.A. et al., supra, pág. 838, reconocimos que la parte demandante es quien tiene el peso de probar que la

---

451, 466 (1985); J. Beermann, The Public Pension Crisis, 70 Wash. & Lee L. Rev. 3, 49-50 (2013).

medida impugnada es irrazonable e innecesaria. Véase, además, United Automobile, Aerospace, Agr. Implement Workers of Am. Int´l Union v. Fortuño, 633 F. 3d 37, 45 (1er Cir. 2011).

IV

Las partes estipularon que los maestros demandantes tienen un contrato válido con el Gobierno de Puerto Rico con relación a su retiro. También se estipuló que el Estado menoscabó sustancialmente ese contrato de retiro. Ante ese panorama, nuestro análisis se enfoca en determinar si el menoscabo sustancial es razonable y necesario conforme nuestra casuística. Trinidad Hernández et al. v. E.L.A. et al., supra; Bayrón Toro v. Serra, supra. Luego de evaluar con detenimiento la prueba admitida, es insoslayable concluir que para propósitos de la cláusula constitucional que prohíbe el menoscabo de obligaciones contractuales, la Ley Núm. 160-2013 es irrazonable, y por consiguiente, inconstitucional en la medida que altera el derecho contractual que tienen los peticionarios-demandantes sobre su pensión de retiro, conforme la Ley Núm. 91, supra.

Los peticionarios-demandantes adujeron en sus alegatos que al aprobar la Ley Núm. 160-2013 la Asamblea Legislativa no consideró el impacto que tendría el retiro masivo de maestros sobre la solvencia del SRM. Asimismo, sostienen que ese retiro anticipado de miles

de maestros agravaría la situación precaria del SRM. Para sostener esas conclusiones, los peticionarios-demandantes presentaron varios informes de economistas y actuarios. Esa prueba pericial en unión a la propia evidencia que presentó el Estado demuestra que los peticionarios-demandantes tienen razón. La Ley Núm. 160-2013 no adelanta la solvencia actuarial del SRM.

En primer lugar, el Informe de los peritos economistas de la Asociación José I. Alameda Lozada y Alfredo González Martínez alerta sobre la consecuencia imprevista de que se retiren de repente 7,000 maestros. Prueba presentada por la Asociación de Maestros, pág. 1181. La opinión de esos peritos es que ese retiro masivo "provocaría una erogación significativa en los fondos del [SRM] ante el aumento de la nómina de pensiones y la cancelación de las inversiones a corto plazo. La cancelación de las inversiones a corto plazo reducirá las aportaciones que recibiría el Fondo con arreglo a su rendimiento". Íd.

En segundo lugar, la ODAE presentó como prueba pericial el informe del actuario José M. Pérez Díaz. En ese informe se analizan diversos escenarios sobre el impacto que puede tener el retiro masivo de miembros del SRM ante la aprobación de la Ley Núm. 160-2013. El actuario Pérez Díaz sostiene que ante el retiro repentino de 5,000 maestros, el SRM agotaría sus activos en el 2022. Opinión actuarial sobre la nueva Ley 160-

2013 Sistema de Retiros de Maestros de Puerto Rico, pág. 12. Si el retiro súbito es de 10,000 miembros, el SRM terminaría sus activos en el 2018. Íd. Por último, el actuario concluyó que de retirarse 15,000 maestros, los activos se agotarían tan pronto como en el 2016. Íd. Compárese esas cifras con el informe de Milliman de 2012 que establece que de no reformarse el SRM, los activos se agotarían en el 2020.

Por su parte, el Estado sostiene que "la Ley 160-2013 en efecto ataja el déficit estructural del Sistema y provee para que el Sistema se regenere en los próximos años". Alegato de las Recurridas, pág. 29. Para respaldar su conclusión, el Estado presentó, en lo pertinente: (1) el Informe actuarial de Milliman de 2012 y (2) la opinión de esa compañía de 27 de enero de 2014. Un análisis riguroso de esa prueba demuestra que el Estado no pudo refutar la prueba presentada por los maestros. Lejos de ayudar a su causa, la prueba que presentó el Estado demuestra que es correcta la postura de los peticionarios-demandantes a los efectos de que la Ley Núm. 160-2013 es irrazonable para propósitos de la cláusula constitucional que prohíbe el menoscabo de obligaciones contractuales. Art. II, Sec. 7 de la Constitución de Puerto Rico, supra.

Primero, notamos que el Informe de Milliman de 2012, pág. 40, contiene una tabla que detalla los miembros activos que al 30 de junio de 2012 aportaban al

SRM. Los datos de esa tabla son muy reveladores y demuestran que con la Ley Núm. 160-2013 es muy probable que ocurra un retiro masivo de maestros que liquide los activos del SRM antes de lo previsto.

Según la tabla antes citada, aproximadamente 7,089 participantes del SRM tenían derecho a retirarse conforme los términos de la Ley Núm. 91-2004, 18 LPRA sec. 391 *et seq.*, según enmendada. Ese número se divide entre los grupos siguientes:

(1) 88 personas que cuentan con 60 años de edad o más y 40 años de servicio o más;

(2) 1,260 personas que cuentan con 60 años o más de edad y entre 10 a 24 años de servicio;

(3) 176 personas que cuentan con 55 años de edad o más y entre 35 a 39 años de servicio;

(4) 1,226 personas que cuentan con 50 años de edad o más y entre 30 a 34 años de servicio y;

(5) 4,339 personas que cuentan con 50 de años o más de edad y entre 25 a 29 años de servicio.

Además, se desprende del Informe de Milliman de 2012 que existen 7,646 participantes del SRM que al 30 de junio de 2012 le faltaban entre uno a cinco años de servicio para obtener el derecho a retirarse conforme los términos de la Ley Núm. 91, supra. Recuérdese que conforme al Art. 40 de la Ley Núm. 91, supra, 18 LPRA sec. 392e, todo participante del SRM que tuviera por lo menos 47 años de edad y 25 años de servicio o 60 años de

edad y 10 años de servicio era elegible para retirarse. Los 7,646 se dividen entre los grupos siguientes:

(1) 8 personas entre 45 a 49 años de edad y entre 30 a 34 años de servicio;

(2) 447 personas entre 45 a 49 años de edad y entre 25 a 29 años de servicio;

(3) 3,671 personas entre 50 a 59 años de edad y entre 20 a 24 años de servicio;

(4) 3,520 personas entre 45 a 49 años de edad y entre 20 a 24 años de servicio.

Segundo, el informe de la compañía Milliman de 27 de enero de 2014 se limitó casi en su totalidad a describir las deficiencias actuariales que sufre el SRM de acuerdo al estudio actuarial de 2012. Si bien al final del informe se explica algunos cambios que realiza la Ley Núm. 160-2013 al SRM, en ningún lugar de ese documento se analiza la cantidad de maestros que se retiraría repentinamente, ni cómo eso afectaría la solvencia del SRM.

Más aun, hay que señalar que la "aportación adicional anual" que busca evitar que el valor de los activos brutos a partir del año 2018 sea menor a $300 millones y la "aportación uniforme para la justicia magisterial" que crea una aportación anual de $30 millones para los años 2016-2017 y 2017-2018 y de $60 millones a partir del año fiscal 2018-2019 no están dirigidas a remediar el éxodo masivo de maestros al que

aluden los demandantes-peticionarios. Véase Art. 1.1 de la Ley Núm. 160-2013. Por el contrario, el Art. 7.1 de la Ley Núm. 160-2013, establece de forma cristalina que el propósito de esas aportaciones es "solventar el déficit de flujo de caja del Sistema" que identificó el estudio de Milliman de 2012. En ningún lugar de la ley ni de ese informe se hace referencia al escenario real de que se retiren los miles de maestros que tienen ese derecho.

Además, surge de la prueba admitida que la Sra. Wanda Santiago López, Directora Ejecutiva Interina del SRM, declaró que alrededor de 10,000 participantes activos han acudido a orientarse sobre los beneficios de retiro luego de aprobarse la Ley Núm. 160-2013. Declaración Jurada de la Sra. Wanda Santiago López, pág. 5. Por su parte, el Lcdo. Rafael Escalera Rodríguez, abogado del SRM, afirmó en la vista oral celebrada el 26 de marzo de 2014 que, en la actualidad, alrededor de 7,340 miembros del SRM pueden retirarse. Grabación Vista Oral de 26 de marzo de 2014, 1:09:04. También expresó que ya se habían recibido aproximadamente 4,100 solicitudes de retiro de personas que tienen derecho a ello. Íd., 1:09:10. Asimismo, el representante legal del SRM indicó que 2,300 cualifican para la ventana de Retiro. Véase Art. 4.4(a) de la Ley Núm. 160-2013. Por último, sostuvo que se han recibido 1,300 solicitudes

para esa ventana. <u>Grabación Vista Oral de 26 de marzo de 2014</u>, 1:09:20.

Entendemos que el retiro masivo de maestros al que aluden los peticionarios-demandantes es previsible. Adviértase que el abogado del SRM concedió en la vista oral que ya se han recibido 4,100 solicitudes de retiro de personas que tienen derecho a ello. Además, el Art. 4.4(a) de la Ley Núm. 160-2013 claramente crea una ventana de retiro temprano para los participantes que, sin importar su edad, cumplan los 30 años de servicio entre el 1 de agosto de 2014 y el 30 de junio de 2016. Asimismo, el Art. 4.9 de la Ley Núm. 160-2013 elimina la aportación al plan de salud, el bono de medicamentos y el aguinaldo de navidad para quienes se jubilen a partir del 1 de agosto de 2014. De esa manera, **solo los que se retiren con anterioridad a esa fecha** son acreedores a esos beneficios adicionales. Eso incentiva que se jubilen anticipadamente aquellos participantes que cumplan con la edad y los años de servicio, para no perder la aportación patronal a un plan médico y otros beneficios.

Por otro lado, se desprende del trámite legislativo acelerado que con la prisa de legislar antes de la Noche Buena, la Asamblea Legislativa no hizo un estudio sobre la cantidad de maestros que se retirarían a causa de la Ley Núm. 160-2013, ni cómo eso afectaría la solvencia del SRM. Era de importancia vital que la Asamblea

Legislativa estudiara ese punto. Adviértase que con la Ley Núm. 160-2013, es natural que los sobre 5,000 empleados activos que tienen la mayor remuneración, por tener más años de servicio, se traspasen como pensionados a la nómina del SRM. Sobre el particular, el actuario Pérez Díaz afirmó que "la jubilación de miembros activos repentinamente aceleraría el colapso del sistema trayéndolo prácticamente hasta el tiempo presente". Informe del perito actuario Pérez Díaz, pág. 12. Dicho de otro modo, con el éxodo de miles de maestros, se eliminan las aportaciones de esos miembros al SRM y se generan nuevas obligaciones sin que exista una fuente de ingreso para ellas.

También pesa en nuestro ánimo el Informe de Milliman de 2012, pág. 5, que indica que el SRM para el año analizado (año fiscal 2011-2012) tuvo una pérdida profusa de $90,000,000 por los aproximadamente 1,400 miembros activos que se retiraron. **¿Cuánto será la pérdida si se retiran los aproximados 7,000 maestros que tienen ese derecho?** Ello abona a la conclusión de que la Asamblea Legislativa tenía el deber de sopesar este asunto cuidadosamente tomando en consideración la jubilación anticipada de miles de maestros, cosa que no hizo.

Como se puede colegir, los demandantes en este caso presentaron evidencia que demuestra que las medidas adoptadas no garantizan la solvencia económica del SRM,

requisito de umbral conforme con nuestra jurisprudencia. Trinidad Hernández et al. v. E.L.A. et al., supra, pág. 839; Bayrón Toro v. Serra, supra, pág. 623. El Estado no presentó prueba que refutara esa conclusión. En su consecuencia, dictaminamos que la Ley Núm. 160-2013 no adelanta el interés estatal importante requerido por nuestro ordenamiento constitucional en casos de reformas de sistemas de retiro: **garantizar la solvencia del mismo sistema**. Íd. Los peticionarios-demandantes demostraron que la Ley Núm. 160-2013 en vez de solventar el SRM, lo coloca en una posición más precaria. La prueba pericial de los peticionarios-demandantes demostró que con la Ley Núm. 160-2013 se agotarán los activos en una fecha anterior o muy contemporánea al año 2020, fecha proyectada por la situación difícil que enfrenta el SRM actualmente. Eso significa que la Ley Núm. 160-2013 es irrazonable y, por lo tanto, inconstitucional.

En atención a lo anterior, concluimos que la Ley Núm. 160-2013, y en particular sus Arts. 3.6, 3.9, 3.11, 4.3(a), 4.4, 4.6(a)(b)(c) y 5.1 a 5.5 son inconstitucionales en la medida que menoscaban sustancialmente el derecho contractual que tienen los maestros demandantes en cuanto a su plan de retiro, conforme los términos de la Ley Núm. 91, supra.

Somos conscientes de que la política pública que impera en esta jurisdicción la establece la Asamblea Legislativa y no este Foro. A.A.R., Ex parte, 187 DPR

835 (2013); Lozada Sánchez et al. v. JCA, 184 DPR 898, 923-924 (2012); Delgado, Ex parte, 165 DPR 170, 192-193 (2005); Caquías v. Asoc. Res. Mansiones Río Piedras, 134 DPR 181, 189 (1993). También tomamos en consideración la doctrina de autolimitación judicial que postula que cuando se cuestiona la validez de una ley, aun cuando se susciten dudas serias sobre su constitucionalidad, el Poder Judicial primero decidirá si hay una interpretación razonable que permita soslayar la cuestión constitucional. German J. Brau et al. v. E.L.A., Op. de 21 de febrero de 2014, 2014 TSPR 26, 2014 JTS 35, 190 DPR __ (2014); E.L.A. v. Aguayo, 80 DPR 554, 596 (1958). Sin embargo, esa deferencia termina cuando se evidencia que el Estado quebrantó la Constitución al aprobar una ley. Esa es la situación que nos ocupa. La deferencia a la política pública legislada no significa la abdicación de nuestro deber constitucional de defender los derechos civiles de quienes reclaman válidamente la reparación judicial de un agravio.

Ante la realidad ineludible de que el Estado menoscabó severamente los derechos contractuales de miles de maestros sin ni siquiera asegurarse de que alcanzaría el interés de adelantar la solvencia del SRM, es nuestro deber constitucional garantizar a los maestros afectados el derecho que tienen a que el Estado no le menoscabe sustancialmente sus derechos contractuales sin cumplir con el estándar aplicable.

Al concluir que la Ley Núm. 160-2013 es irrazonable para propósitos del Art. II., Sec. 7, de la Constitución de Puerto Rico, supra, resulta innecesario entrar a discutir si constituyen alternativas menos onerosas las medidas adicionales que contiene el Informe del Comité de Diálogo, que fue suscrito por altos funcionarios de la Rama Ejecutiva (el Secretario de Estado, Hon. David Bernier Rivera y el Secretario del Trabajo, Hon. Vance Thomas Rider). En vista del resultado al que arribamos, tampoco es necesario discutir los restantes argumentos constitucionales que plantearon los peticionarios-demandantes en sus alegatos.

V

Conviene, entonces, enfatizar el alcance de nuestros pronunciamientos. La Ley Núm. 160-2013 elimina la aportación al plan de salud (hasta $100 al mes), el bono para medicamentos ($100 al año) y el aguinaldo de navidad ($600 al año) para quienes se jubilen a partir del 1 de agosto de 2014. Asimismo, elimina el bono de verano ($100) para todos los participantes. Además, reduce el aguinaldo de navidad de $600 a $200 a quienes se hayan jubilado antes del 1 de agosto de 2014. En Trinidad Hernández et al. v. E.L.A. et al., supra, pág. 839, esc. 2, dijimos que "los beneficios otorgados mediante las leyes especiales que la Reforma del Sistema de Retiro elimina no forman parte de su pensión". Véase,

además, Domínguez Castro et al. v. E.L.A. I, supra, págs. 67-70. Por el contrario, concluimos que eran gracias legislativas que no crean un interés propietario. Además, al comparar el Art. 1-101 de la Ley Núm. 447 de 15 de mayo de 1951, según enmendado, conocida como la Ley de Retiro del Gobierno de Puerto Rico y sus Instrumentalidades, 3 LPRA sec. 761, con el Art. 3 de la Ley Núm. 91-2004, supra, 18 LPRA sec. 391a, notamos que la legislación habilitadora del SRM es diáfana en establecer que esos beneficios adicionales no forman parte de la pensión. En su consecuencia, en el caso que nos atañe concluimos que es constitucional la Sec. 2 de la Ley Núm. 160-2013 que derogó las leyes especiales que concedían esas gracias legislativas que no forman parte de la pensión y el Art. 4.9 de esa misma ley que eliminó ciertos beneficios adicionales a los que se retiren a partir del 1 de agosto de 2014.

Además, es importante señalar que los participantes que entraron a cotizar al SRM con posterioridad a la aprobación de la Ley Núm. 160-2013, tienen derecho solamente a la pensión que establece ese estatuto. Esa fue la obligación contractual que el Estado asumió con ese grupo de trabajadores. Ese grupo no sufrió un menoscabo de su derecho contractual que active el Art. II, Sec. 7 de la Constitución de Puerto Rico, supra.

VI

Por los fundamentos antes expuestos, concluimos que la Ley Núm. 160-2013, y en particular sus Arts. 3.6, 3.9, 3.11, 4.3(a), 4.4, 4.6(a)(b)(c) y 5.1 a 5.5 son inconstitucionales en la medida que menoscaban sustancialmente y de forma irrazonable el derecho contractual que tienen los peticionarios-demandantes en cuanto a su plan de retiro, conforme los términos de la Ley Núm. 91-2004.

Antes de menoscabar sustancialmente las obligaciones contractuales que asumió, el Estado debe asegurarse de que la ley aprobada a esos fines adelanta el interés estatal importante requerido por nuestro ordenamiento constitucional en casos como este: garantizar la solvencia del sistema de retiro.

Por otra parte, concluimos que es constitucional la Sec. 2 de la Ley Núm. 160-2013 que derogó las leyes especiales que concedían esas gracias legislativas que no forman parte de la pensión y el Art. 4.9 de esa misma ley que eliminó ciertos beneficios adicionales a los que se retiren a partir del 1 de agosto de 2014.

Por último, resolvemos que los participantes que entraron a cotizar al SRM con posterioridad a la aprobación de la Ley Núm. 160-2013, tienen derecho solamente a la pensión que establece ese estatuto. Esa

fue la obligación contractual que el Estado asumió con ese grupo de trabajadores.

Se dictará Sentencia de conformidad.


                              RAFAEL L. MARTÍNEZ TORRES
                                   Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Asociación de Maestros de Puerto Rico, *et als.*<br><br>Peticionarios<br><br>v.<br><br>Sistema de Retiro para Maestros de Puerto Rico, *et als.*<br><br>Recurridos | CT-2014-2<br>CT-2014-3 | Certificación Intrajurisdiccional |
| Educadores/as por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc., por sí y en representación de sus miembros, et als.<br><br>Peticionarios<br><br>v.<br><br>Sistema de Retiro para Maestros de Puerto Rico, *et als.*<br><br>Recurridos | | |

SENTENCIA

En San Juan, Puerto Rico, a 11 de abril de 2014.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, concluimos que la Ley Núm. 160-2013, y en particular sus Arts. 3.6, 3.9, 3.11, 4.3(a), 4.4, 4.6(a)(b)(c) y 5.1 a 5.5 son inconstitucionales en la medida que menoscaban sustancialmente y de forma irrazonable el derecho contractual que tienen los peticionarios-demandantes en cuanto a su plan de retiro, conforme los términos de la Ley Núm. 91-2004.

Por otra parte, concluimos que es constitucional la Sec. 2 de la Ley Núm. 160-2013 que derogó las leyes especiales que concedían esas gracias legislativas que no forman parte de la pensión y el Art. 4.9 de esa misma ley que eliminó ciertos beneficios adicionales a los que se retiren a partir del 1 de agosto de 2014.

Por último, resolvemos que los participantes que entraron a cotizar al SRM con posterioridad a la aprobación de la Ley Núm. 160-2013, tienen derecho solamente a la pensión que establece ese estatuto. Esa fue la obligación contractual que el Estado asumió con ese grupo de trabajadores.

Notifíquese inmediatamente por correo electrónico o fax y la vía ordinaria.

Publíquese de inmediato.

Lo acordó y ordena el Tribunal, y lo certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Pabón Charneco emitió una Opinión de conformidad a la que se unió el Juez Asociado señor Estrella Martínez. El Juez Asociado señor Kolthoff Caraballo emitió un Voto de conformidad. El Juez Asociado señor Rivera García emitió una Opinión de conformidad. El Juez Asociado señor Estrella Martínez emitió una Opinión de conformidad. La Jueza Asociada señora Fiol Matta emitió una Opinión disidente a la que se unió el Juez Presidente señor Hernández Denton. La Juez Asociada señora Rodríguez Rodríguez emitió una Opinión disidente a la que se unió el Juez Presidente señor Hernández Denton. El Juez Asociado señor Feliberti Cintrón se inhibió.


                              Aida I. Oquendo Graulau
                          Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Asociación de Maestros de Puerto Rico, *et als.*<br><br>Peticionarios<br><br>v.<br><br>Sistema de Retiro para Maestros de Puerto Rico, *et als.*<br><br>Recurridos | CT-2014-2<br>CT-2014-3 | Certificación Intrajurisdiccional |
|---|---|---|

Opinión de conformidad emitida por la Jueza Asociada señora Pabón Charneco a la cual se une el Juez Asociado señor Estrella Martínez.

En San Juan, Puerto Rico, a 11 de abril de 2014.

Nuestra clase magisterial, que con tanto sacrificio y vocación reparte el pan de la enseñanza con la esperanza de forjar el Puerto Rico que tanto anhelamos, merece mucho más que ser atropellada por el tren de una legislación diáfanamente irrazonable. El norte en la brújula que apunta al progreso socio-económico de nuestra sociedad no puede darse a expensas de nuestros maestros y maestras. Nuestros educadores merecen saber que la confianza que han depositado en las instituciones que conforman los pilares de nuestra democracia no ha sido en vano. Más importante aún, merecen saber que este Tribunal jamás claudicará su deber constitucional de

velar porque los postulados de nuestra Constitución no sean quebrantados.

Por entender que a la luz de la cláusula constitucional que prohíbe el menoscabo de obligaciones contractuales,[3] la Ley Núm. 160-2013 es irrazonable y por consiguiente inconstitucional, estoy conforme con la Opinión que emite hoy una Mayoría de este Tribunal. A pesar de que en más de una ocasión -y hoy me reafirmo por tercera vez- he expresado mi sentir en torno a las reformas de retiros gubernamentales, no puedo permitir que la decisión que hoy suscribimos pase a las páginas de nuestra historia constitucional sin antes emitir unas breves expresiones. Véase *Trinidad Hernández et al. v. E.L.A. et al.*, res. 24 de junio de 2013, 2013 T.S.P.R. 73, 188 DPR ___ (Op. Disidente Pabón Charneco, J.) y *Trinidad Hernández et al. v. E.L.A. et al.*, 2013 T.S.P.R. 82, 189 DPR ___ (Voto Particular Disidente Pabón Charneco, J). Mi conciencia me lo exige y nuestra clase magisterial, indiscutiblemente, se lo merece.

I

Hoy una Mayoría de este Tribunal cumple con su deber constitucional de velar porque el Estado no menoscabe sustancialmente las obligaciones que ha asumido sin cumplir con el estándar exigido por nuestro ordenamiento. Con ello, a su vez, se le devuelve la paz

---

[3] Art. II., Sec. 7, Const. ELA, Tomo I.

a miles de educadores que se encontraban en un estado de desasosiego ante la incertidumbre por conocer su futuro económico a la luz de los cambios generados por la Ley Núm. 160-2013. Como muy bien se discute en la Opinión que antecede, para que una reforma a un sistema de retiro gubernamental sea constitucional nuestro ordenamiento exige que esta sea razonable y necesaria para adelantar **su solvencia actuarial**. *Bayrón Toro v. Serra,* 119 DPR 605, 618 (1987). En el caso de autos, las partes estipularon (1) que los maestros demandantes otorgaron un Contrato válido sobre su retiro con el Gobierno de Puerto Rico y (2) que el Estado menoscabó sustancialmente ese Contrato. En vista de ello, nuestro análisis se limita a determinar si ese menoscabo sustancial persigue un interés importante en beneficio del bienestar general y si la Ley 160-2013 es razonable y necesaria para adelantar ese interés. *Bayrón Toro v. Serra, supra.*

No hay que forzar mucho la mirada al horizonte para vislumbrar que la Ley Núm. 160-2013 no cumple con las exigencias antes mencionadas. La evidencia presentada por los maestros demandantes devela que, lejos de garantizar la solvencia actuarial del Sistema de Retiro de Maestros, la Ley Núm. 160-2013 lo coloca en una posición mucho más frágil. La evidencia pericial presentada por los maestros demandantes, y discutida *in extenso* en la Opinión que antecede, lleva a la

conclusión que la Ley impugnada no es razonable. Es difícil argumentar que una Ley que se diseñó para atajar el déficit estructural de un Sistema de Retiro pero que en vez agrava el problema, sea considerada como una razonable.

Según se discute en la Opinión Mayoritaria los maestros demandantes lograron demostrar con prueba pericial contundente que con la implantación de la Ley Núm. 160-2013 existe la posibilidad de un retiro masivo de maestros que liquidaría los activos del Sistema antes de lo previsto.[4] El Informe Actuarial de Milliman de 2012, en el cual se basó el Estado para sustentar la viabilidad de la Ley Núm. 160-2013, establece que de no reformarse el Sistema de Retiro de Maestros sus activos se agotarían en el 2020. Según el actuario José M. Pérez Díaz de retirarse cinco mil (5,000) maestros, el Sistema agotaría sus activos en el 2022.

Por otro lado, de retirarse una cantidad mayor de maestros los activos se agotarían antes de esa fecha. Es decir, el Estado entendió que para extender por dos (2) años la vida actuarial del Sistema era razonable y necesario menoscabar los derechos de nuestros educadores

---

[4] Según la Sra. Wanda Santiago López, Directora Ejecutiva Interina del Sistema de Retiro de Maestros, luego de la aprobación de la Ley Núm. 160-2013 alrededor de diez mil (10,000) participantes activos se han orientado sobre los beneficios de retiro. Declaración Jurada de la Sra. Wanda Santiago López, pág. 5. Por otro lado, el abogado del Sistema de Retiro de Maestros, el Lcdo. Rafael Escalera Rodríguez, aseveró en la vista oral que al 26 de marzo de 2014, fecha de la vista, aproximadamente 7,340 miembros del Sistema de Retiro de Maestros cualifican para el retiro. Grabación Vista Oral de 26 de marzo de 2014, 1:09:04.

con relación a su retiro. Este dantesco proceder es claramente irrazonable.

Si el Historial Legislativo de la Ley Núm. 160-2013 adolece de un estudio actuarial que demuestre sus efectos y sustente su viabilidad, **¿cómo sabemos que *en efecto* esta pieza legislativa garantiza la solvencia del Sistema?** El historial de este estatuto demuestra que debido a un proceso legislativo atropellado, no se realizó un estudio ponderado sobre la cantidad de maestros que se retirarían repentinamente como resultado de esa legislación ni el efecto que ese éxodo en masa tendría sobre la solvencia misma del Sistema. De sostenerse su constitucionalidad, el posible disloque que provocaría la Ley Núm. 160-2013 en detrimento de nuestro sistema de educación es tal, que su irrazonabilidad, sencillamente, es evidente.

En fin, los maestros demandantes evidenciaron que las medidas adoptadas por la Ley Núm. 160-2013 no garantizan la solvencia actuarial del Sistema y por consiguiente no adelanta el interés importante requerido por nuestro ordenamiento en casos de reformas de retiros gubernamentales. *Bayrón Toro v. Serra, supra. A contrario sensu*, demostraron que esa Ley deteriora aún más la situación actuarial del Sistema en una fecha más próxima que la proyectada. En vista de ello, coincido, *inter alia,* en que la Ley Núm. 160-2013 es

inconstitucional por representar un menoscabo sustancial en la expectativa de los demandantes respecto a su pensión de retiro que se hizo de manera irrazonable y sin lograr el interés importante que motivó la existencia de esta pieza legislativa.

## II

Es por ello que reafirmo mi conformidad con la Opinión que antecede. En su afán de evitar a toda costa una posible degradación al crédito de la Isla,[5] y con un trámite azaroso, la Asamblea Legislativa aprobó una Ley que no adelanta el interés estatal importante requerido por nuestro ordenamiento en casos de reformas de retiro: garantizar la solvencia del sistema. De hecho, todo lo contrario, se aprobó una pieza legislativa que lo empeora y desestabiliza.  Si eso no es irrazonable, no sé qué lo es.

En esta ocasión, la Asamblea Legislativa olvidó que la deferencia que nos merece su poder para legislar asuntos económicos no es sinónimo de sumisión. Hoy reafirmamos valientemente que la función de esta Curia es velar por que los Cuerpos Legislativos al ejercer su poder no se descarrilen de la vía que delinea sus facultades. Esta vez, el tren se les quedó sin frenos y

---

[5] Reitero mi postura en cuanto a que una amenaza de una degradación al crédito es una consideración exógena de Derecho que no debería guiar el proceso de adjudicación de este Tribunal. Véase *Trinidad Hernández et al. v. ELA et al.*, 188 DPR 828 (2013) (Op. disidente emitida por Pabón Charneco, J.).

amenazaba con atropellar a nuestros servidores públicos. Con la Opinión que hoy emitimos, evitamos ese lamentable escenario.


                                    Mildred G. Pabón Charneco
                                         Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Asociación de Maestros de Puerto Rico, et al.

Peticionarios

v.

Sistema de Retiro para Maestros de Puerto Rico, et al.

Recurridos

Organización de Directores y Administradores Escolares de Puerto Rico, Inc., (ODAE), Educadores Puertorriqueños en Acción, Inc. (EPA)

Partes Interventoras

Educadores/as por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc., et al.

Peticionarios

v.

Sistema de Retiro para Maestros de Puerto Rico, et al.

Recurridos

CT-2014-2

CT-2014-3

Voto de conformidad emitido por el Juez Asociado señor Kolthoff Caraballo

> *Como consecuencia de este plan de economías vino la huelga. Levantábase la llamarada del odio. Era lo que predicaba Segundo: odio al rico. Ciertamente que era muy raquítico el jornal; además, acuciado por don Oscar, me vi*

> *obligado a cometer ciertos abusos, los mismos atropellos que le reproché a don Flor. Me daba perfecta cuenta de las injusticias, pero persistía dándoles aliento, todo por "quedar bien" con don Oscar y "asegurarme" el porvenir. Trataba de excusarme pensando que la situación lo requería así. Era preciso salvar a toda costa a la Central de la ruina. Después de todo, los peones deberían agradecer que se les proporcionase trabajo en esta hora crítica en que se contemplaban legiones de inactivos. Así quise callar los gritos de la conciencia.*[6]

En San Juan, Puerto Rico, a 11 de abril de 2014.

Solo en la costumbre de las antiguas monarquías el Soberano arrebataba las tierras y las cosechas, dejando a los súbditos en la más abyecta miseria. Algo parecido es lo que, en términos pragmáticos, ocurre con la Ley Núm. 160-2013 que nos ocupa, y que es la esencia de su problema constitucional: su profunda irrazonabilidad e injusticia.

Una cosa -de por sí triste- es que el Estado despida al obrero. No obstante, otra muy distinta es que ese mismo Estado le niegue a ese obrero el disfrute de lo que este sembró para los tiempos finales de su jornada en la vida. Porque, en el caso de un despido, tarde que temprano, con esfuerzo y la ayuda del Creador, ese

---

[6] E. A. Laguerre, *La Llamarada*, Ed. Cultura, 31ra ed. rev., pág. 158. Este texto de una de las grandes obras de nuestra literatura puertorriqueña me recuerda la pasión con que daba su catedra Mrs. Corchado, mi maestra de español en la Escuela Libre de Música de Hato Rey. Con ella me inicié en esta jornada de apreciar nuestra literatura.

infortunio terminará; otro empleo aparecerá; otra cosecha se dará y suplirá el pan de su alivio. Pero si al tiempo de la zafra de su vida productiva, lo que sembró con paciencia para el "tiempo muerto" le es "confiscado", ciertamente a ese ser humano le faltarán los días para volver a sembrar o las fuerzas en el machete para poder cosechar. Por eso, hoy expreso con gran entusiasmo mi conformidad con la decisión de este Tribunal.

En el caso de autos, hemos concluido que mediante la Ley Núm. 160-2013, el Estado ha menoscabado sustancialmente y de forma irrazonable las obligaciones contractuales que acordó con la clase magisterial pública del País. Por ello, expreso este voto de conformidad con esta mayoría y reafirmo mis expresiones en Trinidad Hernández et al. v. ELA et al., 188 DPR 828 (2013). Entre varias razones, **porque ciertamente el Estado no ha cumplido, como es el fundamento de la Opinión mayoritaria, con el requisito de razonabilidad al no poder demostrar que la ley aprobada atiende efectivamente su propósito,** mientras reduce las pensiones de nuestros obreros y obreras de la educación pública a niveles que hacen prácticamente imposible retirarse,[7] mientras que, a la vez, aumentan las aportaciones que estos tienen que hacer al Sistema de Retiro (Sistema).

---

[7] Según la prueba presentada, en varios casos las pensiones se han disminuido a cifras cercanas al 40% del salario de la persona, luego de cumplir con 30 años de servicio.

I

### *El peso de la prueba*

Como bien fundamenta la Opinión mayoritaria, nuestra Constitución le prohíbe al Estado la promulgación de leyes que menoscaben las obligaciones contractuales.[8] Al examinar las actuaciones de las ramas políticas al amparo de la cláusula de menoscabo de obligaciones contractuales, el escrutinio aplicable por el foro judicial va a depender del tipo de contrato en cuestión, ya sea un contrato privado o uno público.[9] Así pues, en casos como el de autos, cuando el menoscabo se da en el contexto de la contratación pública **el escrutinio judicial tiene que ser más riguroso**, puesto que el interés propio del Estado puede estar envuelto.[10]

Claro está, no debe entenderse que porque el Estado sea parte significa que hay una prohibición absoluta que impida el poder de reglamentación del Estado en beneficio del interés público.[11] Por lo tanto, nuestra función como foro judicial al evaluar la validez de una legislación según la cláusula del menoscabo de obligaciones contractuales en circunstancias como esta consiste en sopesar y buscar un balance entre el deber

---

[8] Art. II., Sec. 7, Const. ELA, LPRA, Tomo I.

[9] Domínguez Castro et al. v. ELA I, 178 DPR 1, 80 (2010).

[10] Trinidad Hernández et al. v. ELA et al., 188 DPR 828, 835 (2013); Domínguez Castro et al. v. ELA I, supra, pág. 81 (2010); Bayrón Toro v. Serra, 119 DPR 605, 620 (1987); U.S. Trust Co. Of New York v. New Jersey 431 US 1, 17 (1977).

[11] Trinidad Hernández et al. v. ELA et al., supra, pág. 834 (2013); Bayrón Toro v. Serra, supra, pág. 619. Veáse, además, U.S. Trust Co. Of New York v. New Jersey, supra, pág. 16.

del Estado de salvaguardar el bienestar y la seguridad de la ciudadanía, y el interés de proteger la estabilidad en las relaciones contractuales.[12]

Conforme lo anterior, hemos establecido que en los casos de contratación pública procede que el reclamante demuestre primeramente que existe una obligación contractual y que la modificación de la obligación ha causado un menoscabo sustancial o severo en sus expectativas. Esto pues, la garantía constitucional contra el menoscabo de obligaciones contractuales se activa cuando se afectan adversamente los términos o condiciones esenciales del contrato, de manera que al modificarse se frustran las expectativas razonables de alguna de las partes.[13]

Es por todo esto, que el peso de la prueba queda inicialmente en manos del litigante que reclama una violación a su protección constitucional. Sin embargo, una vez el reclamante demuestra que existía una relación contractual y que la modificación de dicha relación ha causado un menoscabo sustancial o severo por parte del Estado, este último viene obligado a justificar las razones que han motivado su actuación.

Si bien es cierto que no hay una voz al unísono en cuanto a este aspecto, son varios los tribunales

---

[12] *U.S. Trust Co. Of New York v. New Jersey*, supra, pág. 21.

[13] *Domínguez Castro et al. v. ELA I*, supra, pág. 83; *Allied Structural Steel Co. v. Spannaus*, 438 US 234, 245-246 (1978); *El Paso v. Simmons*, 379 US 479 (1965).

federales y estatales que han pensado de esta forma.[14]
Incluso, en una situación en la cual se ventilaba un
reclamo sobre este asunto ante el Tribunal Supremo
federal, ese máximo foro expresó lo siguiente:

> *In the instant case* **the State has failed to
> demonstrate** *that the repeal of the 1962 covenant
> was similarly necessary. We also cannot conclude
> that repeal of the covenant was reasonable in
> light of the surrounding circumstances.*[15]
> (Énfasis suplido)

Como podemos ver, el Tribunal Supremo federal
determinó que **el Estado había fallado en probar que sus
actuaciones fueron necesarias y razonables.** Aunque no
podemos afirmar que dicha Corte ha establecido
expresamente que el peso de la prueba en circunstancias
como las del caso de autos corresponde al Estado, tales
expresiones y su contexto no me dejan lugar a duda de
que corresponde al Estado el peso de la prueba.

Máxime, cuando no podemos negar responsablemente que
aunque estatutos como el que nos ocupa se identifican
como del tipo socioeconómico, el de autos tiene sobre
los perjudicados un profundo ingrediente laboral,
distinto a otros tipos de casos de **menoscabo sustancial
de la cláusula constitucional.** Siendo así, y ante la
prueba *prima facie* presentada por los obreros afectados

---

[14] S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 894 (9no Cir. 2003); Toledo Area AFL-CIO Council v. Pizza, 154 F.3d 307, 323 (6to Cir. 1998); Mass. Cmty. Coll. Council v. Commonwealth of Mass., 420 Mass. 126, 649 N.E.2d 708, 712-13 (1995); State of Nev. Emps. Ass'n, Inc. v. Keating, 903 F.2d 1223, 1228 (9no Cir. 1990).

[15] U.S. Trust Co. Of New York v. New Jersey, *supra*, pág. 31.

de un **menoscabo sustancial,** ¿por qué hemos de librar al **patrono** de probar en primer orden que su acción fue legítima simplemente porque es el Estado? ¿Por qué hemos de negarle al servidor público una herramienta procesal y probatoria que le reconocemos al empleado en la empresa privada en circunstancias, por ejemplo, como lo son los casos de despido injustificado?

**Ante la ausencia o el vacío de una directriz sobre este aspecto en la ley que nos ocupa, ¿no debe ser nuestra hermenéutica del estatuto una más liberal en beneficio del obrero, ajustándola así a lo que es nuestra norma conforme a nuestro Derecho Laboral? De todos modos el que tiene la verdad y la razón solo necesita de los recursos apropiados para probarlo. ¿No es acaso el Estado el que tiene los mejores recursos para probar que es razonable su acción?[16]**

Lo anterior cobra aún mayor sentido cuando consideramos que es el Estado el que con su acción ha interrumpido la estabilidad de la relación contractual y es el que, a su vez, debe justificar su actuación como necesaria y razonable. Cabe señalar que, nuevamente, es el Estado el que ostenta los recursos para demostrar cuáles fueron **sus** motivaciones para interrumpir el cumplimiento de las obligaciones contractuales.

---

[16] Mi posición con relación a este aspecto se limita a reclamos bajo la cláusula constitucional que prohíbe el menoscabo de obligaciones contractuales que nos ocupa, y en causas de acción con un fuerte ingrediente laboral, en el que el empleado ha probado *prima facie* un menoscabo sustancial.

En el caso de autos, las partes estipularon que al momento de aprobar la Ley Núm. 160-2013 existía una relación contractual entre ambos y, a su vez, que el menoscabo causado por la aprobación de dicha ley es uno sustancial. Para sostener la validez de la Ley Núm. 160-2013, procede entonces que el Estado justifique el menoscabo causado como uno necesario y razonable.

El Estado ha establecido a ciencia cierta que el Sistema requiere de ajustes en los meses venideros para salvar su solvencia. De igual manera, el Estado ha demostrado que aprobó la Ley Núm. 160-2013 en aras de atender la crisis fiscal del Sistema. Sin embargo, el Estado no ha probado en efecto que la referida ley garantiza la solvencia económica del Sistema y por ende que el menoscabo causado al aprobar la ley fuera uno necesario y razonable. Esto, a pesar de que los demandantes han presentado prueba que tiende a sostener que el efecto de la ley aprobada no tan solo es deficiente en atender la situación, sino que podría empeorar las finanzas del Sistema, acelerando su colapso.

El Gobierno no ha presentado prueba que justifique su manera de obrar como necesaria y razonable. Por su parte, los demandantes han demostrado no tan solo que existen medidas menos onerosas –las cuales fueron estudiadas y suscritas en su mayoría por un Comité de Diálogo y Negociación en el cual la Rama Ejecutiva tuvo representación–, sino que la medida es irrazonable por

no atender adecuadamente el problema fiscal del Sistema.


II

**El menoscabo dentro del análisis de razonabilidad**

La Constitución del Estado Libre Asociado de Puerto Rico dispone expresamente que "[n]o se aprobarán leyes que menoscaben las obligaciones contractuales".[17] De una simple lectura de la cláusula contra el menoscabo de obligaciones contractuales, parecería que tal prohibición es una absoluta cuando es por parte del Estado. Sin embargo, la interpretación que se le ha dado tanto a la cláusula contenida en nuestra Constitución como en la federal ha aclarado que solo se activa tal protección ante un menoscabo sustancial o severo.[18] Por ello, el menoscabo que activa la protección constitucional es aquel que modifica de forma sustancial o severa las expectativas de las partes en la relación contractual. Esto no debe entenderse como que se limita únicamente a la acción estatal que destruye por completo las expectativas de una parte.[19] Ahora bien, este primer paso de determinar si el menoscabo causado es uno sustancial o severo, es previo e independiente al análisis sobre necesidad y razonabilidad exigido para sostener su validez.

---

[17] Art. II., Sec. 7, Const. ELA, *supra*.

[18] Trinidad Hernández et al. v. ELA et al., *supra*, pág. 834; Domínguez Castro et al v. ELA I, supra, pág. 80.

[19] U.S. Trust Co. Of New York v. New Jersey, *supra*, pág. 26.

Dentro del análisis de lo que implica razonabilidad como escrutinio en el contexto de la contratación pública, como en el caso de autos, el grado de menoscabo ocupa un papel extremadamente importante. En todos estos casos, la razonabilidad del estatuto se determina tomando en consideración la dimensión e importancia del interés público promovido por el mismo.[20] Por lo tanto, mientras mayor sea el menoscabo causado, mayor deberá ser el interés público involucrado para lograr sostener la validez del estatuto.

Cabe señalar que respecto al criterio de razonabilidad y necesidad, el Tribunal Supremo federal ha manifestado que el Estado no está en total libertad de considerar menoscabar sus obligaciones contractuales a la par con otras medidas de política pública.[21] De igual forma, el Estado no puede ocasionar un menoscabo mayor al necesario para atender el interés público apremiante.[22] A estos efectos, es insostenible un estatuto que imponga un menoscabo más drástico, cuando existe una medida que con un menoscabo más moderado resuelva el mismo asunto.[23]

Por ello es que hemos establecido anteriormente que no se sostendrá el menoscabo a la obligación contractual

---

[20] Warner Lambert Co. v. Tribunal Superior, 101 DPR 378 (1973); Home Building & Loan Association v. Blaisdell, 290 US 398; Hochman, The Supreme Court and the Constitutionality of Retroactive Legislation, 73 Harv. L. Rev. 701.

[21] U.S. Trust Co. Of New York v. New Jersey, *supra*, págs. 30-31.

[22] Íd. pág. 31

[23] Íd.

del Estado si existen medidas alternas que sean menos drásticas o severas que la ejercida por el Estado para lograr su objetivo.[24] Así pues, al evaluar la razonabilidad y necesidad de la medida en el contexto de la contratación pública, contrario a los casos sobre contratación privada, no es apropiado dar completa deferencia a la determinación legislativa sobre la necesidad o razonabilidad de la legislación. En lo pertinente, el Tribunal Supremo federal señaló que:

> "*As is customary in reviewing economic and social regulation, however, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure....* [*But, as to public contracts*], *complete deference to a legislative assessment of reasonableness and necessity is not appropriate* ...".[25]

Así, debemos recalcar que tampoco debe entenderse que porque el Estado sea parte no se le pueda dar ninguna deferencia en cuanto a la necesidad o razonabilidad de la medida. Cuando hablamos de restarle deferencia a la Asamblea Legislativa, nos referimos a auscultar si esta consideró el grado de menoscabo de las obligaciones a la par con otras alternativas; si el Estado menoscabó sustancialmente sus obligaciones cuando con un menoscabo menos drástico pudiera haber alcanzado el fin perseguido; y, por último, si la actuación del Estado es irrazonable a la luz de las circunstancias.

---

[24] Trinidad Hernández et al. v. ELA et al., *supra*, pág. 838; Domínguez Castro et al v. ELA I, supra, pág. 84; Véase, además, U.S. Trust Co. Of New York v. New Jersey, *supra*, págs. 29-31.

[25] Íd., págs. 22-26.

Es importante reiterar que el grado de menoscabo causado es un asunto de umbral al momento de determinar la razonabilidad del estatuto. Por ello, cuando nos vemos ante la situación de evaluar la validez de un estatuto por su razonabilidad es requerido, entre otras cosas, analizar si el mismo consigue efectivamente el interés apremiante del Estado. Como bien hemos mencionado, resulta insostenible un estatuto que causa un menoscabo severo, tomando en consideración que ni tan siquiera resuelve en su totalidad el problema que motiva su aprobación.

Este Tribunal está impedido constitucionalmente de dictaminar la forma y la manera en la cual las otras ramas de gobierno deben atender sus asuntos de política pública. Esto significa que ciertamente no podemos entrar a dirimir consideraciones de política pública desde el estrado. Sin embargo, es precisamente una de nuestras funciones constitucionales evaluar si en su proceder al establecer la política pública del País, las otras ramas de gobierno han sobrepasado sus límites constitucionales. Es decir, no podemos evaluar cómo deberían cumplir sus deberes, sino cómo estas no pueden actuar en el cumplimiento de sus deberes.

Como surgió claramente en la Vista Oral celebrada en este caso, la minoría de este Tribunal equivocadamente entiende que estamos sobrepasando nuestros poderes constitucionales al evaluar si existían alternativas menos onerosas. No obstante, por otra parte, esa minoría

pretende validar el recorte a las pensiones de retiro que a todas luces aparenta ser irrazonable, expresando que la parte demandante no ha podido probar la existencia de medidas menos onerosas. Parecería un sinsentido requerir, por un lado, la presentación de medidas menos onerosas para sostener los planteamientos de los peticionarios y, por otro lado, argumentar que la existencia de tales alternativas no puede ser considerada por esta Corte.

Ciertamente este Tribunal no es el foro para evaluar la idoneidad de tales medidas, pues eso corresponde a la discreción del legislador. En lo que respecta, nos compete simplemente auscultar si existen o no otras medidas, y si fueron evaluadas por la Rama Legislativa previo a aprobar el menoscabo sustancial. Cabe reiterar que de la propia Rama Ejecutiva, el Secretario de Estado, Hon. David Enrique Bernier Rivera y el Secretario del Trabajo, Hon. Vance E. Thomas Rider, con posterioridad a la aprobación de la Ley Núm. 160-2013 han sugerido la posible existencia de medidas menos onerosas y, por ello, han constituido un Comité de Diálogo y Negociación para auscultar las mismas. Posteriormente, como surge de los hechos en la Opinión mayoritaria, ese Comité rindió un informe en el cual recomendaba varias medidas menos onerosas.

## III

***El menoscabo de obligaciones contractuales cuando el Estado es parte requiere un escrutinio distinto al debido proceso de ley en su vertiente sustantiva***

Nuevamente integrantes de este Tribunal confunden nuestro proceder en el caso Domínguez Castro et al. v. ELA I, 178 DPR 1 (2010), con el caso de autos. Dicho caso versaba principalmente sobre si a los peticionarios se les había salvaguardado su derecho constitucional a un debido proceso de ley en su vertiente sustantiva. Como señalamos, en circunstancias en las cuales se cuestionan las actuaciones del Estado en cuanto a una violación al debido proceso de ley en su vertiente sustantiva, el escrutinio es uno muy distinto y mucho más leniente que el requerido cuando se alega un menoscabo de obligaciones contractuales. El escrutinio a utilizarse en el caso de debido proceso de ley en su vertiente sustantiva es un escrutinio de razonabilidad (nexo racional) y está ampliamente discutido en Domínguez Castro et al. v. ELA I, *supra*.

En aquella ocasión la cuestión planteada sobre la violación a la cláusula de menoscabo de obligaciones era mínima y se limitaba a que algunos servidores públicos estaban cobijados por convenios colectivos que regulaban la forma y la manera de prescindir de sus servicios. La Ley Núm. 7-2009 modificaba el convenio colectivo por un tiempo delimitado, alterando temporeramente el procedimiento en que se podía prescindir de los servicios de estos empleados e igualándolo a los otros miles de empleados públicos que no estaban cobijados por el convenio colectivo. Cabe señalar que ese estudio se hizo y este Tribunal avaló el menoscabo como razonable,

pues fue temporero y buscaba poner en igual posición a todos los empleados públicos.

Cuando emití mi voto en el caso de Domínguez Castro et al. v. ELA I, *supra*, tuve la difícil tarea de sopesar el efecto que se le causaba a un sector de la sociedad para salvar las finanzas de todo Puerto Rico. Soy consciente de que mucha gente se vio afectada y sufrió la sensación que causa la pérdida de un empleo. Esa sensación que sentimos en la inmediatez cuando se nos apaga la luz sorpresivamente. Ciertamente, la Ley Núm. 7-2009 dejó a un número sustancial de servidores públicos sin empleo, lo cual para muchas familias significó la pérdida de su única fuente de ingresos. Sin embargo, dicha ley contemplaba varias ayudas para estos afectados, mientras adelantaba un fin importante para todo el País.

Que no quepa duda, hoy nos enfrentamos a una medida muy distinta. Si bien muchos de los afectados por la Ley Núm. 7-2009 aún hoy, 4 años después, no se recuperan de todos sus efectos, para muchos la luz volvió a encenderse. Son muchos los puertorriqueños y puertorriqueñas que han emprendido nuevas vidas y ante la adversidad no tan solo la sobrepusieron, sino que sacaron provecho de la situación y hoy día se encuentran en mejor posición que antes. Muchos de estos ciudadanos, con mucho esfuerzo de su parte, han comenzado nuevos negocios ayudados precisamente por los beneficios contemplados en la propia Ley Núm. 7-2009. Otros, por su

parte, fueron contratados por la empresa privada y hoy cuentan nuevamente con un sustento para sus hogares. No fue fácil para ninguno, sencillamente porque nunca es fácil ver como se nos sacude el suelo y repentinamente se nos cambia nuestra realidad inmediata, independientemente de la crisis económica que lo justifique.

No obstante, estoy completamente convencido de que el asunto que hoy nos ocupa es uno muy distinto. Para estos miles de maestros y maestras podrán pasar los años, podrán cambiar de empleo, incluso podrán tomar algunas previsiones, pero su retiro, de no haber sido por la decisión que tomamos hoy se hubiera esfumado para nunca volver.

El gremio de trabajadores afectados sustancialmente por la Ley Núm. 160-2013, es uno al que el propio estatuto se refiere como *"eje de enseñanza, es el profesional a cargo de la labor más trascendental en la vida de sus alumnos; la influencia de su impacto perdura para siempre. La clase magisterial tiene en sus manos la prosperidad de todo un país"*.[26] Sin embargo, es precisamente ese sector al que como "muestra de agradecimiento" el Estado pretendía condenar a la pobreza.

Hoy, como en <u>Trinidad Hernández et al. v. ELA et al.</u>, *supra*, tengo que expresar nuevamente que "pienso que si el barco está haciendo agua y existe la amenaza

---

[26] Exposición de Motivos Ley Núm. 160-2013.

real de un naufragio, se lanzan por la borda primeramente las bagatelas. Luego, si es necesario las cosas importantes y finalmente las cosas más valiosas. **Para cualquier persona trabajadora la pensión por la cual ha trabajado toda su vida constituye su seguridad y posesión más valiosa**. Por eso, y aunque estoy impedido de identificarlas, veo claramente muchas "bagatelas fiscales" y múltiples "cosas importantes" que precisarían ser arrojadas por la borda, antes que las valiosas pensiones de decenas de miles de nuestros empleados públicos.

Ciertamente, este Tribunal está impedido de dictaminar la forma y la manera en que las ramas de gobierno deben resolver un problema de política pública. No obstante, como resuelve hoy la mayoría de este Tribunal, estamos obligados a impedir cualquier acción de las ramas políticas que vaya dirigida a menoscabar de forma irrazonable sus obligaciones contractuales con sectores de esta sociedad. Por todo lo anterior, estoy conforme.


                                    Erick V. Kolthoff Caraballo
                                         Juez       Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Asociación de Maestros de Puerto Rico, *et als.*<br><br>Peticionarios<br><br>v.<br><br>Sistema de Retiro para Maestros de Puerto Rico, *et als.*<br><br>Recurridos | Certificación Intrajurisdiccional |
| Educadores/as por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc., por sí y en representación de sus miembros, et als.<br><br>Peticionarios<br><br>v.<br><br>Sistema de Retiro para Maestros de Puerto Rico, *et als.*<br><br>Recurridos | CT-2014-2<br><br>CT-2014-3 |

Opinión de conformidad emitida por el Juez Asociado señor RIVERA GARCÍA.

En San Juan, Puerto Rico, a 11 de abril de 2014.

Una vez más, las actuaciones de las ramas políticas del Gobierno de Puerto Rico amenazaban con transgredir la dignidad de miles de servidores públicos. En esta ocasión, les tocó el turno a nuestras maestras y

maestros, con quienes el Estado pretendió alterar su relación contractual en un ejercicio desesperado de auto preservación con intereses ulteriores no alineados al bienestar de nuestros educadores. Ante ese escenario, estoy conforme con la determinación que esboza esta Curia en la opinión que antecede. Lo contrario, sería avalar una acción patentemente inconstitucional y, como consecuencia de ello, desamparar a nuestra clase magisterial, condenándola a un futuro de inseguridad económica en el ocaso de su vida productiva.

Los antecedentes fácticos y procesales, así como el derecho aplicable a los mismos, están correctamente expuestos en la Opinión del Tribunal. No obstante, me veo precisado a emitir unas breves expresiones en torno a la controversia que nos ocupa con el único objetivo de hacer eco de algunos de los postulados que han regido mi conciencia judicial desde que asumí el cargo como miembro de esta Curia.

**I**

En primer lugar, entiendo conveniente resaltar que el problema que el Estado intentó resolver mediante la Ley Núm. 160-2013 era previsible que ocurriera desde el momento en que este entró en su relación contractual con nuestras maestras y maestros. Esto, en la medida en que el propio Estado diseñó un sistema en el cual las aportaciones eran mínimas en comparación con los beneficios concedidos. Así lo reconoció la Asamblea Legislativa al establecer en la parte expositiva de la Ley Núm. 160-2013 lo siguiente:

> **[d]esde sus comienzos** al amparo de la Ley Núm. 218 de 6 de mayo de 1951 que creó la Junta de Retiro para Maestros (la cual luego fue sustituida por el actual Sistema), **éste no contó con las aportaciones adecuadas para mantener un nivel saludable de solvencia.** El Sistema fue diseñado como un sistema de beneficios definidos cuyas pensiones estaban fijadas por ley y no dependían del monto de las aportaciones que hiciera el Estado como patrono o que hicieran los participantes. **La Ley que creó el Sistema estableció un nivel de aportación que no era proporcional a los beneficios que este tenía que pagar** y tampoco se ajustaba a los cambios económicos o actuariales que afectaban el nivel de beneficios.[27]

Adecuadas o no, esas fueron las circunstancias en las que el Estado, desde sus inicios, asumió su obligación para con nuestros educadores. Por lo tanto, la situación de insolvencia que hoy enfrenta el Sistema de Retiro para Maestros ("Sistema de Retiro" o "Sistema") no debe ser sorpresa para nadie. Claro está, con el pasar de los años ha empeorado la situación financiera del Sistema, pero ello solo ha constituido un cambio en el grado o magnitud del problema, no en su tipo. Es decir, el problema del Sistema de Retiro fue desde el principio y continúa siendo de carácter financiero, pero indudablemente en un grado mayor.

Ahora bien, la previsibilidad del problema no debe tomarse como una invitación a la inacción. Nada impide que el Poder Legislativo y Ejecutivo tomen medidas para reformar esta situación. Empero, en ese proceder la primera alternativa no debe ser el menoscabo de la obligación asumida. Máxime, cuando por años el Estado ha

---

[27] (Énfasis y subrayado suplido). Véase, Exposición de Motivos de la Ley Núm. 160-2013, 17ma Asamblea Legislativa, 2da Sesión Legislativa Extraordinaria, pág. 5.

tenido conocimiento de la raíz del problema de solvencia que enfrenta el Sistema de Retiro y, a pesar de ello, ha optado por asumir una actitud languideciente y dormir el "sueño de los justos".

Tanto el voto de conformidad que hoy emito, como estas breves expresiones, no deben tomarse como un cuestionamiento a las prerrogativas constitucionales de las dos ramas hermanas de gobierno. Sin lugar a dudas, la Asamblea Legislativa tiene la facultad de promulgar o enmendar las leyes que entienda pertinentes, incluyendo, indudablemente, la legislación que estableció la Ley del Sistema de Retiro para Maestros del Estado Libre Asociado de Puerto Rico. De igual forma, reconozco la facultad del Gobernador de poner en vigor tales legislaciones y sus respectivas políticas públicas.

Sin embargo, tanto el Poder Legislativo como el Poder Ejecutivo tienen la obligación de circunscribir sus acciones a los contornos constitucionales que rigen nuestro ordenamiento, particularmente en momentos de "crisis" o "emergencia". Más bien es en tales escenarios, precisamente, en los que las dos ramas políticas deben ser más cautelosas y los tribunales más rigurosos en su evaluación. La existencia de una "crisis" o "emergencia" no debe tomarse como pretexto para actuar al margen de nuestra Constitución. Así, estas situaciones no deben constituir puertas de escape que se abran para permitir el trastoque de los principios más básicos que por décadas han regido en nuestro Pueblo.

Recientemente, en una situación similar de "crisis", expresé mi categórico rechazo a los cambios realizados al Plan de Retiro de los Empleados del Gobierno de Puerto Rico. Véase, <u>Trinidad Hernández et al. v. E.L.A. et al.</u>, 188 D.P.R. 828 (2013) (Op. Disidente J. Rivera García). En aquella ocasión, carente de un expediente con prueba que apoyara las posiciones de ambas partes, consigné que las reformas realizadas al mencionado sistema mediante la Ley Núm. 3-2013 eran irrazonables, por lo que arrojaban fuertes visos de inconstitucionalidad. Íd., págs. 894-895.

Hoy, consecuente con esa postura y como custodio de la Constitución de Puerto Rico, reafirmo mi conformidad con la determinación alcanzada por la mayoría de este Tribunal. Así, estoy conforme con decretar la inconstitucionalidad de toda parte de la Ley Núm. 160-2013 que altere el derecho contractual que tienen los peticionarios-demandantes sobre su pensión de retiro. Asimismo, comparto el criterio mayoritario sobre la constitucionalidad de la derogación de las leyes especiales que concedían beneficios adicionales a nuestras maestras y maestros, pero que no forman parte de su pensión. De igual forma, estoy conteste con la determinación de que los participantes que entraron a cotizar al Sistema de Retiro luego de la aprobación de la Ley Núm. 160-2013, solo tienen derecho a la pensión establecida en la referida legislación.

En este punto, entiendo pertinente resaltar que nuestra evaluación del presente caso estuvo enmarcada en

dos aspectos importantes. *Primero*, las estipulaciones hechas por el Estado, a saber: (1) que los maestros tienen un contrato válido con el Gobierno de Puerto Rico; y (2) que las reformas introducidas a su sistema de retiro constituyeron un menoscabo sustancial al referido contrato. *Segundo*, en el pasado hemos reconocido que la adopción de medidas dirigidas a adelantar la solvencia económica de un sistema de retiro constituye un interés importante para el Estado. Véase, Trinidad Hernández et al. v. E.L.A. et al., supra, pág. 837; Bayrón Toro v. Serra, 119 D.P.R. 605 (1987). En vista de estos dos aspectos, la evaluación de este Tribunal se limitó, inicialmente, a indagar si la evidencia presentada por la parte peticionaria-demandante demostraba que las reformas adoptadas no eran razonables, ni necesarias.[28]

Con ese objetivo como norte, evaluamos cada uno de los documentos presentados por la parte demandante, particularmente el Informe de los peritos economistas suministrados por la Asociación de Maestros y el Informe del actuario José M. Pérez Díaz presentado por la Organización de Directores Escolares de Puerto Rico. Como bien surge de la opinión que antecede, ambos

---

[28] Ello, conforme al estándar adoptado por una mayoría de los miembros de este Tribunal en Trinidad Hernández et al. v. E.L.A. et al., supra, pág. 838, en el cual se estableció que la parte demandante tiene el peso de probar que la medida impugnada es irrazonable e innecesaria. Aunque difiero sobre este particular, ya que entiendo que ante la existencia de un menoscabo sustancial es el Estado quien tiene el peso de la prueba de demostrar que las medidas impugnadas son razonables y necesarias – véase, Trinidad Hernández et al. v. E.L.A. et al., supra (Rivera García, J., Op. disidente) – reconozco que al presente, la norma corresponde a la establecida en Trinidad Hernández et al. v. E.L.A. et al., supra. Siendo así, acojo como correcto el análisis expuesto en la opinión mayoritaria por ser la norma que impera al presente.

informes demuestran el impacto negativo que tendría el retiro súbito de miles de educadores sobre la solvencia del Sistema de Retiro. Esto, ante el hecho incuestionable de que habría un aumento en la nómina de pensiones y una disminución en las aportaciones. Siendo así, las medidas adoptadas en vez de solventar el Sistema de Retiro, lo colocan en una posición de mayor precariedad. No hallamos en el expediente del caso una sola prueba que demuestre lo contrario.

Bajo ninguna circunstancia pretendemos realizar una determinación *de novo* sobre la viabilidad de otras alternativas que pudieran atender el problema de solvencia que enfrenta el Sistema de Retiro y que, a su vez, aseguren que el Estado honre sus acuerdos contractuales. Lo que hoy la opinión de esta Curia plantea es que la alternativa seleccionada por el Estado no cumple su objetivo, según demostraron los demandantes-peticionarios y según surge, incluso, de la propia prueba presentada por el Estado y por las declaraciones ofrecidas en la Vista Oral por vía de sus representantes legales. En la medida en que la legislación adoptada no cumple con su objetivo, y, estipulado por ambas partes el menoscabo sustancial en las obligaciones contractuales de los peticionarios-demandantes, esta se torna irrazonable y no amerita que entremos a evaluar su necesidad. Ello sin mencionar que el inminente retiro súbito de miles de maestros afectaría el derecho constitucional a la educación que gozan nuestras niñas y niños. Véase, Art. II, Sec. 5,

Const. E.L.A., L.P.R.A., Tomo I. Ante ello, estoy conforme con la determinación de esta Curia de decretar la inconstitucionalidad de la Ley Núm. 160-2013, conforme a lo especificado en la opinión que antecede.

De esta manera, hoy reafirmo con vehemencia que los jueces somos árbitros que debemos cantar las jugadas según las vemos, no como otros pretenden que las veamos. Por lo que siempre debemos estar ávidos a escuchar las posturas que le planteen las partes en un pleito y adjudicar con plena honestidad intelectual conforme a la ley, el derecho y la justicia. El éxito en las decisiones económicas que se pretendan implantar bajo el palio del bienestar común jamás debe ser pretexto para atropellar al ser humano y, menos aún, menospreciar su dignidad.

Edgardo Rivera García
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Asociación de Maestros de Puerto Rico, *et al.*<br><br>Peticionarios<br><br>v.<br><br>Sistema de Retiro para Maestros de Puerto Rico, *et al.*<br><br>Recurridos | CT-2014-2 | |
| Educadores/as por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc., por sí y en representación de sus miembros, *et al.*<br><br>Peticionarios<br><br>v.<br><br>Sistema de Retiro para Maestros de Puerto Rico, *et al.*<br><br>Recurridos | Cons.<br><br><br><br>CT-2014-3 | Certificación Intrajurisdiccional |

Opinión de conformidad emitida por el Juez Asociado SEÑOR ESTRELLA MARTÍNEZ

> *Habla, habla tu verdad, MAESTRO,*
> *y que no humillen tu vida y tu presencia;*
> *si has demostrado ser héroe sin cetro,*
> *también demuestra que tu voz es ciencia.*
>
> *A ti maestro*
> *Fidencio Escamilla Cervantes*

San Juan, Puerto Rico, a 11 de abril de 2014.

La soga del Estado pretendía extenderse hasta los maestros y maestras, servidores públicos que no cualifican para los beneficios del seguro social y que se encuentran en condiciones laborales precarias. El Estado pretendía degradar aún más la condición del maestro y la maestra, en

aras de no degradarse a sí mismo. En ese acto egoísta, el Estado terminó enlazado con su propia soga por las casas acreditadoras. No pudo evitar lo inevitable y mucho menos a costa del más humilde. Llegó la hora para que el Estado ponga la palabra en la acción y adopte las medidas más razonables y efectivas que están sobre la mesa, y reforme lo que verdaderamente hay que reformar. De lo contrario, el egoísmo del Estado nunca encontrará base en el Derecho.

Por considerar que la Ley Núm. 160-2013 está plagada de cambios drásticos al Sistema de Retiro de los Maestros que contravienen la Constitución de Puerto Rico, estoy conforme con la determinación adoptada por este Tribunal.

En ocasión anterior, elaboré el derecho aplicable a este tipo de actuaciones gubernamentales en detrimento de los servidores públicos de este País. Así, no vacilé en determinar la inconstitucionalidad de las actuaciones del Estado al aprobar la Ley Núm. 3-2013. Véase, Opinión Disidente del Juez Asociado señor Estrella Martínez Trinidad Hernández, et al. v. E.L.A., res. 24 de junio de 2013, 2013 T.S.P.R. 73, 188 DPR ____. Los postulados allí elaborados aplican de igual forma a los maestros y maestras que forjan la educación pública en nuestra Isla. Con voluntad firme, nos reiteramos.

I

Como es de conocimiento público, el 24 de diciembre de 2013, se aprobó la Ley Núm. 160 que estableció la Ley del Sistema de Retiro para Maestros del Estado Libre Asociado de Puerto Rico y derogó la Ley Núm. 91-2004.

Insatisfechos con el trámite acaecido y la reforma promulgada, el 8 de enero de 2014, la Asociación de Maestros de Puerto Rico, por sí y en representación de varios de sus miembros, presentó una *Demanda sobre injunction preliminar y permanente y solicitud de sentencia declaratoria* ante el Tribunal de Primera Instancia. En ésta, solicitó la paralización de la implantación de la Ley Núm. 160 y que se declarara nula, ilegal e inconstitucional. Posteriormente, acudió ante este Tribunal mediante la *Solicitud de Certificación Intrajurisdiccional* presentada el 14 de enero de 2014.

Como consecuencia, este Tribunal emitió una resolución el 14 de enero de 2014 concediendo lo solicitado y designando al Hon. Ángel R. Pagán Ocasio como Comisionado Especial para que hiciera las determinaciones de hechos correspondientes. Luego, el 22 de enero de 2014, Educadores/as por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc., por sí y en representación de sus miembros, (EDUCAMOS) presentó una *Petición de Certificación* en la que también solicitó que se declarara inconstitucional el estatuto y se paralizaran sus efectos. Este Tribunal consolidó los recursos.

En compendio, los peticionarios sostienen que la Ley Núm. 160 viola sus derechos constitucionales, en relación

al menoscabo de relaciones contractuales, sin que exista relación alguna entre las prohibiciones y restricciones que se hacen y sus objetivos. Además, arguyen que la actuación del Estado no consideró alternativas menos onerosas y tampoco responde a un interés legítimo o autorizado por el derecho aplicable, pues, en efecto libera al Estado de la responsabilidad económica frente al Sistema de Retiro de Maestros (Sistema). A su vez, afirman que el menoscabo es permanente y que los aumentos en sus aportaciones y la reducción de beneficios inciden ilegal e inconstitucionalmente sobre su peculio. En fin, señalan que las medidas adoptadas no guardan relación con los objetivos de la Ley Núm. 160.

Por el contrario, el Estado alega que la grave situación fiscal por la que atraviesa el País le impide inyectar el dinero necesario para atender el déficit actuarial del Sistema. Al mismo tiempo, reclama que no atender la situación del Sistema conllevará la falta de fondos para pagar las pensiones y consecuentemente el crédito sería degradado. Acorde, indica que la Ley Núm. 160 atiende la situación económica del Sistema al establecer un plan de aportaciones definidas con una pensión mínima garantizada, aumentar la edad de retiro para los futuros maestros y maestras, aumentar la aportación individual y patronal, eliminar las leyes especiales que conceden beneficios adicionales y fomentar una aportación uniforme y una aportación adicional anual. Todo lo anterior, a la vez que se garantizan los beneficios acumulados al permitir recibir una pensión equivalente a la anualidad producto de

los beneficios acumulados al 31 de julio de 2014 más la anualidad a base del nuevo programa de aportaciones definidas vigente desde el 1 de agosto de 2014. Igualmente, se les reconoce la posibilidad de jubilarse al alcanzar los 55 años de edad y 30 años o más de servicio; o 60 años de edad y 5 años de servicio. Por otra parte, señala que se acogieron propuestas presentadas que no agravarían el fondo general y, aún de acogerse todas, éstas resultarían insuficientes para reducir el déficit actuarial.

Luego, el 30 de enero de 2014, las partes presentaron las *Estipulaciones de hechos de las partes de conformidad con la orden del Comisionado Especial* y el 7 de febrero de 2014 recibimos el *Informe del Comisionado Especial.* En éste último, se desglosan las estipulaciones realizadas, los documentos presentados en evidencia y se determinan como hechos, en lo pertinente, que: (1) desde sus comienzos el Sistema no es sustentable; (2) el Estado, administración tras administración, ha sido moroso en el financiamiento y ha ejecutado una restructuración para extender la vida del Sistema; (3) el Sistema presenta un déficit de efectivo de $334.5 millones para el 30 de junio de 2013, decreciendo anualmente hasta el 2020 cuando el déficit alcanzará los $316.8 millones para aumentar al 2023 a $363.2 millones; (4) la situación es una crítica que amerita atención inmediata; (5) las casas acreditadoras advirtieron que para evitar que el crédito fuera degradado era necesario hacer unas reformas al Sistema sin impactar significativamente el fondo general; y (6) la degradación a "chatarra" no fue mayor debido a las reducciones de los déficit operacionales

y las reformas a los sistemas de retiro público que pueden contribuir sustancialmente a la estabilidad fiscal.

Finalmente, recibimos los alegatos de las partes en el caso de epígrafe, y luego de evaluarlos con detenimiento, la controversia quedó sometida ante esta Curia.

II

A.

Es un principio de arraigo constitucional que "no se aprueben leyes que menoscaben las obligaciones contractuales". Const. P.R., Art. II, Sec. 7, LPRA, Tomo 1. Este principio encuentra una posición análoga en la Constitución federal cuando se prohíbe a los Estados la promulgación de estatutos que perjudiquen las relaciones contractuales. Const. EE.UU., Art. I, Sec. 10, LPRA Tomo 1. Véanse, además, U.S. Trust Co. of New York v. New Jersey, 431 U.S. 1, 14 (1977); E. Chemerinsky, Constitutional Law: Principles and Policies, 4th ed. Wolters Kluwer, Maryland, § 8.3.1, pág. 645 (2011).

Al amparo de estas disposiciones constitucionales se promueve la estabilidad contractual que impide al Estado y a los gobiernos locales amortiguar sus obligaciones hacia una parte contratante o dificultar irrazonablemente la ejecución de un contrato. Véanse, U.S. Trust Co. of New York v. New Jersey, supra, pág. 15; 2 R.D. Rotunda & J.E. Nowak, Treatise on Constitutional Law: Substance and Procedure, 5th ed., Thomson Reuters, Minnesota, § 15.8 (b), pág. 879 (2012).

Como elaboramos en nuestra Opinión Disidente en Trinidad Hernández, et al. v. E.L.A., supra, a fin de

resolver si se constituye un menoscabo de una obligación contractual, resulta necesario determinar si la legislación promulgada tiene el efecto de perjudicar ese compromiso de forma sustancial. La razón para ello es que la protección contra el menoscabo de obligaciones contractuales no es absoluta. Warner Lambert Co. v. Tribunal Superior, 101 DPR 378, 394 (1973); Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 428 (1934). Ahora bien, a estos efectos, debemos recordar que una vez establecidos los derechos y obligaciones de las partes, éstos son vinculantes al amparo de la ley, y las partes confían en esos derechos. Véanse, General Motors Corp. v. Romein, 503 U.S. 181, 186 (1992); Energy Reserves Group, Inc. v. Kansas Power and Light Co., 459 U.S. 400, 411 (1983); U.S. Trust Co. of New York v. New Jersey, supra, pág. 17; Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 244-245 (1978). Por ello, si los compromisos contraídos son afectados de forma sustancial estamos ante una posible violación a la cláusula de menoscabo contractual. City of El Paso v. Simmons, 379 U.S. 497, 508 (1965); Home Bldg. & Loan Ass'n v. Blaisdell, supra, pág. 430.

De acuerdo con lo expresado, no se trata de que el Estado esté impedido de modificar sus obligaciones con el fin de promulgar un interés público, ya sea la consecución de la salud, el mejoramiento de la seguridad pública o el bienestar general, sino más bien de que tal modificación no sea una de naturaleza sustancial. Warner Lambert Co. v. Tribunal Superior, supra, pág. 394; Energy Reserves Group,

Inc. v. Kansas Power and Light Co., 459 U.S. 400, 410 (1983); Allied Structural Steel Co. v. Spannaus, *supra*, págs. 240-241.

Es la función de los tribunales evaluar la actuación gubernamental para armonizar el interés del Estado en ejecutar su política pública con el de las partes contratantes en no sufrir un perjuicio sustancial. U.S. Trust Co. of New York v. New Jersey, *supra*, pág. 21. Al realizar esta tarea, los tribunales no debemos perder de perspectiva que la mera existencia de un interés público importante no siempre justificará un menoscabo contractual. Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 505 (1987).

El escrutinio a aplicarse dependerá de si la relación a ser afectada por la actuación gubernamental es una de naturaleza privada o pública. En el primero de los casos, es decir, aquellos de naturaleza privada, los tribunales otorgarán deferencia al Estado respecto a la razonabilidad y necesidad de la legislación promulgada. Domínguez Castro v. E.L.A., 178 DPR 1, 22-23 (2010). En estos casos, en donde se afectan los contratos privados entre las partes, el interés público protegido debe ser uno legítimo y significativo que no lesiones los derechos y responsabilidades de las partes contratantes privada de forma innecesaria o irrazonable. Energy Reserves Group, Inc. v. Kansas Power and Light Co., *supra*, págs. 411-412; Allied Structural Steel Co. v. Spannaus, *supra*, págs. 244 y 247; U.S. Trust Co. of New York v. New Jersey, *supra*, pág. 22; Domínguez Castro v. E.L.A., *supra*, pág. 84.

No obstante, cuando la relación contractual afectada es de naturaleza pública, en el cual el Estado es una de las partes, el escrutinio de adjudicación constitucional es mucho más oneroso para el Estado. U.S. Trust Co. of New York v. New Jersey, *supra*, pág. 23; Domínguez Castro v. E.L.A., *supra*, pág. 81. Como consecuencia, cuando evaluamos el menoscabo contractual sobre obligaciones en las cuales el Estado es una de las partes contratantes, resulta indispensable examinar si éste cedió poderes que vinculan indebidamente a las legislaturas futuras y sucesivas. U.S. Trust Co. of New York v. New Jersey, *supra*, pág. 23. De igual forma, no podemos abdicar el hecho de que una vez el Estado se impone una obligación, está forzado a cumplirla. Íd., pág. 24. Permitir al Estado eludir su obligación al amparo de su propio poder, es simple y llanamente impermisible. Ante esta realidad, se examina con mayor rigor la actuación del Gobierno que produce el menoscabo contractual. Tal acción sólo sobrevivirá cuando sea necesaria y razonable. Íd., págs. 25-26. En ese análisis, el Tribunal debe estar consciente de que el Estado velará por sus propios intereses, por lo que se abandona la norma de deferencia al juicio de la Asamblea Legislativa respecto a qué presenta una medida razonable y necesaria. Íd., pág. 26; Keystone Bituminous Coal Ass'n v. DeBenedictis, *supra*, pág. 505; Energy Reserves Group, Inc. v. Kansas Power and Light Co., *supra*, pág. 412.

Sobre si la medida es razonable y necesaria, es importante establecer que para que ésta sea razonable no

puede intentar mitigar una situación prevista o intencionada por el Estado al momento de contraer su obligación contractual. U.S. Trust Co. of New York v. New Jersey, *supra*, pág. 31. La medida será necesaria cuando no exista una modificación menos drástica o medios alternos para alcanzar el interés articulado por el Estado. Domínguez Castro v. E.L.A., *supra*, pág. 84; U.S. Trust Co. of New York v. New Jersey, *supra*, págs. 29-31. El análisis es equiparable a un escrutinio estricto. E. Chemerinsky, op cit., § 8.3, pág. 655. Es por ello que para validar el acto gubernamental, en estos casos, además, resulta indispensable escudriñar si la medida es temporera y dirigida a atender una situación pública de emergencia, social o económica en su naturaleza. Domínguez Castro v. E.L.A., *supra*, pág. 85. En ausencia de estos criterios, la balanza se inclina a favor de la protección de la relación contractual menoscabada. Allied Structural Steel Co. v. Spannaus, *supra*, pág. 250.

B.

La normativa antes reseñada aplica a los planes de retiro. Máxime cuando los planes públicos de retiro han sido reconocidos por este Tribunal como un "interés propietario de naturaleza contractual protegido por la garantía constitucional contra el menoscabo de obligaciones contractuales". Bayrón Toro v. Serra, 119 DPR 605, 607-608 (1987). Los planes de retiro, como el de autos, son contratos públicos en los que el Estado y el empleado están vinculados desde su otorgamiento. Íd., pág. 618. Constituyen para el empleado una parte esencial del

contrato de empleo y un beneficio de considerable importancia por constituir, en la mayoría de los casos, la única fuente de ingreso futuro que proveería una razonable seguridad económica. Íd., págs. 616-617. Los planes de retiro erigen una obligación moral del Estado. Íd., pág. 615, citando a Rivera v. Rodríguez, 93 DPR 21, 24 (1966).

Ahora bien, el Estado tiene la facultad de enmendar el plan de retiro ofrecido. A estos efectos, hemos expresado que el Sistema de retiro puede ser enmendado cuando el participante aún no se ha retirado. Asimismo, expusimos que para que estas enmiendas se sostengan deben ser razonables y con el fin de adelantar la solvencia actuarial del Sistema. Bayrón Toro v. Serra, supra, pág. 618. Por ello, aducimos que variaciones en condiciones y requisitos, tales como años de servicio, aportaciones al fondo y edad para recibir los beneficios son esenciales para mantener al fondo en estado solvente. Íd., pág. 623. Sin embargo, ello no significa que el Estado tenga a su haber un comodín que le permita actuar a su antojo. Sus actuaciones estarán sujetas al escrutinio estricto antes explicado. Es decir, las enmiendas deben ser necesarias y razonables para el fin público importante por el cual se promueven, lo que se traduce en que no existían medidas alternas para evitar el menoscabo y lo que se intenta mitigar no era previsto o intencionado por el Estado o sólo le beneficie a éste. En este análisis, no debemos relegar la norma de que las "leyes que crean derechos al disfrute de pensiones deben interpretarse liberalmente a favor del beneficiario[,]a fin de que se cumpla el

propósito reparador para las cuales fueron aprobadas". Calderón Morales v. Adm. de los Sistemas de Retiro, 129 DPR 1020, 1032 (1992).

Esa es la norma jurídica que este Tribunal está obligado aplicar a los hechos ante nuestra consideración. Al igual que hicimos en ocasión anterior, debemos comprender en qué consiste el Sistema de Retiro de Maestros para dilucidar si los cambios incorporados por la Ley Núm. 160 violentan la cláusula constitucional de menoscabo de obligaciones contractuales.

III

A.

El inicio del hoy conocido Sistema tiene su origen en el 1917 cuando se instituyó el Fondo de Pensiones para Maestros, en virtud de la aprobación de la Ley Núm. 62 de 5 de diciembre de 1917. Mediante ésta, se creó un sistema de pensiones y anualidades para la clase magisterial. El Sistema sufrió su última alteración al aprobarse la Ley Núm. 91-2004, según enmendada, conocida como la Ley Orgánica para el Sistema de Retiro para Maestros del Estado Libre Asociado de Puerto Rico, 18 LPRA sec. 391, *et seq.* Ésta última dispuso que los miembros del Sistema, sus dependientes y beneficiarios, disfrutarían de un pago de anualidades definidas por retiro y por incapacidad, anualidades por defunción y otros beneficios. El Sistema se nutre de las aportaciones patronales e individuales de sus miembros y el rendimiento de sus activos.

El Sistema configurado por la Ley Núm. 91, *supra*, establece que sus miembros aportarían el 9% y el Estado el

8.5% de su salario para sustentarlo.[29] Con ello, se confiere al miembro el derecho a una pensión vitalicia, la cual puede recibir cuando se alcanza la edad de: (1) 60 con 10 años de servicios acreditados tendría derecho a una pensión vitalicia equivalente al 1.8% de su salario promedio más alto durante cualesquiera 36 meses, es decir, de la compensación promedio por los años de servicios acreditados; (2) 50 con 30 años de servicio acreditable para una pensión vitalicia de 75% de la compensación promedio; (3) menos de 50 con 30 años de servicio acreditable para una pensión vitalicia de 65% de la compensación promedio; (4) 50 con más de 25 años pero menos de 30 años de servicio acreditable para una pensión vitalicia del 1.8% de la compensación promedio por los años de servicios acreditados; y (5) menos de 50 pero más de 47 con más de 25 años pero menos de 30 años de servicio para el 95% del 1.8% de la compensación promedio por los años de servicios acreditados. Sin embargo, todo miembro activo que se retirara sin alcanzar 55 años de edad y sin tener acreditados 30 años de servicio debía contribuir al fondo con el 9% de su compensación promedio por 5 años. A su vez, la Ley Núm. 91, *supra*, reconoce beneficios por

---

[29]Originalmente, la aportación patronal era de 6% en el 1951, aumentó en el 1960 a un 7%; en el 1961 a 7.70%, en el 1962 a un 8.40% y alcanzó en el 1967 la cifra de un 8.5%. Luego, no hubo aumento hasta el 2011. Véase, Ley Núm. 114-2011, 18 LPRA sec. 391*l*. Por su parte, las aportaciones originales eran de un 7% y llegaron al 9% en el 2000.

muerte antes y posterior al retiro, y beneficios por incapacidad ocupacional y no ocupacional.[30]

De esta forma, el Sistema buscó propiciar la seguridad económica de la clase magisterial al garantizar una pensión digna para los maestros y maestras cuando se jubilen, por lo que se favoreció que contara con la capacidad de administrar carteras de préstamos, inversiones y recursos. Además, se configuró la salvaguarda de que cualquiera de las inversiones realizadas serían llevadas a cabo con previsión, cuidado y razonabilidad, sin que éstas fueran con fines especulativos, y con un balance entre expectativas de rendimiento y riesgo. Véase, Art. 43 de la Ley Núm. 91, 18 LPRA sec. 392h. Asimismo, y para conservar el referido Sistema, se dispuso que cualquier cambio en la estructura de sus beneficios debía ser sustentado con estudios actuariales previos donde se determine su costo y fuente de financiamiento. Véase, Art. 3 de la Ley Núm. 91, 18 LPRA sec. 391a.

Actualmente, el sistema de retiro cuenta con 42,707 miembros activos con un salario promedio anual de $30,275; una cantidad de 31,370 retirados con un beneficio promedio de $1,371 mensual, un total de 2,171 miembros incapacitados y cerca de 2,964 beneficiarios adicionales. Para el próximo año fiscal, el Sistema necesita $736,590,722 para cumplir con los llamados beneficios

---

[30]Al crearse el Sistema, la edad de retiro era los 60 años con un mínimo de 10 años de servicio. Sin embargo, en el 1973 se creó el sistema por mérito antes expuesto.

básicos y aquellos aprobados por legislación especial.[31] Es decir, las aportaciones de sus miembros y del Estado, como patrono, no alcanzan para cubrir el flujo de efectivo que se requiere para atender sus obligaciones. Así, se estima que además de las aportaciones realizadas se necesitarán $331 millones para el 2014. Esta cifra alcanzaría los $363 millones para el 2023. Claro está, ello no considera el rendimiento de los activos que se calcula en un 5.95%.[32]

Con ese cuadro, se estima que el Sistema de retiro tiene un déficit actuarial de $10,251,272,526, con una solvencia de 17.9%.[33] Véase, Valorización Actuarial del

---

[31]La contribución anual requerida (*Annual Required Contribution, ARC*) indica la cantidad necesaria para cubrir el costo normal del plan más una provisión para la amortización del déficit de la obligación actuarial acumulada. Desde el 1999, el Estado no ha contribuido la cantidad necesaria para cubrir este costo. Véase, Informe pericial del actuario Glenn Bowen de 27 de junio de 2014, pág. 3.

[32]El Sistema de retiro requiere una cuantía menor a la indicada en la medida que el rendimiento de los activos se mantenga en el 5.95% proyectado. Sin embargo, posterior al 2021 ese rendimiento no es esperado porque se proyecta que si no se hace cambio alguno al modelo del sistema de retiro éste no contará con activos luego del 2020. Véanse, Valorización Actuarial del Sistema de Retiro de los Maestros, *supra,* pág. 20; Informe sobre la aplicación del pronunciamiento #25 de Contabilidad de Gobierno en el Sistema de Retiro de Maestros, Ap. XXVII presentado por Asociación de Maestros de Puerto Rico, Anejo 1; Exposición de Motivos, Ley Núm. 160, *supra*; Informe pericial del Estado preparado por el actuario Glenn Bowen, 27 de enero de 2014, pág. 1.

[33]Al 30 de junio de 2004, la valorización actuarial determinó que el Sistema tenía un nivel de capitalización de 51%, en el 2007 de un 43.8%. Véanse, Puerto Rico System of Annuities and Pensions for Teachers, Parissi, P.S.C., pág. 7 en http://www.cepsr.pr.gov/data/library/publ/InfAct/VARRETM2006.pdf. Esto es cónsono con lo expuesto por Morningstar Pension Report de 20 de noviembre de 2013 recogido en el Informe Pericial del actuario José M. Pérez Díaz, pág. 9, Informe del Comisionado, B-III, que demuestra que el plan

Sistema de Retiro de los Maestros al 30 de junio de 2012, Milliman, Wayne, PA, págs. 19, 20, 26. Un déficit actuarial se crea cuando se otorgan beneficios mayores a los activos que posee el Sistema, por lo que éste incrementa al: (1) faltar aportaciones recurrentes; (2) aumentar obligaciones por un número mayor de beneficiarios no contemplados en su implementación; y (3) el rendimiento inadecuado de sus activos.

Lejos de enfrentar y ejecutar medidas que garantizaran a los miembros del Sistema sus derechos, el Estado propició al desangramiento de éste y lo colocó en una posición vulnerable; la que hoy pretende resolver a cargo de sus perjudicados.[34] Como parte de los factores que deterioraron al Sistema de retiro, se encuentran: (1) las aportaciones insuficientes; (2) los programas de

---

de retiro para maestros y maestras tenía una obligación financiada de 40.8% para el 2007; 24.7 para el 2009; 23.9 para el 2010, 20.8 para el 2011 y 17.0 para el 2012. http://www.noticel.com/uploads/gallery/documents/Commonwe alth of Puerto Rico PensionReport1.pdf. Véase, además, Valorización Actuarial del Sistema de Retiro de Maestros al 30 de junio de 2007, Milliman, Wayne, PA, págs. 9 en http://www.cepsr.pr.gov/data/library/publ/InfAct/VARRETM2 007.pdf.

En comparación con los estados, se demuestra que en el agregado los planes de pensiones tienen una solvencia de 66.4% y la fuente de financiamiento operacional es en su mayoría el fondo general. Véase, Morningstar: The State of City Pension Plans 2013: A Deep Dive Into Shortfalls and Surpluses, http://global.morningstar.com/CityPensions2013/Excerpt St ateofCityPensions2013.pdf

[34]Nótese que el Estado reporta como una obligación neta por pensión el Sistema de Retiro de Maestros (*net pension obligation*) en la cuantía de $2,462,232,000, lo que equivale a menos del 4% de la deuda relacionada al Fondo General, los municipios, corporaciones públicas y agencias. Véase, Estados financieros del Estado Libre Asociado de Puerto Rico al 30 de junio de 2012, págs. 35, 82, 209, 212.

retiro temprano; (3) los cambios en la expectativa de vida de los participantes; y (4) el impacto de leyes especiales.[35] Véase, Exposición de Motivos, Ley Núm. 160.

Específicamente, el Estado propició la llamada "crisis" al ignorar la necesidad de incrementar oportunamente las aportaciones, el flujo de efectivo necesario y la pobre administración. Éste no estaba ajeno a la realidad que emana desde la creación del Sistema. Había sido advertido por los actuarios de tal necesidad. Incluso, se prevenía que el crecimiento de los activos del Sistema sería muy bajo mientras que el aumento de las obligaciones sería significativo. A estos efectos, cabe destacar que la tasa de rendimiento de los activos bajó de un 8% a un 5.95%.[36] En efecto, el Sistema no contaba ni cuenta con las aportaciones adecuadas para mantener su solvencia. La razón consiste en que el beneficio definido concebido por el Sistema no depende del monto de las aportaciones recibidas y tampoco se ajusta a los cambios económicos o actuariales que afectaban el nivel de

---

[35]En origen, el Estado se comprometió a sufragar estos beneficios del fondo general. Sin embargo, existe información de que el Gobierno no cumplió con tal compromiso. A estos efectos, se informa que éste adeudó al Sistema de Retiro de Maestros $1.5 mil millones (2005); $5.968 mil millones (2006); $4.665 mil millones (2007); $1.340 mil millones (2008). Véase, Informe preliminar de la Asociación de Maestros de Puerto Rico sobre los sistemas de retiro emitido como consecuencia de la Orden Ejecutiva OE-2010-10 de 12 de marzo de 2010. http://www.amprnet.org/articles_files/documents/Informe%20Preliminar%20AMPR%20Comision%20Sistemas%20de%20Retiro%20ago%202010.pdf, última visita 4 de febrero de 2014.

[36]Véanse, Evaluación Económica de posibles Fuentes de recaudos y el impacto de estos sobre la situación económica del Sistema de Retiro de Maestros, 30 de enero de 2014, JLDV, Estudios Económicos, Inc., pág. 4; Informe pericial del actuario Glenn Bowen, 27 de enero de 2014, pág. 4.

beneficios desde su creación.[37] Sin embargo, no es hasta el 2011 que el Estado decidió aumentar limitadamente su aportación patronal. Aprobó una medida que tan sólo incrementó la aportación patronal en 1% por cuatro años y en 1.25% para años posteriores hasta el 1 de julio de 2020.[38] Peor aún, el Estado sólo realizó contribuciones por una fracción de lo requerido, lo que conllevó al Sistema utilizar sus recursos para pagar lo que el Estado debió haber financiado.[39] El Estado simplemente desatendió todas las recomendaciones para aumentar las aportaciones patronales. Véase, Exposición de Motivos, Ley Núm. 160.

Como si lo expresado fuera insuficiente, el Estado propagó programas de retiro temprano, cambios en los requisitos para ser acreedor a la jubilación e incluso permitió la compra de años de servicio a intereses que no cubrían el costo actuarial a ser recibido.[40] Como consecuencia, se exacerbó el problema debido a que estas ventanas redujeron el ingreso de efectivo al Sistema, aumentaron los desembolsos y el Estado dejó de hacer las aportaciones patronales de aquellos empleados que se

---

[37]El financiamiento para este tipo de plan consiste en que las aportaciones más los ingresos derivados de éstas (*actuarial assets*) contribuirán para los beneficios pagados y los gastos administrativos del Sistema (*actuarial accrued liability*). Cuando ésta última es mayor que los activos actuarios, estamos ante un déficit (*unfunded actuarial accrued liability*).

[38]Ley Núm.114-2011, 18 LPRA sec. 391*l*.

[39]Véase, Morning Star Pension Report de 20 de noviembre de 2013 http://www.noticel.com/uploads/gallery/documents/Commonwealth of Puerto Rico PensionReport1.pdf.

[40]Ley Núm. 33-2001; Ley Núm. 358-2000; Ley Núm. 45-2000; Ley Núm. 44-2000. Véase, además, Informe pericial del actuario Glenn Bowen, págs. 2-3.

acogieron a retiro temprano.[41] Además, el Estado empeñó su palabra en el afán desmedido de acaparar reconocimiento. De esta forma, aprobó el aumento de pensiones mínimas a ser recibidas,[42] las pensiones por incapacidad, defunción[43] y por retiro en un 3%.[44] Igualmente, y sin que existiera una fuente de financiamiento viable, otorgó mayores beneficios a los maestros y maestras al proveer para la contribución de un plan médico hasta de $100 a ser pagado del fondo general, Bono de Navidad de $600,[45] Bono de Verano de $100[46] y Bono de Medicamentos de $100.[47] El Estado en su demasía, acepta que los beneficios especiales están supuestos a ser sufragados por el fondo general, "pero ello no ha ocurrido así". Véase, Exposición de Motivos de la Ley Núm. 160, *supra*. En efecto, dejó de financiar los beneficios legislados, por lo cual el Sistema tuvo que recurrir a sus activos.[48] De igual forma,

---

[41]A estos efectos, la aportación patronal dejada de realizar alcanzó los $23,395,051 al 30 de septiembre de 2013. Véase, Informe Positivo de la Comisión de Asuntos Laborales y Sistemas de Retiro del Servicio Público de la Cámara de Representantes del 21 de octubre de 2013 con relación al P. de la C. 1335, 2da Sesión Ordinaria, 17ma Asamblea Legislativa.

[42]Ley Núm. 38-2007.

[43]Ley Núm. 272-2004.

[44]Véanse, Ley Núm. 38-2007; Ley Núm. 171-2003; Ley Núm. 39-2001; Ley Núm. 160-1999; Ley Núm. 226-1998; Ley Núm. 207-1995; Ley Núm. 62-1992.

[45]Véanse, Ley Núm. 144-2005; Ley Núm. 170-2003; Ley Núm. 109-1997.
[46]Ley Núm. 38-2001.

[47]Ley Núm. 162-2003.

[48]A modo de ejemplo, del informe actuarial al 30 de junio de 2012, se desprende que el Estado adeuda al sistema de retiro $58,451,038 desde el 2008 al 2013 por

también desatendió el problema del cambio en la expectativa de vida que aumentó desde el 1950 al presente. Como secuela, la alteración en la expectativa de vida obliga al Sistema a sufragar pensiones por más tiempo de lo concebido.

B.

Todas estas actuaciones y omisiones por parte del Estado conllevaron el deterioro del Sistema. Ahora bien, en un atropellado proceso, el Estado aprobó la Ley Núm. 160. Al suscribir la pieza legislativa, adujo la necesidad de "actuar inmediatamente para mejorar y asegurar la salud fiscal del Sistema, de modo que se cierre la brecha entre los activos netos y aquellos requeridos para continuar con el pago de las pensiones de nuestros actuales y futuros maestros retirados". Véase, Exposición de Motivos, Ley Núm. 160, *supra.* Con ello, el Estado pretende justificar su actuación al aprobar la Ley Núm. 160, *supra*, y, aunque acepta que ésta representa un menoscabo de sus obligaciones contractuales en la medida que afecta adversamente las expectativas de los maestros y maestras, respecto a su retiro, sostiene que no habían alternativas más razonables. Véase, Estipulaciones de Hechos de las partes de conformidad con la orden del Comisionado Especial, estipulaciones números 84 y 85.

Consecuentemente, nos corresponde exponer las medidas alternas que se presentaron antes de la aprobación de la Ley Núm. 160, por los principales representantes de la

---

concepto de la contribución al plan médico. Véase, Valorización Actuarial del Sistema de Retiro de Maestros al 30 de junio de 2012, Milliman, Wayne, PA, pág. 34.

clase magisterial, las cuales incluyen: (1) la reducción de los gastos administrativos del Departamento de Educación y del Sistema de un 10%;[49] (2) el saldo de $24 millones relacionado con la falta de aportaciones patronales de los que se acogieron a jubilación temprana; (3) el pago de las aportaciones patronales para los que se acogieron a retiro temprano; (4) la eliminación de las pensiones privilegiadas; (5) la imposición de un tope máximo de $3,500 como pensión; (6) el nombramiento de las plazas requeridas para incrementar el flujo de aportaciones que entran al Sistema; (7) un aumento de un por ciento en la contribución a las empresas foráneas para asignarlo al Sistema;[50] (8) la asignación de los fondos no reclamados de la Lotería Electrónica; (9) la imposición de un cargo adicional al consumo de cigarrillos, bebidas alcohólicas y comidas rápidas; (10) la imposición de un cargo de hasta un 10% a los premios mayores de $1,000 obtenidos por concepto de juegos al azar; (11) la recuperación de $3,000 millones en deudas por cobrar de las contribuciones sobre ingresos y el impuesto sobre el valor y uso; (12) nutrir el sistema con el cobro a los municipios, agencias y corporaciones públicas por lo adeudado con relación al servicio de electricidad y agua;

---

[49]Ello equivale a un aumento de flujo de efectivo al Sistema de $54.4 millones anuales. Véase, Exposición de Motivos, Ley Núm. 160, *supra; Evaluación Económica de posibles Fuentes de recaudos y el impacto de estos sobre la situación económica del Sistema de Retiro de Maestros*, 30 de enero de 2014, JLDV, Estudios Económicos, Inc., pág. 7.

[50]Se propuso un aumento de un por ciento en la contribución de estas empresas, lo que estimó un recaudo de $489 millones anuales.

(13) eliminar los contratos privados, cuyas prestaciones pueda ser realizados por empleados públicos; (14) el pago de las aportaciones que se adeudan al Sistema; (15) investigar las transacciones realizadas por el Sistema relacionada a la emisión de bonos.

De estas medidas, el Estado acogió favorablemente algunas de ellas: (1) reducir en un 10% los gastos del Departamento de Educación y del Sistema; (2) pagar $24 millones por las deudas en el desembolso de aportaciones patronales por retiro temprano;[51] (3) eliminar prospectivamente las pensiones privilegiadas; y (4) nombrar plazas requeridas en las escuelas. Por el contrario, el Estado rechazó el impuesto a las foráneas al expresar que podría causar la pérdida del crédito contributivo. En cuanto a los cargos por cigarrillos y bebidas alcohólicas indicó que no reducirán significativamente la cuantía que necesita el Sistema. Al evaluar las propuestas de asignar al Sistema los fondos no reclamados de la lotería y de imponer un cargo de hasta un 10% a los premios mayores de $1,000, el Estado se limitó a indicar que podrían afectar el flujo de efectivo del fondo general, y por tanto, agravar el déficit fiscal.

Ahora bien, para exponer en justa perspectiva las opciones que tenía el Estado antes de aprobar la Ley Núm. 160, nos remitimos específicamente a las piezas legislativas propuestas tanto por la Cámara como el Senado. Entre estas medidas está el: (1) P. del S. 859 de 19 de diciembre de 2013, con el fin de redirigir la

---

[51]El Estado nunca ha aceptado que adeuda esa cuantía de dinero.

asignación del Fondo Especial para Becas de la Universidad de Puerto Rico al Sistema para disminuir el déficit actuarial; por lo que se transferirían $30 millones anuales en abonos mensuales de los ingresos netos de la Lotería Adicional; (2) P. del S. 848 presentado el 13 de diciembre de 2013, mediante el cual se propone dedicar la mitad del uno por ciento del arbitrio impuesto por la Ley Núm. 154-2010, según enmendada, al fondo del Sistema, lo que representaría cerca de $244.5 millones anuales;[52] (3) R. C. del S. 281 de 1 de noviembre de 2013, para traspasar el premio en metálico no reclamado de la IVU Loto;[53] y el (4) P. de la C. 1355 de 22 de agosto de 2013, con el fin de aclarar que el Departamento de Educación está obligado a pagar la aportación patronal que corresponde a un empleado que se acogió a retiro temprano de forma tal que cubra el impacto actuarial que conlleva.

A su vez, el Estado tenía a su disponibilidad las propuestas presentadas para atender el Sistema de Retiro de los Empleados Públicos. A saber: (1) P. de la C. 926 de 12 de marzo de 2013, que propone eliminar la exención contributiva a los espíritus destilados u otras bebidas alcohólicas, lo que redundaría en $180 millones anuales;[54] (2) el P. de la C. 868, que establecería la "Ley de Juegos

---

[52]La Ley Núm. 154-2010 fue enmendada por la Ley Núm. 2-2013 que aprobó un arbitrio fijo de 4% para el periodo de 2013 al 2017.

[53]Para octubre de 2012, se estimó esta cantidad en $2,723,000.

[54]Nótese que se esgrimió como propuesta por los gremios imponer un impuesto a las bebidas alcohólicas y cigarrillos que el Estado despachó por entender que éstas no producirían recaudos significativos.

al Azar" con el fin de transferir fondos de los ingresos brutos generados por las máquinas tragamonedas, lo cual se estima en $180 millones; (3) el P. de la C. 917, que transferiría de la Contribución Mínima Tentativa un porcentaje determinado al Sistema; se estima que esta iniciativa podría redundar en $150 millones anuales; (4) el P. de la C. 922, que procura disponer que el 1% del arbitrio a la adquisición de cierta propiedad mueble y servicios se destine al Sistema; (5) el P. de la C. 997, que proponía establecería una contribución especial a las cooperativas de ahorro y crédito, subsidiarias y afiliadas para el fondo del retiro de los maestros y maestras; (6) el P. de la C. 1045, que provee para descontar las deudas de ciertas remesas al Sistema, lo cual resultaría en una inyección inmediata de $60,542,036; (7) el P. del S. 23, que recomendó crear la "Pega Dominical", cuyos fondos serían destinados a reforzar las finanzas del Sistema; (8) el P. del S. 219, que planteaba enmendar la "Ley de Seguro de Responsabilidad Obligatorio para Vehículos de Motor", a los fines de disponer que $4 de la prima pagada por el seguro obligatorio fuera destinada al Sistema; estimándose que existen 3,045,000 vehículos de motor, por lo que la medida podría aportar fondos en $12,180,000 anuales; (9) el P. del S. 428, con el fin de enmendar la "Ley de Seguro de Responsabilidad Obligatorio para Vehículos de Motor" para incluir 84 centavos mensuales a la prima universal inicial del seguro de responsabilidad obligatorio y destinarla al Sistema de Retiro; la cual redundaría en $2,557,000 anuales; (10) el P. del S. 431, que establecía

la cesión de un 2% del dinero retenido por toda entidad bancaria o financiera en nuestra jurisdicción, como parte del dinero en circulación de los depósitos de nómina de pensionados del Sistema y de la nómina de empleados públicos;[55] y el (11) el P. del S. 474, que destinaría al Sistema el exceso de $6,500,000 de los fondos transferidos por la Asociación de Suscripción Conjunta, provenientes de la partida de "Fondos Retenidos por el Asegurador Pertenecientes a Otros", luego de que éstos se convierten en propiedad del Gobierno de Puerto Rico y pasen al fondo general.

Además de estas propuestas, y luego de la aprobación de la Ley Núm. 160, el Gobernador, Hon. Alejandro García Padilla, anunció su anuencia a la creación de un Comité de Diálogo con el fin de auscultar otras posibilidades para atender el Sistema y salvaguardar el plan de retiro de la clase magisterial. Durante este proceso, la clase magisterial incluyó un sinnúmero de propuestas dirigidas a inyectar fondos recurrentes al Sistema.[56] Entre éstas, se propuso un impuesto a los premios de juego al azar y máquinas de entretenimiento para adultos,[57] un impuesto de

---

[55]Se refiere al dinero depositado pero no acreditado a la cuenta de su destinatario. Ese dinero devenga intereses para las entidades bancarias mientras se finaliza ese proceso.

[56]Incluso, se identificó que las medidas incorporadas por la Ley Núm. 160 generan $95.5 millones de fondos para el Sistema.

[57]En este renglón se indicó que las máquinas de entretenimiento para adultos generan $1,800 millones anuales, de los cuales el 60% se distribuye a los jugadores sin que éstos paguen impuestos, por lo que imponer un 10% a esta cantidad redunda en 108 millones anuales.

$5 a las estadías en hoteles, la identificación de las deudas del Estado con el Sistema, cambios en la base de la deuda actuarial, moratoria para la concesión de préstamos, aumentar a 20% el recorte de gastos administrativos del Sistema, la inclusión de 11,000 maestros y maestras que trabajan en escuelas privadas, impuesto a la entrada o salida de extranjeros no residentes,[58] y la imposición de pago de sellos, comprobantes y aranceles a las cooperativas del sector de ahorro y crédito y al sector de seguros en sus operaciones notariales. Las medidas propuestas generarían unos $450 millones, con el fin de atender la insuficiencia operacional del Sistema.[59] Finalmente, las medidas fueron recogidas en un Informe Final emitido el 6 de febrero de 2014 del cual se desprende que éstas podrían atender la insuficiencia operacional fiscal del Sistema.[60]

A base de lo expuesto, resulta patente que la Ley Núm. 160 no constituye la única alternativa que el Estado debió considerar para atender la falta de flujo efectivo que influye en el crecimiento del déficit actuarial que refleja el Sistema.

IV

Ahora bien, en el caso de autos, el Estado reconoce y estipuló que la aprobación de la Ley Núm. 160 constituye

---

[58]Este impuesto podría allegar la cantidad de $20 millones anuales al Sistema.

[59]Véase, http://www.noticel.com/noticia/155425/consenso-irresoluto-del-comite-de-dialogo-de-maestros.html.

[60]Véase, http://www.amprnet.org/articles_files/documents/Informe%20Final%20Comite%20de%20Dialogo%20y%20Negociacion%20SRM%20FADSRM.pdf.

un menoscabo de las obligaciones contractuales, pues afecta adversamente el retiro de los participantes del Sistema. A pesar de ello, resulta imperativo resaltar algunas de las implicaciones que acarrearía la implantación de la Ley Núm. 160. De este modo, podremos evaluar objetivamente si nos enfrentamos a la acción gubernamental más razonable.

A estos efectos, destacaré los cambios que la implantación de la Ley Núm. 160 impone sobre los peticionarios, es decir, los participantes activos que actualmente pertenecen y cotizan en el Sistema. En primer lugar, la Ley Núm. 160 en su Art. 3.9(c) limita y aumenta la edad de retiro a 55 con 30 años de servicio o 60 años de edad con 5 años de servicio para aquellos participantes activos que no tenga derecho a retirarse bajo la Ley Núm. 91. Como consecuencia, elimina para estos empleados la oportunidad de retirarse a base de las diferentes escalas que contemplaba la Ley Núm. 91, por las cuales han aportado, y les obliga a trabajar por mayor tiempo al esperado con el agravio de que tampoco tendrán derecho a la pensión que ostentaban. Tan siquiera tendrán derecho al 75% de la retribución promedio del maestro que confería la Ley Núm. 91. Más aún, al examinar las declaraciones juradas presentadas en el caso de autos, resalta que los cambios introducidos por la Ley Núm. 160 repercuten en una disminución de la pensión por retiro a ser recibida que oscila entre un 17 a 37 %.

La razón para lo anterior, consiste en que la Ley Núm. 91 proveía el beneficio de una pensión vitalicia al

momento de acogerse al retiro que estaba establecida mediante una fórmula a base del salario promedio y años de servicios. De esta forma, el participante del Sistema tenía conocimiento de la pensión a la que sería acreedor durante aquellos momentos en los que más necesitaría. Sin embargo, el esquema diseñado por la Ley Núm. 160 reconoce este beneficio definido hasta el momento de su aprobación más lo acumulado por las aportaciones que hagan el empleado y su rendimiento. Bajo este panorama, el participante desconoce cuánto realmente tendrá disponible al momento de retirarse. Ello, pues, el Art. 5.10(c) de la Ley Núm. 160 dispone que la pensión acumulada será calculada al momento de retirarse con el balance acumulado de las aportaciones a la Cuenta de Aportaciones Definidas, un factor establecido por la Junta en consulta con sus actuarios, a base de la expectativa de vida actuarial y una tasa de interés particular. Así, existen tres factores que el participante no controla. A base de ellos, la pensión para ese maestro o maestra puede disminuir con el hecho aislado de que la expectativa de vida aumente, según determinado por el actuario. Como consecuencia, no podrá planificar su retiro, ya que no contará con una cantidad definida a ser recibida impidiéndole una planificación adecuada para sus años de descanso. A lo anterior, se añade que estos empleados tampoco disfrutarán del Bono de Verano ($100), un Bono de Medicamentos ($100), ni un Aguinaldo de Navidad ($600).[61] Más relevante aún, el hecho de que no son acreedores de los beneficios del seguro

---

[61]Véase, Sec. 2 de la Ley Núm. 160.

social ni del Medicare. Por tanto, carecen de las salvaguardas de beneficios complementarios que atiendan sus necesidades.

Ahora bien, con el propósito de justificar el cambio de pensión, el Estado proveyó en el Art. 4.4 de la Ley Núm. 160 una cláusula que permite a aquellos que, entre el 1 de agosto de 2014 y el 30 de julio de 2016, cumplan 30 años de servicio acreditados retirarse con una pensión del 70 % del salario promedio. No obstante, si la persona no tiene los 55 años de edad debe continuar realizando su aportación individual hasta alcanzar esa edad. Además, para poder disfrutar de esta concesión el empleado deberá retirarse antes del 31 de julio de 2014, lo que implica una merma en el ingreso mensual que tiene ese participante debido a que la pensión por retiro es menor a su salario. Estos participantes son incentivados a retirarse al 31 de julio de 2014 para poder disfrutar del Bono de Medicamentos, Aguinaldo de Navidad y una aportación para planes de beneficio de salud.[62]

El Estado pretende salvaguardar el cambio de fórmula al sostener que la Ley Núm. 160 garantiza una pensión mínima de $1,625. A poco se examine el Art. 3.11(a) de la pieza legislada destaca que esa pensión mínima no está disponible para todos los participantes. De hecho, aplica únicamente a los participantes que ingresen al Sistema a partir del 1ro de agosto de 2014 y cumplan con la edad de retiro de 62 y 5 años de servicio, y aquellos que estuvieran activos antes de esta fecha, pero que no eran

---

[62]Véase, Art. 4.9 de la Ley Núm. 160.

elegibles para retirarse al momento de la aprobación de la Ley Núm. 160 y se retiren cuando alcancen la nueva edad de retiro establecida para éstos de 55 con 30 años de servicio.[63] Por tanto, no aplica al empleado que al momento de aprobarse la ley cumplía con los requisitos para retirarse. Así, se premia a aquellos integrantes del Sistema a partir del 1ro de agosto de 2014, ya que con sólo 5 años de servicio y una aportación mínima de $10,000 tienen garantizados una pensión mínima de $1,625. Sin embargo, una mayoría de los participantes activos no gozan de esta salvaguarda.

Por otra parte, la Ley Núm. 160 incrementa la aportación individual de los participantes de un 9% a un 14.02% en menos de 6 años. No obstante, la aportación patronal se incrementa a partir del 2021 de 19.75% a 20.525%, es decir, en menos de un porciento.[64] Tal proceder, lejos de beneficiar al magisterio deteriora y margina aún más a esta clase trabajadora. Así, los maestros y maestras que acuden a las aulas de un salón de clase a impartir el pan de la enseñanza y quienes contribuyen con su propio peculio para lograr tal fin, son lesionados con la disminución de su sueldo sin contar con la protección futura de una pensión de retiro.

A su vez, la Ley Núm. 160 modifica los requisitos para ser acreedor de una pensión por incapacidad al imponer en su Art. 4.6 el requisito de 5 años de servicio antes de ser acreedor de este beneficio y limitar el

---

[63]Véase, estipulación número 81 del Informe del Comisionado Especial.

[64]Véase, Art. 4.3(b) de la Ley Núm. 160.

máximo de pensión a recibir a un 33% de su sueldo promedio. De esta forma, existe un cambio irrazonable a las condiciones en las que se otorgó su nombramiento.[65]

De otra parte, la dádiva de $100 para aumentar la pensión mínima a los miembros retirados del Sistema en o antes del 31 de julio de 2014[66] se disminuye al absorber el impacto por la pérdida o disminución de ciertos beneficios contemplados en leyes especiales como lo son la merma del Bono de Verano y la reducción del Aguinaldo de Navidad por $400.[67] Igualmente, aunque la Ley Núm. 160 dispone que aquellos participantes que cumplen con los requisitos para recibir una pensión de retiro al amparo de la Ley Núm. 91 podrán disfrutar de esos beneficios más lo que acumulen de sus aportaciones definidas, resulta improbable que ello suceda, ya que el estatuto dispone que para estos casos las aportaciones realizadas antes del 1ro de agosto de 2014 serán las utilizadas para el pago de esas pensiones.[68]

Como si fuera poco, la Ley Núm. 160 aumenta el interés a ser pagado para el reconocimiento de servicios no cotizados, limita la facultad de devolver y transferir aportaciones y modifica los beneficios por defunción.

V

Ante tales modificaciones, la clase magisterial de forma unísona reclama que la aprobación de la Ley Núm. 160 menoscaba sustancial e irrazonablemente sus derechos con

---

[65]Véase, Art. 4.6(b) de la Ley Núm. 160.

[66]Véase, Art. 3.11(b) de la Ley Núm. 160.

[67]Véase, Art. 4.9 de la Ley Núm. 160.

[68]Véase, Art. 5.4(b) de la Ley Núm. 160.

relación a su retiro. Exponen que existían alternativas menos onerosas que el Estado despachó sin consideración alguna. A su vez, arguyen que la aprobación de la Ley Núm. 160 adolece de estudios que demuestren los efectos reales de esta pieza legislativa.

En el caso ante nos, es un hecho estipulado que la reforma instaurada por la Ley Núm. 160 menoscaba sustancialmente las obligaciones del Estado, pues afecta adversamente las expectativas de la clase magisterial en cuanto a su retiro.

Establecida esa realidad, nuestra función exige examinar si la modificación realizada por la Ley Núm. 160 persigue un interés importante en beneficio del bienestar general y si esa es necesaria y razonable para adelantar ese interés. Sin embargo, el hecho aislado de que exista un interés público importante no siempre justifica un menoscabo contractual severo. Ante ello, nos corresponde evaluar si los compromisos contraídos por el Estado son afectados sustancialmente. Para esto, será determinante auscultar la verdadera razón detrás de la modificación. Debemos recordar que en este tipo de casos la deferencia a la actuación del Estado merma en la medida que éste siempre velará por sus propios intereses. Así, la medida aprobada se sostendrá si es razonable y necesaria.

La disposición será razonable cuando mitiga una situación imprevista o no intencionada del Estado y subsistirá de ser necesaria; es decir, cuando no existía una modificación menos radical o medios alternos para adelantar el propósito del Estado.

A pesar de que el Estado conocía de la precaria situación que atravesaba el Sistema, no configuró medidas para atajar la crisis y contribuyó a su acrecentamiento. Así, continuó aprobando ventanas de retiro, no aumentó la aportación necesaria, no aportó la contribución anual requerida del Sistema, dejó de asignar y desembolsar los fondos para cubrir con los beneficios adicionales otorgados, desatendió el cambio de expectativa de vida de los miembros del Sistema, e incluso no cumplió con su deber de aportar como patrono para aquellos que se acogieron a un retiro temprano, entre otras.

Todas estas actuaciones demuestran que el Estado no estaba ajeno a la situación del Sistema. Por el contrario, la situación era prevista por éste e intencionada. El Estado conocía que la estructura aprobada para el retiro de los maestros y maestras no era sustentable. Sin embargo, se cruzó de brazos al no hacer las modificaciones necesarias y exacerbó las condiciones al actuar desmedidamente sin hacer las aportaciones requeridas. Por ende, el Sistema decayó por la "mala administración en realizar las aportaciones requeridas al Sistema y obtener el rendimiento óptimo de inversiones". Véase, Informe Pericial del actuario José M. Pérez Díaz, pág. 6, Informe del Comisionado, B-III; Morning Star Véase, Morning Star Pension Report de 20 de noviembre de 2013 visitado en http://www.noticel.com/uploads/gallery/documents/Commonwea lth of Puerto Rico PensionReport1.pdf.

Por otra parte, la medida aprobada pretende sostenerse exclusivamente en el informe actuarial del

Sistema al 30 de junio de 2012. Éste no contiene ni está realizado con el objetivo de analizar, estudiar y presentar diferentes alternativas para cambiar el tipo de Sistema. El mismo se circunscribe a exponer su situación fiscal contable. Siendo esto así, la aprobación de la Ley Núm. 160 está carente de una evaluación de los efectos deliberados o imprevistos que conlleva. Tampoco existe un estudio actuarial que sustente su viabilidad. Véanse, Informe Pericial de Jaime L. Del Valle Caballero, Apéndice: J.I. Alameda Lozada & A. González Martínez, <u>Análisis de los fundamentos económicos asociados a la ley de reforma del Sistema de Retiro de los Maestros de Puerto Rico</u>, págs. 3, 11-12,14, Informe del Comisionado A-XXVII; Informe Pericial del Perito Fernando J. Troncoso, Informe del Comisionado, B-II.

Sobre este particular, y a modo de ejemplo, se desconoce qué efecto tendrá el retiro en masa de maestros o maestras en virtud de la aprobación de la Ley Núm. 160. En este sentido, se advierte que el retiro masivo de participantes del Sistema conlleva un efecto directo al aumentar la madurez del Sistema debido a que habrá más miembros inactivos que miembros activos; lo que conllevaría la reducción de las aportaciones que nutren al Sistema.[69] De igual forma, el efecto que esto acarrearía

---

[69]Se estima que unos 7,000 maestros puedan optar por retirarse al convalidarse la Ley Núm. 160. Nótese que el Sistema orientó a 10,000 participantes sobre los efectos de la Ley Núm. 160. Véase, Declaración Jurada de la Sra. Wanda Santiago López, Directora Ejecutiva Interina del Sistema, parr. 20, pág. 5, Informe del Comisionado Especial, Apéndice E-II(1). Conforme a la Sección VII inciso B de la Valorización Actuarial del Sistema de Retiro de Maestros al 30 de junio de 2012, pág. 40, se

es un impacto inmediato a los activos del Sistema, que serían utilizados para solventar tal situación. Actuarialmente, se estima que al amparo de la Ley Núm. 160 de jubilarse 5,000 empleados se agotarían los activos en el 2022, de jubilarse 10,000 participantes en el 2018 y de jubilarse 15,000 en el 2016. Véase, Informe Pericial del actuario José M. Pérez Díaz, *supra*, pág. 12. También, se ignora si las aportaciones existentes son suficientes para sufragar la porción de la pensión atribuida a la Ley Núm. 91, y si las aportaciones bajo el nuevo Sistema definido serán capaces de garantizar una pensión mínima de $1,625 a quienes les aplica.

Como bien señalan los peticionarios, no es un requisito indispensable cubrir el 100% de las obligaciones futuras de los planes de pensiones. De hecho, en los estados la media es de un 68.4%. Así, cuando se propone una cubierta razonable, es decir, de un 65% de las obligaciones del fondo, se tiene el efecto de disminuir

---

refleja un censo de 1,490 maestros y maestras que cualifican para un retiro de 75% del promedio del salario más alto por tener 30 años o más de servicio y 50 años de edad; 4,339 maestros y maestras que poseen al menos 25 años y menos de 30 años de servicio con 50 años de edad, los cuales cualifican para una pensión del 1.8 de la compensación promedio por el número de años acreditables; 8 maestros con 30 años de servicio y menos de 50 años de edad; 447 maestros y maestras con al menos 25 años y menos de 30 años de servicio que tienen 47 años de edad pero no alcanzan los 50 años de edad, por lo que califican para el 95% del 1.8 de la compensación promedio por el número de años acreditables y 1,260 miembros activos con al menos 60 años de edad y 10 pero menos de 25 años de servicio. Es importante desatacar que según el referido informe actuarial 1,400 miembros activos que se retiraron después de la valorización anterior representaron $90 millones en pérdidas. Íd., pág. 5. Nótese que aún de sustituirse la totalidad de las plazas vacantes, conllevará una disminución de la nómina que impacta directamente las aportaciones que ingresan al Sistema.

considerablemente la amortización anual requerida, ya que el déficit actuarial sería de $6.6 mil millones. Véase, Informe Pericial de Jaime L. Del Valle Caballero, *supra*, págs. 6 y 11. No obstante, al examinar el estatuto aprobado es patente que éste tampoco logra el fin público esbozado de evitar la erosión de los fondos del Sistema, con el fin de aminorar la brecha entre los activos netos y aquellos requeridos para continuar con el pago de las pensiones. Mucho menos, asegura que el Estado no tenga que solventarlo a largo plazo. Esto queda demostrado al determinarse que el principal efecto sería extender la cantidad de los activos del Sistema al 2038.[70] Informe Pericial del actuario José M. Pérez Díaz, *supra*, pág. 11. De igual forma, las medidas aprobadas para inyectar fondos al Sistema sólo redundan en un incremento recurrente anual de $54.5 millones más el aumento de las aportaciones individuales,[71] lo cual es insuficiente para cubrir la deficiencia estipulada de $322 millones para el próximo año fiscal. Véase, Informe Pericial de Jaime L. Del Valle Caballero, *supra*, pág. 7. A su vez, el Estado no inyecta de inmediato el flujo de efectivo al Sistema. Advertimos que no es hasta el año fiscal 2016-2017 que el Estado se compromete a realizar la Aportación Uniforme para la

---

[70]Claro está, asumiendo que el estatuto no propiciará el retiro en masa de los maestros.

[71]De acuerdo con la Valorización Actuarial del Sistema de Retiro de los Maestros al 30 de junio de 2012, *supra*, pág. 20, estimamos el incremento en la aportación individual en $13,382,290 ($1,338,229,000 x .01).

Justicia Magisterial de $30 millones.[72] Tal hecho nos parece paradójico cuando el Estado, al rechazar las opciones presentadas por los gremios magisteriales, se escudó en que éstas "son insuficientes para reducir el déficit actuarial y de flujo de efectivo que al presente aqueja al Sistema". Véase, Exposición de Motivos de la Ley Núm. 160.[73]

En conclusión, la medida aprobada menoscaba sustancialmente el contrato de los miembros activos en el Sistema sin que se haya realizado una evaluación de los beneficios y costos socioeconómicos, de la viabilidad del nuevo Sistema propuesto, o de las medidas alternativas consideradas. Peor aún, la evaluación de las medidas incorporadas por la Ley Núm. 160 proyecta un deterioro en la posición fiscal del Sistema y un desatino al interés que se pretendía alcanzar.

El análisis expresado demuestra que la actuación gubernamental al aprobar la Ley Núm. 160 no es razonable, ya que no se trata sobre una situación imprevista por el Estado. Además, tampoco podemos concluir que ésta es una necesaria. A base de las propias actuaciones del Estado, existen otras medidas alternas menos drásticas que pudo implementar en aras de salvaguardar el derecho de pensión de los participantes activos del Sistema.

---

[72]De acuerdo con el Art. 7.1 de la Ley Núm. 160, esta aportación incrementa a partir del año fiscal 2018-2019 a $60 millones hasta el año fiscal 2041-2042.

[73]Advertimos, que las casas acreditadoras han hecho ese señalamiento de que la deuda no sufragada por pensiones se mantenía elevada. *Moody's downgrades Puerto Rico GO and related bonds to Ba2, notched bonds to Ba3 and COFINA bonds to Baa1, Baa2: outlook negative;* Fitch Ratings: *Fitch Downgrades Puerto Rico GO and Released Bet Rating to 'BB'; Outlook Negative*, 11 de febrero de 2014.

VI

Ante el marco jurídico expuesto, resulta indiscutible que la Ley Núm. 160 es inconstitucional por aprobarse sin un análisis adecuado y más importante aún por menoscabar sustancialmente las obligaciones contractuales del Estado con los maestros y maestras en forma innecesaria e irrazonable, sin que alcance los objetivos por los cuales fue aprobada.

Acoger la pretensión del Estado equivaldría a echarle la soga al cuello al Sistema y estrangular su solvencia antes del año 2020, acelerando la muerte que precisamente se pretendía evitar. Por tanto, es obligatorio concluir que la Ley Núm. 160 es inconstitucional en la medida que afecta a los participantes activos del Sistema, al momento de su aprobación, y altera los beneficios otorgados a éstos en virtud de la Ley Núm. 91.[74] Siendo ello así, estoy conforme con la decisión emitida por una mayoría de esta Curia.

Luis F. Estrella Martínez
Juez Asociado

---

[74]El proceso de colegiar, de ordinario, requiere llegar a un consenso en el cual algunos de los componentes del bloque mayoritario no siempre quedan plenamente satisfechos con la totalidad de los remedios conferidos en la Opinión del Tribunal. Esa situación se manifiesta, con mayor claridad, en esta coyuntura histórica en la que para proveer justicia al magisterio la Constitución de Puerto Rico requiere la cantidad mínima de cinco votos para decretar la inconstitucionalidad de la ley. Por eso, impartí mi voto de conformidad a la Opinión de este Tribunal, porque la misma desata los males principales que engendraba la Ley Núm. 160. Ahora bien, la cortesía en colegiar no me impide que con valentía reitere mis expresiones vertidas en el caso de Cruz et al. v. ELA, res. 28 de junio de 2013, 2013 TSPR 78, 189 DPR ___ (2013),con relación a los beneficios legislados por leyes especiales.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Asociación de Maestros de Puerto Rico, *et al.*<br>        Peticionarios<br><br>v.<br><br>Sistema de Retiro para Maestros de Puerto Rico, *et al.*<br>        Recurridos | CT-2014-2 | |
| Educadores/as por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc., por sí y en representación de sus miembros, *et al.*<br>        Peticionarios<br><br>v.<br><br>Sistema de Retiro para Maestros de Puerto Rico, *et al.*<br>        Recurridos | Cons.<br><br><br><br><br><br><br>CT-2014-3 | Certificación<br><br>Intrajurisdiccional |

Opinión disidente emitida por la Jueza Asociada SEÑORA FIOL MATTA a la cual se une el Juez Presidente señor Hernández Denton

En San Juan, Puerto Rico, a 11 de abril de 2014.

El caso que tenemos ante nuestra consideración nos exige hacer un balance entre dos intereses muy importantes. Por un lado, el interés público del Estado de garantizar el cumplimiento de sus obligaciones a través de medidas legislativas que sean económicamente viables y de asegurarse de contar con el presupuesto necesario para

brindar los servicios básicos de salud, educación y seguridad pública a toda la ciudadanía. Por el otro, el interés de las maestras y los maestros del sistema de enseñanza pública en que el Estado cumpla con las condiciones de retiro vigentes al momento de contratación. Ambos, el Estado y los maestros, sostienen que su motivación principal es proteger el retiro digno de la clase magisterial. A esa preocupación también responde este disenso.

Debemos evaluar la validez constitucional de la Ley Núm. 160-2013, Ley del Sistema de Retiro para Maestros del Estado Libre Asociado de Puerto Rico, aprobada el 24 de diciembre de 2013, que reforma el Sistema de Retiro para Maestros de Puerto Rico (Sistema de Retiro) establecido por la Ley Núm. 91-2004, 18 L.P.R.A. sec. 391 et seq. Entre las modificaciones al Sistema de Retiro están su transformación de un plan de beneficios definidos a uno de aportación definida. La ley también aumenta la edad de retiro y las aportaciones individuales y patronales. Además, elimina beneficios adicionales creados mediante leyes especiales.

El informe presentado por el Hon. Ángel Pagán Ocasio, a quien designamos como Comisionado Especial para recoger la prueba presentada por las partes,[75] describe un sistema de

---

[75] 2014 T.S.P.R. 4, 190 D.P.R. __ (2014). El 7 de febrero de 2014 el Comisionado Especial presentó su informe en el cual indicó que las partes habían sometido el caso

retiro moribundo, afectado por la morosidad fiscal del Estado en su financiamiento y que no ha resultado ser sustentable y autosuficiente.[76] Añade que los activos del sistema son menores que los pasivos, por lo que, ante la insuficiencia de ingresos provenientes de las aportaciones o del rendimiento de las inversiones, se ha recurrido a la venta de los activos no líquidos para poder obtener efectivo para el pago de los beneficios.[77] Esto ha creado, al 30 de junio de 2013, un déficit actuarial de $10,251,273,000[78] y un déficit de efectivo de $334.5 millones.[79] El informe revela que la situación fiscal del Sistema de Retiro para Maestros es crítica y amerita atención inmediata y que, debido a la crisis gubernamental por la que atraviesa Puerto Rico, su reformulación debe atenderse con premura.

Ante el Comisionado, las partes demandantes y demandadas estipularon que la Reforma del Sistema de

---

mediante declaraciones juradas de los testigos que hubiesen testificado y por prueba documental consistente en su mayoría de informes periciales de diversos profesionales. El Comisionado Especial en su informe hizo la salvedad de que no tuvo la oportunidad de evaluar el comportamiento de los testigos ni de los peritos por lo que no pudo evaluar la credibilidad de sus testimonios. Al igual que la Opinión mayoritaria, acogemos las determinaciones de hechos presentadas por el Comisionado.

[76] Determinación de Hecho # 102, Informe del Comisionado Especial, pág. 35.

[77] Determinación de Hecho # 103, *Íd.,* pág. 35.

[78] Determinación de Hecho # 105, *Íd.,* pág. 35-36.

[79] Determinación de Hecho # 106, *Íd.,* pág. 36.

Retiro de Maestros representaba un menoscabo de las obligaciones del Estado, pues afecta adversamente las expectativas de los maestros respecto a su retiro.[80] También reconocieron que según, el Informe de Valorización Actuarial preparado por Milliman, si el Gobierno no inyecta fondos adicionales a los que por ley debe aportar, los activos del sistema se terminarían para el año fiscal 2019-2020.[81] De no hacerse un cambio, el Fondo General del Gobierno tendría que asumir las deficiencias entre los ingresos del sistema y el costo del pago de las pensiones y el gasto administrativo del sistema.[82]

Ante esta crisis en las finanzas del sistema, la Asamblea Legislativa aprobó el proyecto que reforma el Sistema de Retiro para Maestros. El Estado alega que su intención fue garantizar que los maestros pudieran recibir el pago de sus pensiones. Los maestros, por su parte, alegan que la aplicación retroactiva del nuevo sistema de retiro vulnera la cláusula constitucional que le prohíbe a la legislatura menoscabar las obligaciones contractuales.[83]

---

[80] Estipulación de Hecho #84, Informe del Comisionado Especial, pág. 32.

[81] Estipulación de Hecho # 86, *Íd.,* pág. 32.

[82] Estipulación de Hecho # 909, *Íd.,* pág. 33.

[83] Art. II, Sec. 7, Const. de Puerto Rico, LPRA, Tomo I. Esta cláusula proviene del Art. 2 de la Ley Jones de 1917. J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. U.P.R., 1982, Vol. III, págs. 187.

El propósito principal de dicha limitación constitucional es asegurar la estabilidad del tráfico jurídico y promover la certeza de las relaciones contractuales.[84] Sin embargo, la protección constitucional contra el menoscabo de obligaciones contractuales no es absoluta y es susceptible de ser balanceada con el poder de reglamentación del Estado.[85] Y es que en nuestro ordenamiento el Estado tiene el poder para reglamentar y promover medidas que salvaguarden el bienestar de la sociedad. Por eso, no todo menoscabo contractual es inconstitucional, su validez será analizada a la luz de los criterios jurídicos establecidos para ello.[86]

En ocasiones anteriores hemos confrontado la necesidad de establecer este balance y hemos desarrollado unos criterios para determinar la constitucionalidad de una ley bajo la cláusula de menoscabo de las obligaciones contractuales en las que el Estado es parte. En síntesis, la modificación evaluada debe ser, además de razonable, necesaria para adelantar el propósito gubernamental importante.[87] De hecho, hemos tenido la oportunidad de

---

[84] Trinidad Hernández y otros v E.L.A., 188 D.P.R. 828, 834 (2013); Warner Lambert Co. v Tribunal Superior, 101 D.P.R. 378, 395 (1973).

[85] Trinidad Hernández y otros v. ELA, *supra*; Bayrón Toro v. Serra, 119 D.P.R. 605, 619-620 (1987); United States Trust Co. v. New Jersey, 431 US 1, 21 (1977).

[86] Bayrón Toro v. Serra, *supra,* pág. 619; Trinidad Hernández y otros v. E.L.A., *supra*, pág. 834.

[87] Bayrón Toro v. Serra, *supra*, pág. 620.

atender este asunto en situaciones de hechos muy parecidas al presente, al considerar la constitucionalidad de la reforma de otros sistemas de retiro para empleados públicos.[88]

Desde el 1987, en Bayrón Toro v. Serra, este Tribunal se apartó de la noción de que las pensiones de los sistemas de retiro del gobierno eran una gracia del estado.[89] En aquel momento resolvimos que los participantes de un Sistema de Retiro del Gobierno tenían un interés propietario de naturaleza contractual.[90] Este interés nacía con el ingreso del empleado al sistema y estaba protegido por la garantía constitucional contra el menoscabo de obligaciones contractuales. Por ello, "antes de que pueda acogerse a la jubilación, los términos del sistema de retiro pueden ser enmendados por el Gobierno siempre que las enmiendas sean razonables y con el fin de adelantar la solvencia actuarial del mismo".[91] Sin embargo, explicamos que una vez el empleado se retire, su pensión no puede ser cambiada.

En aquella ocasión tuvimos la oportunidad de examinar la constitucionalidad de las enmiendas al Reglamento del Sistema de Retiro de la Universidad de Puerto Rico. Entre

---

[88] Bayrón Toro v. Serra, *supra*; Trinidad Hernández y otros v. ELA, *supra*.

[89] Bayrón Toro v. Serra, *supra*, pág. 618.

[90] *Íd.,* pág. 607-608.

[91] *Íd.,* pág. 618; Trinidad Hernández y otros v. ELA, *supra*, pág. 835.

las modificaciones analizadas se encontraba un aumento en la edad requerida para que un participante de ese sistema, con por lo menos 30 años de servicio, pudiera retirarse y recibir el 75% de su compensación promedio. Además, se limitaba la elegibilidad para recibir la anualidad de retiro por años de servicio y se aumentaba la aportación individual requerida al fondo del sistema. En aquel entonces tomamos en consideración que el sistema de retiro de la Universidad se encontraba en una "grave crisis actuarial, que ponía al sistema en peligro de tener que liquidar sus activos".[92] Por eso, las modificaciones eran "esenciales para mantener el fondo en estado solvente".[93] Ante el interés de mantener la solvencia del sistema, expresamos que el Estado debe tener la flexibilidad de hacer modificaciones razonables y necesarias para fortalecer los cimientos del sistema. Concluimos que reconocerle esta facultad era indispensable para el éxito del sistema de retiro. Por lo tanto, resolvimos que las modificaciones fueron razonables y necesarias, dirigidas a salvar la solvencia actuarial del mismo.

Recientemente, en Trinidad Hernández y otros v. E.L.A. evaluamos la situación delicada del reclamo de menoscabo inconstitucional de obligaciones contractuales de cientos de empleados públicos ante la Ley Núm. 3-2013

---

[92] Bayrón Toro v. Serra, *supra*, pág. 621-622.

[93] *Íd.,* pág. 623.

que reformaba el Sistema de Retiro de los Empleados del Gobierno de Puerto Rico y sus Instrumentalidades.[94] En síntesis, la reforma congeló la acumulación de beneficios y aumentó la edad de retiro de manera escalonada para aquellos participantes que se encontraban cerca de dicha edad, de manera similar a la llamada "ventana" de retiro de la ley que está ahora ante nuestra consideración. Además, incrementó la aportación individual, cambió los empleados públicos activos a un plan de contribución definida y modificó los beneficios otorgados por leyes especiales para utilizar el ahorro en la producción de fondos para el sistema. Tras determinar que dicha reforma menoscabó sustancialmente las obligaciones del Estado y de los empleados, evaluamos si las modificaciones perseguían el interés importante en beneficio del bienestar general de asegurar la solvencia actuarial del sistema.

Nuestro análisis tomó en consideración que para el año fiscal 2018-2019, el sistema de retiro de los empleados públicos se quedaría sin fondos suficientes para cubrir el pago de la pensión. Además, notamos que la magnitud del déficit del Sistema de Retiro de Empleados Públicos y el de Maestros era equivalente a más de cuatro veces el ingreso anual del Fondo General.[95] A la luz de esos criterios, entendimos que la reforma de la Ley Núm. 3-2013 era razonable y necesaria porque garantizaba la

---

[94] _Trinidad Hernández y otros v. E.L.A._, _supra_.

[95] _Trinidad Hernández y otros v. E.L.A._, _supra_, pág. 837.

solvencia del sistema.[96] Finalmente, reafirmamos que la determinación de la Asamblea Legislativa en torno a las medidas aprobadas constituyó un ejercicio de política pública que merece la deferencia del poder judicial en nuestro sistema de separación de poderes.[97] Concluimos que la ley 3-2013 fue un ejercicio de la prerrogativa de la Asamblea Legislativa dirigido a adoptar medidas para evitar que el sistema de retiro de empleados públicos colapsara.[98] Además, sostuvimos que la exposición de motivos sostenía la conclusión que la ley era razonable y necesaria para atender la crisis financiera que atentaba contra la aquel sistema.

Sin embargo, hoy, ante una ley que prácticamente tiene las mismas consecuencias para las maestras y los maestros que tuvo la Ley Núm. 3-2013 para los empleados públicos y que persigue el mismo propósito de asegurar la solvencia del sistema, una mayoría de este Tribunal, al aplicar el mismo estándar de revisión, llega a una conclusión distinta. La Opinión del Tribunal resuelve que, bajo la prohibición constitucional al menoscabo de obligaciones contractuales, la Ley Núm. 160-2013 "es irrazonable, y por consiguiente, inconstitucional en la medida que altera el derecho contractual que tienen los

---

[96] *Íd*.

[97] Trinidad Hernández y otros v. E.L.A., *supra*, pág. 838; Domínguez Castro y otros v. E.L.A. I, 178 D.P.R. 1, 45 (2010).

[98] Trinidad Hernández y otros v. E.L.A., *supra*, pág. 836.

peticionarios-demandantes sobre su pensión de retiro, conforme la Ley Núm. 91, *supra*".[99]

Entre las disposiciones no avaladas en la Opinión se encuentran: el aumento en la edad mínima para quienes se jubilen a partir del 1 de agosto de 2013;[100] el aumento a 62 años en la edad mínima de retiro para maestros de nuevo ingreso,[101] el aumento en la aportación individual de los maestros[102] y la imposición de un tope de 33% del salario mensual promediado a cinco años a las pensiones por incapacidad.[103] Además, se deroga la disposición que establece una pensión mínima de $1,625 para los maestros activos al 31 de julio de 2014 que no se puedan retirar a esa fecha con una pensión cuyo beneficio sea igual o mayor a 65% del salario promediado[104] y la disposición que excluye del derecho a pensión mínima a los maestros activos que se jubilen con menos de 30 años de servicio a partir del 1 de agosto de 2014.[105] Así mismo se declara la inconstitucionalidad de la disposición que impide que ciertos participantes puedan solicitar el reembolso de sus

---

[99] Opinión Mayoritaria, pág. 22.

[100] Art. 3.9 de la Ley Núm. 160-2013.

[101] *Íd.*

[102] Art. 4.3 y Art. 5.5 de la Ley Núm. 160-2013.

[103] Art. 4.6, de la Ley Núm. 160-2013.

[104] Art. 3.11, de la Ley Núm. 160-2013.

[105] *Íd.*

aportaciones,[106] y la que crea una ventana de retiro incentivado.[107]

Específicamente, al aplicar el criterio de razonabilidad, la mayoría concluye que el Estado no consideró el impacto que tendría el retiro masivo de maestros, incentivados por la ventana de retiro temprano creada por el artículo 4.4(a) de la ley, y por la eliminación de los beneficios concedidos por leyes especiales para aquellos participantes que se retiren a partir del 1 de agosto de 2014. En cuanto a esto concluye que un retiro masivo colocaría al sistema en una posición más precaria, agotándose los activos del sistema en una fecha anterior al año 2020. Entiende que el Estado no refutó las alegaciones de las partes demandantes y concluye que "la Ley Núm. 160-2013 no adelanta el interés estatal importante requerido por nuestro ordenamiento constitucional en casos de reformas de sistemas de retiro: garantizar la solvencia del mismo sistema".[108]

Para llegar a esta conclusión la mayoría utiliza principalmente dos informes periciales presentados por la Asociación de Maestros de Puerto Rico y la Organización de Directores y Administradores Escolares de Puerto Rico (ODAE). Es importante recordar que en el proceso ante el

---

[106] Art. 5.10 de la Ley Núm. 160-2013.

[107] Art. 4.4 (a) de la Ley Núm. 160-2013.

[108] Opinión Mayoritaria, pág. 30.

Comisionado Especial, no se celebró una vista evidenciaria sino que las partes acordaron presentar el caso mediante declaraciones juradas y prueba pericial documental. Por eso, al no haber determinación alguna sobre la credibilidad de los testigos y los peritos, el valor probatorio que otorguemos a los informes periciales dependerá únicamente de cuan bien sustentados estén sus planteamientos y, sobre todo, sus conclusiones.

El informe del perito de la ODAE, el actuario José M. Pérez Díaz, advierte que su informe no representa una valoración actuarial del Sistema de Retiro. Admite que la valoración realizada por los actuarios de Milliman cumple con los elementos requeridos por los Actuarial Standards of Practice de la profesión actuarial en los EE.UU.[109] Expresa que utilizó los datos, resultados y conclusiones de Milliman para su estudio. El actuario Pérez Díaz sostiene que desarrolló un "modelo financiero bastante complejo" para predecir el impacto de la Ley 160-2013 en el Sistema de Retiro a partir del año 2013.

El informe no describe cuál fue el modelo que desarrolló ni los fundamentos y métodos que utilizó. Expresa de manera escueta que "el efecto principal de la ley sería extender la cantidad de activos del sistema hasta el año 2038, el mismo año en que el sistema

---

[109] J. Pérez Díaz, *Opinión Actuarial sobre la Nueva Ley 160-2013 Sistema de Retiro de Maestros de Puerto Rico*, enero 2014, pág. 2.

comenzaría con la misma cantidad de activos que comenzó en el 2013. O sea, el sistema prácticamente no desarrollaría activos del 2013 a 2038 dada la necesidad tan grande de pagar beneficios de pensiones. Luego los activos se agotarían completamente en el 2057".[110] El actuario entonces concluye que el retiro repentino de miles de participantes aceleraría el colapso del sistema hasta una fecha anterior al 2020. Sin embargo, el actuario no explica cómo llegó a esta conclusión ni qué factores consideró en su análisis. Me parece que este informe no merece la credibilidad que le otorga la mayoría para declarar la irrazonabilidad de la medida.

El informe de los economistas Alameda y González Martínez padece de la misma debilidad.[111] La cita a la que hace referencia la Opinión mayoritaria tampoco está sustentada por una explicación satisfactoria del modelo utilizado para llegar a la conclusión de que si se retiran 7,000, 10,000 o 12,000 maestros se provocará una erosión significativa de los fondos del Sistema. Si bien es obvio

---

[110] *Íd.,* pág. 11. (Énfasis omitido).

[111] Notamos que este informe, *Análisis de los Fundamentos Económicos Asociados a la Ley de Reforma del Sistema de Retiro de los Maestros de Puerto Rico*, es usado como referencia por uno de los peritos de la Asociación de Maestros, Jaime L. del Valle Caballero en su informe titulado *Evaluación económica de posibles fuentes de recaudos y el impacto de estos sobre la situación económica del Sistema de Retiro de Maestros*. Cabe señalar que del Valle Caballero no utiliza en su informe la conclusión de los economistas de que el retiro masivo produciría una erosión significativa en los fondos del Sistema de Retiro.

que un aumento en la cantidad de pensionados creará una carga mayor al Sistema, ninguno de los informes considera si la reforma a la estructura del sistema, así como las medidas que le allegarían aportaciones adicionales, lograrían paliar el efecto de un retiro masivo de maestros. No es suficiente la prueba presentada para concluir que la reforma al sistema aprobada por la legislatura empeoraría la solvencia del sistema.

Por otro lado, consta en el historial legislativo del proyecto de ley, que la Directora Ejecutiva Interina del Sistema de Retiro para Maestros, señora Wanda Santiago López, señaló la importancia de observar el número de maestros que se jubilarían ya que ello regularía que el sistema asumiera más obligaciones.[112] La señora Santiago López recomendó que se evaluara la posibilidad de adelantar la fecha de comienzo de la Aportación Adicional Anual y de la Aportación Uniforme para la Justicia Magisterial. Además, en su declaración jurada la Directora señaló que "aun con el impacto de la ventana creada por la Ley 160-2013, las aportaciones del Fondo General necesarias para solventar el Sistema están muy por debajo de los aproximados $562 millones anuales adicionales que

---

[112] Véase, *Informe Conjunto de las Comisiones de Asuntos Laborales y Sistemas de Retiro del Servicio Público y la Comisión de Hacienda y Presupuesto de la Cámara de Representante* del 21 de diciembre de 2013; *Informe Positivo sobre el P. de la C. 1589* y *Segundo Informe Positivo sobre el P. de la C. 1589* de la Comisión de Hacienda y Finanzas Públicas del Senado, del 23 de diciembre de 2013.

serían necesarios aportar del Fondo General para la subsistencia del Sistema en ausencia de la Reforma".[113]

La mayoría de este Tribunal entiende que la Ley 160-2013 es irrazonable porque no adelanta el interés gubernamental importante requerido por la jurisprudencia para este tipo de situación: asegurar la solvencia del Sistema de Retiro. Llega a esta conclusión partiendo de una premisa, que si bien es posible, es especulativa. La mayoría entiende que la ley podría precipitar un retiro masivo de maestros y maestras. De ahí, salta a la conclusión de que el retiro en masa causará el colapso del sistema.

Sin embargo, el historial legislativo revela que la Legislatura tuvo ante su consideración el impacto negativo potencial en el flujo de caja del Sistema de Retiro que causaría el retiro en masa de maestros y maestras ante la reforma de la ley y que se identificó al menos una alternativa en la eventualidad de que esto ocurriera. Además, se constató que, de surgir el problema, lo que se necesitaría para enfrentarlo sería muchos menos que lo que haría falta para solventar el sistema existente. Por lo tanto, el Legislador tuvo ante sí el problema, lo consideró y determinó que no era necesario ni conveniente

---

[113] Declaración Jurada de la Sra. Wanda Santiago López, pág. 4-5.

hacer nada hasta tanto se precisara su verdadero impacto, esto es, hasta tanto y en cuanto se pasara de la especulación a la realidad.

Siendo ello así la decisión de la mayoritaria constituye una intervención en las prerrogativas de la Asamblea Legislativa que es contraria a la deferencia requerida por nuestro sistema de separación de poderes. No debemos minar los esfuerzos de las ramas políticas de atender los graves problemas socioeconómicos que enfrentamos actualmente como país. Este es un problema de gran complejidad ligado a la situación fiscal precaria del Gobierno Central. El Estado ha enfatizado en que esta medida no es una medida aislada sino que forma parte de la restructuración de todos los sistemas de retiro público así como de los gastos del Gobierno Central. La evaluación de esta medida no puede basarse meramente en la posibilidad de que surja una situación en particular que produzca el efecto contrario al deseado. Una decisión legislativa de gran envergadura no debe ser descartada por una especulación basada en conclusiones no fundamentadas.

En vista de lo anterior y por entender que la legislatura actuó motivada por la obligación de proteger el interés mayor de garantizar que los maestros y las maestras puedan recibir el pago de su pensión en el futuro cercano, disiento.

Liana Fiol Matta
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Asociación de Maestros de Puerto Rico, et al.<br><br>        Peticionarios<br><br>            v.<br><br>Sistema de Retiro para Maestros de Puerto Rico, et als.<br><br>        Recurridos<br>―――――――――――――<br>Educadores/as   por la      Democracia, Unidad,     Cambio, Militancia        y Organización Sindical, Inc., por sí       y       en representación    de sus   miembros   et als.<br><br>        Peticionarios<br><br>            v.<br><br>Sistema  de  Retiro para   Maestros   de Puerto Rico, et al.<br><br>        Recurridos | CT-2014-2<br><br><br><br><br><br><br><br>Certificación Intrajurisdiccional<br><br><br><br><br><br>CT-2014-3 |

Opinión disidente emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 11 de abril de 2014

> [T]he lawless science of our law-
> That codeless myriad of precedent,
> That wilderness of single instances.
> *Aylmer´s Field*, Alfred Lord Tennyson

Hoy, una mayoría de este Tribunal, por razones que escapan la comprensión y el alcance del Derecho, anuncia al País que la Ley del Sistema de Retiro para Maestros del Estado Libre Asociado de Puerto Rico, Ley Núm. 160 de 24 de diciembre de 2013, no cumple con el estándar constitucional que recientemente aplicamos para sostener la constitucionalidad de la Reforma del Sistema de Retiro de Empleados del Estado Libre Asociado de Puerto Rico. Ley Núm. 3 de 4 de abril de 2013.

Alcanza este resultado incurriendo, sin asomo de sonrojo, en dos novedades, a saber: tergiversando y obviando en gran medida el análisis de menoscabo de obligaciones contractuales que este Tribunal hizo hace apenas unos meses para declarar válida la Ley de Reforma del Sistema de Retiro de Empleados del Estado Libre Asociado. Como sabe el País, ambas leyes son prácticamente idénticas, ambas pretendían atender la precariedad actuarial de ambos sistemas a través de mecanismos de gran similitud dirigidos a solventar dicha precariedad. No hay **justificación jurídica** que valga para que la primera fuera constitucional y ésta no.

Además, la mayoría, desvanece de su retórica el viejo mantra de deferencia al Poder Legislativo con el cual validaban el cuatrienio pasado innumerables ponencias en las que rehusaban escudriñar legislación aprobada por aquella Asamblea Legislativa. A modo de ejemplo, basta recordar *Domínguez Castro et al v. E.L.A. et al.*, 178 D.P.R. 1 (2010), donde frente a un

argumento igual que el de ahora sobre menoscabo de obligaciones contractuales, se validó la Ley Especial Declarando Estado de Emergencia Fiscal y Estableciendo Plan Integral de Estabilización Fiscal para Salvar el Crédito de Puerto Rico, Ley Núm. 7 de 9 de marzo de 2009 (Ley Núm. 7), que ordenaba el despido de miles de empleados públicos, luego de meramente leer la exposición de motivos de aquel estatuto.

Nadie debe llamarse a engaño. La "victoria" que hoy algunos reclamarán es un mero espejismo; y más que nada, recuerda el triunfo de Pirro, rey de Epiro, sobre los romanos. **El Sistema de Retiro de Maestros está en quiebra y necesita de una profunda reestructuración.** La decisión de hoy meramente pospone esa medida adusta y la pospone en perjuicio de los propios maestros y cuando finalmente se tome, tendrá que ser mediante una ley más drástica que la que hoy se rechaza pues, para ese entonces, el Sistema de Retiro para Maestros (SRM) estará más insolvente, por tener que continuar desembolsando sus activos para cumplir con sus obligaciones. En ese momento, de haber un cambio de administración, quienes hoy aducen defender emiten un órdago panegírico sobre los derechos de los maestros recobrarán su memoria y retomarán el viejo discurso de deferencia a la Asamblea Legislativa.

Por entender que las medidas aprobadas mediante la Ley Núm. 160 de 24 de diciembre de 2013, al igual que las medidas adoptadas por la Ley Núm. 3 de 4 de abril de 2013, son necesarias y razonables para garantizar la solvencia actuarial del Sistema de Retiro para Maestros

y que las partes demandantes no lograron probar que existían medidas menos onerosas para alcanzar ese fin, disiento. En consideración de la deferencia que constantemente le hemos reconocido a la legislatura en circunstancias similares, este Tribunal debió reconocer la constitucionalidad de la Reforma al Sistema de Retiro para Maestros, en lugar de convertirse en una *supralegislatura* y echar a un lado los principios más básicos de nuestro sistema republicano de gobierno y la doctrina de separación de poderes.

I

A continuación, procedo a repasar los hechos que dan origen a la controversia ante nuestra consideración.

El 24 de diciembre de 2013, la Asamblea Legislativa aprobó la Ley del Sistema de Retiro para Maestros del Estado Libre Asociado de Puerto Rico, Ley Núm. 160 de 24 de diciembre de 2013 (Ley Núm. 160). El 8 de enero de 2014, la Asociación de Maestros de Puerto Rico (Asociación), por sí y en representación de sus miembros, presentó ante el Tribunal de Primera Instancia una demanda sobre *injunction* preliminar y permanente, y una solicitud de sentencia declaratoria contra el Estado Libre Asociado de Puerto Rico y el Sistema de Retiro para Maestros de Puerto Rico (SRM), solicitando que se declare inconstitucional la Ley Núm. 160. El Tribunal de Primera Instanció citó a las partes a una vista para atender la procedencia del *injunction* preliminar el 27 de enero de 2014. Posteriormente, Educadores Puertorriqueños en Acción, Inc. (E.P.A.) y

la Organización de Directores y Administradores Escolares de Puerto Rico (O.D.A.E.) solicitaron intervenir en el pleito.

El 14 de enero de 2014, la Asociación presentó ante el Tribunal Supremo de Puerto Rico una *Solicitud de certificación intrajurisdiccional*, solicitando nuestra intervención directa e inmediata en el pleito ante el Tribunal de Primera Instancia, pues versa sobre una cuestión novel de derecho y es una controversia de alto interés público. La Asociación también presentó una *Moción en auxilio de jurisdicción* solicitando que paralizáramos los efectos de la Ley Núm. 160 hasta que se atendieran sus reclamos en los méritos.

Mediante *Resolución* dictada en esa misma fecha, declaramos *ha lugar* a ambas solicitudes. Además, en virtud de la Regla 51 del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. XXI-B, nombramos al Hon. Ángel Pagán Ocasio como Comisionado Especial para que recibiera la prueba de las partes y emitiera las correspondientes determinaciones de hecho, a ser consignadas en un Informe Especial a rendirse no más tarde del 7 de febrero de 2014.

El 17 de enero de 2014, el Estado y el SRM presentaron una *Urgente moción de reconsideración* ante nosotros, solicitando que dejáramos sin efecto nuestra *Resolución* del 14 de enero de 2014 ordenando la paralización de los efectos de la Ley Núm. 160. Razonaron que el remedio concedido por este Tribunal no cumplió con los requisitos para la concesión de un *injunction* preliminar, pues no se celebró vista

evidenciaria alguna antes que se concediera el *injunction* preliminar solicitado.

Por su parte, el 21 de enero de 2014, Educadores/as por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc. (EDUCAMOS) también instó ante el Tribunal de Primera Instancia una demanda de *injunction* preliminar y permanente, y de sentencia declaratoria impugnando la constitucionalidad de la Ley Núm. 160. Al día siguiente, el 22 de enero de 2014, EDUCAMOS presentó ante el Tribunal Supremo una *Petición de certificación* y una *Urgente moción de consolidación*, solicitando que certificáramos su pleito ante el Tribunal de Primera Instancia y lo consolidáramos con el pleito presentado por la Asociación.

El 23 de enero de 2014, a la vez que se celebraba la conferencia con antelación a la vista evidenciaria que señaló el Comisionado Especial, la Asociación y las partes interventoras presentaron ante este Tribunal una moción solicitando que concediéramos una prórroga para la fecha de entrega del informe del Comisionado. Fundamentaron su solicitud en que, ante la complejidad de la controversia y el tiempo que tomaría preparar los estudios actuariales, les sería imposible prepararse adecuadamente. No obstante, mientras este Tribunal evaluaba la petición de la Asociación, en la vista celebrada ante el Comisionado Especial, las partes acordaron estipular todos los hechos materiales del caso y sólo desfilar prueba documental. Esto, debido a que el pleito versa sobre una controversia

esencialmente de derecho, por lo que no sería necesario celebrar una vista evidenciaria. Informe del Comisionado Especial, en la pág. 2. El Comisionado acogió lo acordado entre las partes y señaló la continuación de la vista evidenciaria para el 29 de enero de 2014.

Mientras continuaban los procesos ante el Comisionado Especial, el 27 de enero de 2014, este Tribunal emitió una *Resolución* en la que declaró con lugar la solicitud de consolidación de EDUCAMOS y denegó la moción de reconsideración presentada por el Estado y el SRM. Por otro lado, solicitó al Comisionado Especial que nos informara cuánto tiempo adicional necesitaba para realizar su encomienda.

Posteriormente, mediante una *Comparecencia especial* del 30 de enero de 2014, el Comisionado Especial nos informó queno necesitaba tiempo adicional alguno para preparar su informe. Durante la vista del 29 de enero, las partes acordaron presentar una estipulación de hechos, lo que haría innecesaria la celebración de la vista evidenciaria. Finalmente, el Comisionado rindió su Informe el 7 de febrero de 2014.

Luego de que las partes presentaran varios escritos sobre los términos que tendrían para presentar sus objeciones al Informe del Comisionado Especial y sus respectivos alegatos, establecimos un calendario mediante *Resolución* dictada el 11 de febrero de 2014. Concedimos a las partes hasta el 21 de febrero de 2014 para presentar sus comentarios y objeciones al Informe,

y hasta el 3 de marzo de 2014 para presentar sus alegatos de forma simultánea.

Después de recibir las objeciones y comentarios al Informe del Comisionado Especial, y los alegatos de todas las partes, el 6 de marzo de 2014, sin que parte alguna lo solicitara, decretamos una *Resolución* ordenando la celebración de una vista oral el 26 de marzo de 2014. Esta vista se celebró según ordenada.

En síntesis, en sus respectivos alegatos, las partes demandantes sostienen que la Ley Núm. 160 es inconstitucional porque violenta la prohibición constitucional contra el menoscabo de obligaciones contractuales. Esto, pues el Estado no demostró que los menoscabos contractuales legislados eran razonables y necesarios para lograr la solvencia del SRM, y no consideró alternativas menos onerosas. Asimismo, alegan que la Ley Núm. 160 viola el debido proceso de ley y la igual protección de las leyes, Const. P.R. Art. II, Sec. 7, la separación de poderes, la dignidad del ser humano, Const. P.R. Art. II, Sec. 1, y el Artículo VI, Sección 10 de la Constitución de Puerto Rico. Por último, indican que la acción del Estado constituyó una expropiación forzosa y un enriquecimiento injusto.

Por su parte, el Estado Libre Asociado y el SRM sostienen que las medidas adoptadas en la Ley Núm. 160 son razonables y necesarias para adelantar el interés público de garantizar la solvencia del Sistema de Retiro de Maestros de Puerto Rico y atajar la crisis fiscal que enfrenta Puerto Rico.

Finalmente, a más de tres meses de que se presentara la demanda inicial ante el Tribunal de Primera Instancia y tras un procedimiento sumamente ineficiente para un tribunal colegiado como el nuestro, cinco jueces de esta Curia proceden a resolver esta controversia.

II

Previo a analizar los méritos de la controversia ante nuestra consideración, precisa realizar varios señalamientos.

Llama la atención el asunto de umbral que atiende la mayoría en la ponencia que hoy anuncia. Pone de manifiesto el error de derecho sustantivo en que incurrió la mayoría cuando declaró inconstitucional mediante una Resolución varios artículos de la Ley Núm. 18 de 15 de mayo de 2013 (Ley Núm. 18), legislación que enmendaba las Reglas de Procedimiento Civil con el fin de limitar la competencia de este Foro para atender recursos de certificación intrajurisdiccional, entre otros recursos.

En aquel entonces, advertimos a la mayoría que su proceder era a todas luces improcedente. Según sostuvimos en nuestro disenso es evidente la improcedencia de una declaración de inconstitucionalidad a través de una Resolución. Advertimos lo innegable: una *Resolución* de este Tribunal no genera precedente y sólo es vinculante para las partes en el pleito en que se emita. *Alvarado Pacheco y otros v. E.L.A.*, 188 D.P.R. 594 (2013) (Rodríguez Rodríguez, J., Op. Disidente). En esa

ocasión, enfatizamos que era la primera vez que una determinación de esa índole ocurría en nuestra historia constitucional. *Id.* en la pág. 689.

Hoy, conscientes del error manifiesto entonces cometido, con una pizca de ironía y amplificando su anomalía jurídica, la mayoría adopta los pronunciamientos que en el pasado realizó incorrectamente mediante Resolución. Mediante la ponencia que hoy se anuncia, intentan impartirle la vinculación jurídica que caracteriza a las opiniones de este Foro.

Por otro lado, según he venido señalando, el trépido trámite con el que una mayoría ha manejado este litigio levanta, como mínimo, serias suspicacias. Particularmente ante las consecuencias de esta controversia en la situación fiscal y política del País. Para muestra, compárese el trámite seguido en este caso con el trámite seguido por este Tribunal en *Trinidad Hernández v. E.L.A.*, 188 D.P.R. 828, 832-833 (2013), y en *Brau v. E.L.A,* 2014 T.S.P.R. 26, 190 D.P.R. ___ (2014). ¿Qué justifica las diferencias?

Discutido lo anterior, pasemos entonces a evaluar el derecho aplicable a la controversia que nos ocupa.

III

La Constitución de Puerto Rico establece que no se aprobarán leyes que menoscaben las obligaciones contractuales. Const. P.R. Art. II, Sec. 7. Al igual que la disposición análoga en la Constitución federal, Const. E.E.U.U Art. 1, Sec. 10, esta cláusula busca proteger la estabilidad de las relaciones

contractuales. *Trinidad Hernández*, 188 D.P.R. en la pág. 833; *Domínguez* Castro, 178 D.P.R. en la pág. 81, *Warner Lambert Co. v. Tribunal Superior*, 101 D.P.R. 378, 395 (1973). No obstante, en el pasado hemos señalado que esta prohibición no es absoluta, por lo que no todo menoscabo contractual es inconstitucional. *Bayrón Toro v. Serra*, 119 D.P.R. 605, 619 (1987). La prohibición constitucional contra el menoscabo de obligaciones contractuales debe armonizarse con el poder de razón de estado, el cual permite al soberano legislar y reglamentar en beneficio del interés público. *Trinidad Hernández,* 188 D.P.R. en la pág. 834, citando a *U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1, 21 (1977) y *Warner Lambert Co.* 101 D.P.R. en la pág. 394.

Al evaluar la validez de un estatuto a la luz de esta cláusula constitucional, los tribunales deben aplicar un criterio de razonabilidad. *Warner Lambert Co.*, 101 D.P.R. en la pág. 395. Habida cuenta que esta cláusula protege tanto las obligaciones contractuales entre sujetos privados como las obligaciones contractuales contraídas por el Estado con particulares, cuando el Estado pretende menoscabar sus propias obligaciones contractuales, el escrutinio aplicable debe ser más cuidadoso, evitando que el Estado actúe exclusivamente en beneficio propio. *Trinidad Hernández,* 188 D.P.R. en la pág. 835; *Domínguez Castro*, 178 D.P.R. en la pág. 80; *Bayrón Toro*, 119 D.P.R. en la pág. 620; *U.S. Trust Co. of New York*, 431 U.S. en las págs. 25-26.

Cuando se evalúa la validez de un menoscabo de las obligaciones contractuales del propio Estado, el tribunal debe establecer un balance razonable entre el intento legislativo de promover el bien común y la protección constitucional de las obligaciones contractuales contra la aplicación arbitraria e irrazonable de las leyes. *Warner Lambert Co.*, 101 D.P.R. en la pág. 395. Por lo tanto, este Tribunal ha adoptado un escrutinio con miras a establecer un balance entre el interés público que persigue dicha legislación y la confianza que han depositado los particulares sobre las obligaciones contractuales contraídas con el Estado. *Id*.

En la primera etapa del escrutinio, el tribunal debe determinar si existe una obligación contractual, si la legislación menoscaba esa obligación y cuál es la magnitud de ese efecto. *Trinidad Hernández*, 188 D.P.R. en la pág. 834. Por ello, debe auscultar si de hecho existe una obligación contractual entre los particulares y el Estado. *Id.; Domínguez Castro*, 178 D.P.R. en la pág. 80; *Warner Lambert Co.*, 101 D.P.R en la pág. 395. Luego, debe examinar si la legislación impugnada modifica la obligación de forma tal que, en efecto, constituya un menoscabo de la obligación contractual. *Bayrón Toro*, 119 D.P.R. en las págs. 620-21. Finalmente, debe evaluar si el menoscabo es uno severo o sustancial. *Domínguez Castro*, 178 D.P.R. en la pág. 80; *Bayrón Toro*, 119 D.P.R. en la pág. 621, *Warner Lambert Co.*, 101 D.P.R. en la pág. 395.

Un menoscabo contractual será considerado sustancial cuando frustre adversamente las expectativas de una de las partes. *Trinidad Hernández, supra; U.S. Trust Co. of New York, supra,; Warner Lambert Co., supra.* Esto ocurre cuando el estatuto impugnado "modifica o afecta adversamente los términos o condiciones esenciales del contrato que principalmente dieron motivo a la celebración de éste de modo que se frustren las expectativas razonables de las partes". *Domínguez Castro*, 178 D.P.R. en la pág. 83.

Una vez se determine que la legislación impugnada constituye un menoscabo sustancial de una obligación contractual, el menoscabo será válido si la modificación es razonable y necesaria para adelantar el interés público que persigue. *Domínguez Castro*, 178 D.P.R. en la pág. 84. "En fin, si el menoscabo surge como consecuencia de una modificación razonable y necesaria dirigida a adelantar un interés público, se sostendrá su validez". *Trinidad Hernández*, 188 D.P.R. en la pág. 835, citando a *U.S. Trust Co. of New York*, 431 U.S. en la pág. 29.

En específico, hemos sostenido que la modificación será razonable si la "interferencia gubernamental responde a un interés legítimo y si está racionalmente relacionada con la consecución de dicho objetivo". *Trinidad Hernández*, 188 D.P.R en las págs. 834-835. Citando a *Domínguez Castro*, 178 D.P.R. en la pág. 80 y *Warner Lambert Co.*, 101 D.P.R. en la pág. 395. Es decir, para que la modificación se considere razonable, el menoscabo legislado debe guardar una

relación racional con el fin que persigue. No obstante, además de ser razonable, las medidas adoptadas deben ser necesarias para adelantar el propósito gubernamental importante. *Domínguez Castro*, 178 D.P.R. en la pág. 84, citando a *Bayrón Toro*, 117 D.P.R. en la pág. 620 y *U.S. Trust Co. of New York*, 431 U.S. en la pág. 29. Las modificaciones serán consideradas necesarias si no podían realizarse modificaciones menos drásticas y no existían alternativas menos onerosas para lograr el mismo objetivo. *U.S. Trust Co. of New York*, 431 U.S. en las págs. 29-30.

Cónsono con nuestro sistema republicano de gobierno, donde las tres ramas estamos obligadas a respetar nuestras respectivas funciones, Const. P.R. Art. I, Sec. 2; *Trinidad Hernández*, 188 D.P.R. en la pág. 838, este Tribunal ha sido consistente en otorgar cierta deferencia a la determinación que realice la Asamblea Legislativa sobre la razonabilidad y necesidad de los menoscabos que ha legislado. *Trinidad Hernández*, 188 D.P.R. en la pág. 838; *Domínguez Castro*, 178 D.P.R. en la pág. 85. "La determinación de la Asamblea Legislativa en torno a [la razonabilidad y necesidad de] las medidas aprobadas constituye un ejercicio de política pública que merece nuestra deferencia en este sistema de separación de poderes". *Trinidad Hernández*, 188 D.P.R. en la pág. 838. No obstante, esta deferencia de ninguna forma es absoluta. *Trinidad Hernández*, 188 D.P.R. en la pág. 836, citando a *Domínguez Castro*, 178 D.P.R. en la pág. 85, *U.S. Trust Co. of New York*, 431 U.S. en las págs. 25-26.

El que sólo se le otorgue *cierta* deferencia en vez de una deferencia *absoluta* a la determinación legislativa sobre la necesidad y razonabilidad de las medidas adoptadas no implica que los tribunales realizarán un juicio *de novo* sobre si las alternativas disponibles servirían de mejor forma el interés público de la legislación. *Trinidad Hernández*, 188 D.P.R. en la pág. 838; *Domínguez Castro*, 178 D.P.R. en la pág. 85*; Buffalo Teachers Federation v. Tobe*, 464 F.3d. 362, 370 (2do Cir. 2006). La cláusula contra el menoscabo de obligaciones contractuales no exige que los tribunales sirvan como *supralegislaturas*, evaluando por su cuenta cuáles de las alternativas disponibles a la Asamblea Legislativa era la más apropiada. *Baltimore Teachers Union v. Mayor and City Council of Baltimore*, 6 F.3d 1012, 1021-22 (1993), citado con aprobación en *Domínguez Castro*, 178 D.P.R. en la pág. 85. Nuestra responsabilidad como Tribunal no es evaluar si la legislatura *podía* adoptar otras medidas, como desviar fondos de servicios esenciales del gobierno o aumentar los impuestos. Nuestra responsabilidad es evaluar si las medidas adoptadas cumplen con el escrutinio aplicable al menoscabo de obligaciones contractuales del propio Estado. De esta forma, velamos porque el Estado no abuse de su poder al equiparar el menoscabo de contratos con otras alternativas de política pública o imponer un menoscabo más severo del necesario para lograr el mismo propósito. *Baltimore Teachers Union*, 6 F.3d en las págs. 1019-20, citando a *United States Trust*, 431 U.S. en las págs. 30-31.

Conforme a la deferencia que debemos a la determinación de razonabilidad y necesidad que realizó la legislatura, el menoscabo de la obligación contractual no se sostendrá si la parte demandante demuestra que existen alternativas menos onerosas a las que el legislador escogió para lograr el interés público que persigue el estatuto. *Trinidad Hernández*, 188 D.P.R. en la pág. 837; *Domínguez Castro*, 178 D.P.R. en la pág. 84. No será suficiente que la parte demandante meramente alegue de forma generalizada que existen alternativas menos onerosas, sino que debe detallar cómo éstas se implementarían y lograrían el mismo propósito de la legislación que impugnan. *Trinidad Hernández*, 188 D.P.R. en las págs. 837-38. Particularmente, deben presentar evidencia suficiente como para convencer al tribunal que estas alternativas son viables y menos onerosas. *Trinidad Hernández*, 188 D.P.R. en la pág. 838.

En *Bayrón Toro v. Serra*, 119 D.P.R. 605 (1987), tuvimos la oportunidad de evaluar la razonabilidad de unos cambios al Sistema de Retiro de Empleados de la Universidad de Puerto Rico aprobados por el Consejo de Educación Superior. Las enmiendas realizadas variaron las condiciones y requisitos para participar en el Sistema de Retiro de la U.P.R., a saber: los años de servicio requeridos para acogerse al retiro, la cuantía de las aportaciones que realiza el participante al fondo y la edad necesaria para acogerse a los beneficios del retiro. Al evaluar las enmiendas,

encontramos que éstas menoscabaron la obligación contractual del Estado con los participantes pues

> los participantes de un Sistema de Retiro del Gobierno tienen un derecho adquirido de naturaleza contractual que surge con el ingreso del empleado al sistema... Una vez el empleado se ha retirado, cuando ha cumplido con todas las condiciones para el retiro, su pensión no está sujeta a cambios o menoscabos. Sin embargo, antes de que pueda acogerse a la jubilación, los términos del sistema de retiro pueden ser enmendados por el Gobierno siempre que las enmiendas sean razonables y con el fin de adelantar la solvencia actuarial del mismo.

*Id*. en la pág. 618.

Por ser parte esencial del contrato de empleo que aceptaron al ingresar en el servicio público, los cambios a los términos y condiciones del plan de retiro que analizamos en *Bayrón Toro* frustraron las expectativas de los demandantes y constituyeron un menoscabo sustancial de las obligaciones contractuales del Estado. *Id*. en la pág. 617. Sin embargo, a la luz de las circunstancias del caso, sostuvimos la validez de los cambios por éstos ser razonables y necesarios para garantizar la solvencia actuarial del Sistema de Retiro. *Id*. en la pág. 623. Al momento de adoptar las enmiendas, el Sistema de Retiro

> se encontraba ante una grave crisis actuarial, que ponía al sistema en peligro de tener que liquidar sus activos. En un informe rendido por los actuarios se señala que los desembolsos del fondo aumentaron a un nivel mayor que los ingresos y se señala como causa principal para la deficiencia actuarial la jubilación de participantes a temprana edad.

*Id*. en la pág. 622.

Por lo tanto, reconocimos que

> el Estado debe tener la capacidad y la flexibilidad para hacer cambios y enmiendas razonables que sean necesarias para adelantar los intereses del Sistema de Retiro y fortalecerlo tanto en sus cimientos como en sus estructuras. Variaciones en condiciones y requisitos tales como años de servicio, aportaciones al fondo y edad para recibir los beneficios son esenciales para mantener el fondo en estado solvente. Esta flexibilidad es vital para que el Sistema de Retiro pueda enfrentarse a situaciones inesperadas y para que pueda también mantenerse a la par con avances en las ciencias actuariales. Reconocerle al Estado la facultad para adoptar modificaciones en los sistemas de retiro dentro de los parámetros aquí expresados, es indispensable para que estos planes puedan operar exitosamente.

*Id*. en la pág. 623.

En fin, concluimos que no existía un menoscabo indebido de las obligaciones contractuales porque los menoscabos contractuales eran razonables y necesarios para salvar la solvencia misma del sistema de retiro, según las circunstancias del caso. *Id*. en la pág. 623.

Recientemente, en *Trinidad Hernández, supra,* validamos la Reforma del Sistema de Retiro de los Empleados del Gobierno de Puerto Rico y sus Instrumentalidades, Ley Núm. 3 de 4 de abril de 2013. Esta ley no sólo menoscabó las condiciones y requisitos para participar en el Sistema, sino que también congeló los beneficios acumulados bajo un plan de beneficio definido y movió a los empleados a un plan de contribución definida. *Trinidad Hernández*, 188 D.P.R. en la pág. 832. A diferencia de las modificaciones que evaluamos en *Bayrón Toro, supra*, donde los cambios sólo afectaban los requisitos y condiciones para acogerse al retiro, en *Trinidad Hernández, supra*, los cambios

afectaban los beneficios de la pensión en sí. Al evaluar estas modificaciones a la luz del criterio de razonabilidad aplicable cuando el Estado intenta menoscabar sus propias obligaciones contractuales, determinamos que según se desprendía de la Exposición de Motivos de la Reforma del Sistema de Retiro:

> las medidas adoptadas [eran] necesarias y razonables para atender de forma adecuada la crisis financiera que atenta contra la solvencia actuarial de este sistema. Ello ciertamente constituye un interés público importante pues, al garantizar la solvencia económica del sistema, se beneficia a todos sus participantes y se atiende, en parte, la crisis fiscal que enfrenta el País en protección del bienestar de todos los puertorriqueños y puertorriqueñas.

*Id*. en la pág. 837.

Consecuentes con lo resuelto en *Domínguez Castro*, 178 D.P.R. 1 (2010), le otorgamos cierta "deferencia a la determinación de la Asamblea Legislativa respecto a la necesidad y razonabilidad de la medida". *Trinidad Hernández*, 188 D.P.R. en la pág. 836, citando a *Domínguez Castro*, 178 D.P.R. en la pág. 85. En fin, sostuvimos la validez de las enmiendas porque, según se desprendía de la Exposición de Motivos de la Ley Núm. 3, el Estado demostró su razonabilidad y necesidad, y la parte demandante no demostró que existían alternativas menos drásticas o severas a las seleccionadas por el legislador para garantizar la solvencia del Sistema de Retiro. Los demandantes simplemente alegaron de forma generalizada que existían alternativas menos onerosas, sin detallar cómo se realizarían y cómo lograrían garantizar la solvencia

del sistema de retiro. *Trinidad Hernández*, 189 D.P.R. en las págs. 837-38.

IV

En este caso, las partes han estipulado que existe una obligación contractual entre los demandantes y el Estado que es menoscabada sustancialmente por la Ley Núm. 160, pues afecta adversamente las expectativas de por lo menos uno de los demandantes respecto a su retiro. Informe del Comisionado Especial, en la pág. 32. Por lo tanto, conforme al análisis anteriormente reseñado, sólo nos resta por determinar si el menoscabo legislado en la Ley Núm. 160 es razonable y necesario a la luz del interés público que persigue: garantizar la subsistencia y solvencia del SRM, y la salud económica del País. Exposición de Motivos de la Ley Núm. 160 de 24 de diciembre de 2013, en la pág. 18. Para ello, primero debemos considerar el contexto del SRM y las deficiencias que esta legislación pretende remediar. Veamos.

Una lectura del Informe del Comisionado nombrado por una mayoría de este Tribunal denota que estamos ante un Sistema de Retiro de Maestros (SRM) "moribundo", Informe del Comisionado Especial, en la pág. 35, "que amerita atención inmediata". *Id.* en la pág. 37. Este Sistema "atraviesa una crisis financiera que amenaza con dejarlo sin fondos suficientes para cumplir con sus obligaciones, actuales y futuras [hacia todos sus participantes]". Exposición de Motivos de la Ley Núm. 160, en la pág. 1.

Actualmente, el SRM cuenta con un déficit actuarial de más de diez mil millones de dólares ($10,251,273,000). Informe del Comisionado Especial, en la pág. 36. Esto figura una cobertura actuarial de apenas un diecisiete por ciento (17%). Prueba presentada por los codemandados, Apéndice II-2, Declaración Jurada de la Hon. Melba Acosta, en la pág. 4. Es decir, por cada dólar que el SRM está obligado a desembolsar, sólo posee diecisiete centavos ($0.17). *Id.* La cobertura actuarial promedio en planes estatales comparables es alrededor de setenta por ciento (70%) y el plan de retiro estatal con la próxima cobertura actuarial más deficiente es la del sistema de Illinois con una cobertura de treinta y cuatro por ciento (34%) o el doble de la cobertura del SRM. Exposición de motivos de la Ley Núm. 160, en la pág. 2; Prueba presentada por los codemandados, Apéndice I, Informe Pericial del Actuario Glen Bowen, Milliman, Inc., en la pág. 1.

Para el año fiscal 2013-2014, se proyecta que el SRM tendrá una deficiencia en el flujo de efectivo en caja de $322 millones. Informe del Comisionado Especial, en la pág. 33. Entre el 2015 y el 2023, esta deficiencia anual fluctuará entre los $317 y $362 millones de dólares. *Id.* Para cubrir esta deficiencia y cumplir con el pago de sus obligaciones hacia sus participantes, el SRM estaría obligado a vender sus activos de forma que pueda compensar por su déficit actuarial y cumplir con todas sus obligaciones. Informe del Comisionado Especial, en la pág. 35. Esto ya ha

ocurrido, pues en el 2013 el SRM tuvo que recurrir a la venta de activos para cubrir sus obligaciones para el semestre. Declaración Jurada Melba Acosta, en la pág. 6. De continuar en esta trayectoria, se estima que para el año 2020 el Sistema de Retiro de Maestros agotará todos sus activos y no contará con fondos suficientes para cubrir el pago de sus obligaciones, incluyendo el pago de las pensiones de los maestros ya retirados. Informe del Comisionado Especial, en la pág. 35. Declaración Jurada Melba Acosta, en la pág.6. Exposición de Motivos de la Ley Núm. 160, en la pág. 8.

Una vez el SRM no cuente con más activos para vender, entre el 2021 y el 2023 el Estado Libre Asociado vendría obligado a inyectar anualmente entre $317 y $363 millones adicionales a los que ya aporta como patrono al SRM. Informe del Comisionado Especial, en la pág. 32. A partir del 2020, el Fondo General de Puerto Rico tendría que aportar al SRM un promedio anual de $562 millones al año, una porción considerable del déficit proyectado de $820 para el término 2013-14. Melba Acosta, en la pág. 7. Este impacto sobre el fisco puertorriqueño sería equivalente al impacto que hubiese tenido el Sistema de Retiro de Empleados del Estado Libre Asociado de no haberse aprobado la reforma de la Ley 3. Melba Acosta, en la pág. 8. "Esto claramente afectaría las operaciones del gobierno y tendría consecuencias nefastas incluyendo despidos y reducción de jornada laboral". Melba Acosta, en la pág.4. Requeriría "recortes drásticos en los servicios gubernamentales de seguridad, salud y educación,

incluyendo recortes adicionales de personal, además de aquellos ajustes que tenga que hacer [el gobierno] para reducir el déficit de $820 millones que todavía carga el Fondo General". Exposición de Motivos de la Ley Núm. 160, en la pág. 8.

Ante este panorama desolador, la Asamblea Legislativa aprobó la Ley del Sistema de Retiro para Maestros del Estado Libre Asociado de Puerto Rico, Ley Núm. 160 de 24 de diciembre de 2013. Según se desprende de la Exposición de Motivos de la Ley, este estatuto es "un plan de reforma integral para atender el déficit actuarial del Sistema". Exposición de Motivos de la Ley Núm. 160, en la pág. 13. Las enmiendas al SRM tienen el propósito de reducir significativamente "tanto el déficit actuarial del Sistema como el déficit de caja que sufre el mismo y que amenaza con dejarlo sin activos en un futuro cercano". *Id*. en la 13.

Sin duda, como bien han estipulado las partes, para atender la crisis estructural delSistema esta medida ha resultado en un menoscabo sustancial a las obligaciones contractuales de los participantes. Informe del Comisionado Especial, en la pág. 32. Ahora bien, para efectos del escrutinio aplicable debemos precisar en qué consiste este menoscabo para poder evaluar su razonabilidad y necesidad.

Para garantizar la solvencia del SRM y el pago de las pensiones de los participantes ya retirados y los todavía activos, la Ley Núm. 160 contempla las siguientes medidas:

(1) la congelación de la acumulación de beneficios de participantes actuales bajo la Ley 91, eliminando la acumulación de nuevos beneficios bajo el plan de beneficios definidos actual, pero respetando toda acumulación ganada por dichos participantes hasta el presente;

(2) el traslado de los miembros activos bajo la Ley 91 a un plan de aportación definida con un beneficio mínimo garantizado para los participantes activos al 31 de julio de 2014;

(3) la eliminación prospectiva de la pensión por mérito;

(4) el incremento en la edad de retiro para futuros maestros;

(5) el incremento en la aportación de los participantes al Sistema;

(6) el incremento de la aportación patronal, adicional al incremento ya legislado mediante la Ley 114-2011;

(7) la modificación de los beneficios otorgados por las Leyes Especiales para los participantes retirados y la eliminación de dichos beneficios de forma prospectiva; y

(8) la modificación de los beneficios de incapacidad y de los beneficiarios de participantes.

Exposición de Motivos de Ley Núm. 160, en la pág. 13.

Esto es, la Ley Núm. 160 menoscaba las obligaciones del Estado en la medida en que altera los criterios y requisitos para participar en el SRM, modifica los beneficios de pensión por retiro no acumulados y elimina los beneficios de las leyes especiales. Todo esto correlativo a aportaciones adicionales que realizará el Fondo General de Puerto Rico mediante una Aportación Uniforme para la Justicia Magisterial y una Aportación Adicional Anual. Estas aportaciones significan un aumento en lo que actualmente aporta el Estado Libre Asociado de Puerto Rico como patrono al SRM. Exposición de Motivos de la Ley Núm. 160, en la pág. 13.

Habiendo definido en qué consiste el menoscabo que debemos evaluar, pasemos entonces a evaluar su razonabilidad y necesidad. Según surge de la exposición de motivos de la Ley Núm. 160, la Asamblea Legislativa entendió necesario y razonable adoptar estas medidas para lograr la solvencia del SRM. Específicamente, la Asamblea Legislativa expresó que:

> estas medidas son necesarias y razonables para resolver la situación deficitaria del Sistema de Maestros, dentro de nuestro ordenamiento legal y constitucional. Son las alternativas menos onerosas disponibles para lograr el fin público apremiante de: (1) evitar que el Sistema de Maestros se quede sin fondos para pagar las pensiones a nuestros retirados; (2) honrar los beneficios acumulados por los maestros retirados y por aquellos que continúan educando diariamente a nuestros niños y jóvenes; (3) reducir significativamente el impacto proyectado del déficit anual del Sistema en el Fondo General, lo que de no hacerse afectaría la prestación de servicios públicos esenciales a la ciudadanía; y (4) evitar la catástrofe socio-económica y fiscal que supondría la degradación del crédito de Puerto Rico al nivel de 'chatarra'.

Exposición de Motivos de la Ley Núm. 160, en la pág. 17.

Asimismo, la Hon. Melba Acosta Febo, Secretaria de Hacienda del Estado Libre Asociado de Puerto Rico, funcionaria que a su vez tiene a su cargo la presidencia de la Junta del Sistema de Retiro de Maestros, señaló que mediante la Ley Núm. 160:

> se logró presentar una solución que reduce significativamente las necesidades de flujo de efectivo del SRM aliviando así la presión que existe sobre el Fondo General que presenta un déficit presupuestario, mientras se asegura la estabilidad y solvencia actuarial del sistema, (esto es, el pago de pensiones a los maestros y maestras en años venideros).

Declaración jurada de la Hon. Melba Acosta Febo, en la pág. 9.

Al evaluar cada uno de los menoscabos, vemos que éstos están dirigidos a atender directamente los problemas estructurales del SRM y su déficit de flujo de efectivo para así garantizar su solvencia. Por tal razón, los menoscabos legislados — los cambios a los requisitos y condiciones de elegibilidad, los cambios a los beneficios por pensión, y la eliminación de los beneficios de las leyes especiales — son razonables, pues guardan una relación racional con el fin de garantizar la solvencia del SRM.

Consecuentemente, resta por determinar si la parte demandante ha demostrado que existen alternativas menos drásticas o severas que las que el legislador escogió para lograr su objetivo. *Trinidad Hernández,* 188 D.P.R. en la pág. 837, citando a *Domínguez Castro*, 178 D.P.R. en la pág. 84, *U.S. Trust Co. of New York*, 431 U.S. en las págs. 29-31. Contrario a lo ocurrido en *Trinidad Hernández*, en este caso la parte demandante ha presentado varias alternativas a las medidas que adoptó la Asamblea Legislativa y ha desfilado prueba sobre cómo se podrían implementar y el impacto que tendrían sobre la solvencia actuarial del SRM. Sin embargo, "no demostraron que tienen evidencia para convencer al tribunal en un juicio que estas alternativas son viables y menos onerosas". *Trinidad Hernández*, 188 D.P.R. en la pág. 838.

Algunas de las medidas que proponen los demandantes son precisamente alternativas que ya forman

parte de la Ley Núm. 160, luego de ser recibidas y estudiadas en reuniones con los gremios magisteriales. Estas son: la reducción de diez por ciento (10%) de los gastos administrativos del Departamento de Educación y del SRM; el pago de la deuda de $24 millones que los demandantes alegan tiene el Departamento de Educación como patrono con el SRM; la eliminación de las pensiones privilegiadas; y nombrar todas las plazas de maestros vacantes. Exposición de Motivos de la Ley Núm. 160, en la pág. 11.

En cuanto a las demás alternativas esbozadas por los demandantes, al momento de aprobar la Ley Núm. 160, el Estado las consideró y las descartó por ser insuficientes para lograr la solvencia actuarial del SRM o no ser viables. Exposición de Motivos de la Ley Núm. 160, en la pág. 12. Más allá, la Secretaria de Hacienda testificó mediante declaración jurada que:

> [l]amentablemente, debido a la magnitud del problema, entendemos que no existe ninguna otra posibilidad para que el SRM mantenga los derechos de pensión que existen hoy en día, siendo la única posibilidad para garantizar la solvencia del SRM la reforma contenida en la Ley 160-2013.
>
> . . . .
>
> Como parte del proceso de aprobación de la Ley 160-2013, hubo varias reuniones con grupos magisteriales para traer propuestas para no reformar el sistema. Recibí y fui consultada de las propuestas que fueron presentadas por estos grupos. Ninguna de ellas resuelva el problema de $10 billones del sistema. O no son viables, o simplemente son muy tímidas. Igual ocurre con diversos proyectos de ley a los que, aunque sometidos, no se les ha podido dar curso, porque no son viables y/o no logran la solvencia actuarial del SRM.

Declaración jurada de la Hon. Melba Acosta Febo, en las págs. 12-13.

Las expresiones de la Secretaria de Hacienda demuestran que el Estado evaluó las diferentes alternativas a su disposición, incluyendo las propuestas por la parte demandante, y luego de estudiarlas concluyó que no eran viables o suficientes para lograr el propósito de la Ley Núm. 160: garantizar la solvencia actuarial del SRM y atender a su vez la crisis fiscal del país. Sin reparo alguno, debemos concluir que la parte demandante no ha demostrado que existían otras alternativas menos onerosas que lograrían la solvencia del SRM, razón por la cual no podemos apartarnos de nuestra doctrina jurisprudencial y prescindir de la deferencia que en ocasiones similares hemos extendido a la Asamblea Legislativa. Por todo lo anterior, la Ley Núm. 160 constituye un menoscabo contractual permisible, pues es una medida necesaria y razonable para garantizar la solvencia del SRM.

B

Por el contrario, hoy una mayoría de este Tribunal usurpa las funciones del legislador al sostener que las medidas de política pública que el Poder Legislativo adoptó para atender la crisis actuarial del Sistema de Retiro de Maestros son irrazonables, pues no van dirigidas a solventar la crisis actuarial del sistema y, en cambio, ponen al Sistema en peor situación. Tal determinación es inconsistente con nuestros pronunciamientos anteriores sobre la cláusula contra menoscabos contractuales en el contexto de los planes de retiro de los empleados públicos. Veamos.

La Opinión mayoritaria concluye que "[l]uego de evaluar con detenimiento la prueba admitida, es insoslayable concluir que para propósitos de la cláusula constitucional que prohíbe el menoscabo de obligaciones contractuales, la Ley Núm. 160 es irrazonable, y por consiguiente, inconstitucional". Op. Mayoritaria, en la pág. 22. Fundamenta su conclusión en que "los demandantes en este caso presentaron evidencia que demuestra que las medidas adoptadas no garantizan la solvencia económica del SRM, requisito de umbral conforme con nuestra jurisprudencia. El Estado no presentó prueba que refutara esa conclusión". Op. Mayoritaria, en la pág. 29. Sin profundizar de forma alguna en por qué en este caso no debemos otorgarle la misma deferencia que le reconocimos a la determinación de la Asamblea Legislativa sobre la razonabilidad y necesidad de las medidas adoptadas en *Trinidad Hernández*, 188 D.P.R. 828 (2013), y *Domínguez Castro*, 178 D.P.R. 1 (2010), la opinión mayoritaria simplemente hecha a un lado la determinación de la legislatura al respecto.

Concluye que el Estado "no pudo refutar la prueba presentada por los maestros sobre cómo el supuesto retiro masivo que impulsa la Ley Núm. 160 tendría un efecto devastador sobre la solvencia del SRM", Op. Mayoritaria, en la pág. 24. De esta forma, la decisión mayoritaria impone al Estado el peso de demostrar la razonabilidad y necesidad de las medidas que ha adoptado, aplicándole un estándar de prueba inarticulado e ininteligible y revocando sin más

explicaciones lo resuelto por este Tribunal en *Trinidad Hernández*, *Domínguez Castro* y *Bayrón Toro*.

La mayoría del Tribunal sostiene que la prueba pericial presentada por los demandantes demostró que la Ley Núm. 160 no promueve la solvencia del SRM. No estoy de acuerdo con prescindir de la deferencia que debemos otorgar a la Asamblea Legislativa al amparo de esta prueba pericial, pues tiene escaso o ningún valor probatorio. En primer lugar, la mayoría fundamenta sus conclusiones en estos informes sin expresarse sobre la admisibilidad y relevancia de los mismos ,. Recordemos que, contrario al procedimiento que exige la Regla 51 de nuestro Reglamento, el Comisionado Especial no realizó determinación alguna sobre la admisibilidad de la prueba documental presentada por las partes:

> Las partes estipularon que presentarían el testimonio de los testigos, [sic.] mediante declaraciones juradas. Lo que significa, según estipulación, que de haberse sentado a declarar dichos testigos, el contenido de su declaración jurada es lo que en efecto hubiesen declarado; **todo ello sin perjuicio de las objeciones y de la admisibilidad y relevancia que cada parte pueda tener.**

Informe del Comisionado Especial, IV Prueba Documental, en la pág. 38, n. 12.

Adicionalmente, el Comisionado Especial nos indica que:

> Resulta menester pormenorizar que el Comisionado Especial no tuvo la oportunidad de evaluar el 'demeanor' o comportamiento de los testigos ni de los peritos en la silla testifical, ni evaluar su credibilidad mientras testificaban, ante la estipulación de todos los abogados de someter el caso mediante declaraciones juradas.

*Id*., en la pág. 34, n. 7.

En segundo lugar, utiliza los informes de los peritos economistas de la Asociación, José I. Alameda Lozada y Alfredo González Martínez, y el informe del actuario José M. Pérez Díaz, perito de la O.D.A.E., sin considerar las bases científicas ni los métodos utilizados para las opiniones esbozadas en sus informes, pues éstos no las revelan. Surge del informe de los economistas Alameda Lozada y González Martínez que éstos entienden que es una situación imprevista de la Ley Núm. 160 el que 7,000 maestros opten por retirarse antes de tiempo. A su vez, indican que podrían ser 10 mil o 12 mil maestros adicionales, a pesar de que no citan fuente alguna para sustentar estas proyecciones. Apéndice O.D.A.E. pág. 1181.

Por su parte, el actuario Pérez Díaz se limita a señalar en su Opinión Actuarial lo siguiente:

> El impacto de la Ley Núm. 160-2013 sobre el Sistema se resume en los siguientes puntos:
>
> […]
>
> 2. **Según nuestro modelo, el efecto principal sería extender la cantidad de activos del sistema hasta el año 2038, el mismo año en que el sistema comenzaría con la misma cantidad de activos que comenzó en el 2013.** O sea, el sistema prácticamente no desarrollaría activos del 2013 al 2038 dada la necesidad tan grande por pagar beneficios de pensiones. Luego los activos se agotarían completamente en el 2057.
> […]
>
> 4. En realidad esta ley le añade mucho riesgo de insolvencia al sistema porque del 2013 al 2038 pueden pasar muchos eventos negativos que abonen a la rápida insolvencia del sistema.
>
> En el caso del impacto de los escenarios de 5,000, 10,000 y 15,000 de nuevos jubilados repentinamente tenemos lo siguiente:
>
> Bajo la Ley Núm. 160-2013 pasaría lo siguiente:

Tabla IV

| Cantidad de Jubilados | Año fiscal en que se agotarían los activos del sistema |
|---|---|
| 5,000 | 2022 |
| 10,000 | 2018 |
| 15,000 | 2016 |

Según los resultados en las [sic] Tabla IV, la jubilación de miembros activos repentinamente aceleraría el colapso del sistema trayéndolo prácticamente hasta el tiempo presente. Hace lógica este comportamiento porque según nuestros resultados los jubilados terminan recibiendo mucho más en beneficios comparado con lo que aportan al sistema en una base anual. Por lo tanto, cuando un grupo de 5,000, 10,000 o 15,000 miembros se jubila repentinamente la utilización de beneficios de pensiones se dispara respectivamente. Opinión actuarial. (Énfasis en el original).

Esas cifras, en las cuales se basa la Opinión mayoritaria, las computó el actuario Pérez Díaz a base de "un modelo financiero bastante complejo [que él desarrolló] que puede predecir cuál será el impacto de la Ley 161-2013...". Opinión actuarial sobre la nueva Ley 160-2013 SRM, pág. 11. No detalla en qué consiste dicho "modelo financiero". De hecho, de las doce páginas a doble espacio que conforman la referida Opinión Actuarial, sólo los párrafos citados son alusivos al supuesto impacto que tendría el especulativo retiro masivo de maestros.

Entendemos que la Opinión Actuarial citada tiene muy poco valor probatorio pues no detalla las bases empíricas y fácticas que sostienen sus conclusiones. Regla 702 de las Reglas de Evidencia, 32 L.P.R.A. Ap. V, sec. 702. Además, la Opinión Actuarial es

contradictoria al reconocer que la Ley Núm. 160 prolonga la subsistencia de activos hasta el 2057 para luego aludir a "muchos eventos negativos" que podrían provocar dicha insolvencia para el 2016, 2018 o 2022. Sin embargo, no atiende ni evalúa cuál es la probabilidad de esos "muchos eventos negativos" a los que alude, por lo que su determinación al respecto no merece que se le adjudique valor probatorio alguno.

La mayoría no explica por qué las opiniones de estos peritos merecen mayor credibilidad que la prueba presentada por la Asamblea Legislativa, de forma tal que deba ceder la deferencia que le hemos reconocido al aplicar este escrutinio. Consideramos que las aseveraciones no fundamentadas de la Opinión Actuarial del actuario Pérez Díaz no son suficientes para rebatir la presunción de constitucionalidad que reviste la ley impugnada. Ni siquiera sabemos qué factores consideró el perito, si tomó en consideración el resto de las disposiciones de la Ley Núm. 160 si analizó aisladamente el impacto de este retiro especulativo en masa.

Contrario a la contención del actuario Pérez Díaz y de las partes demandantes, el expediente demuestra que la Rama Legislativa sí tuvo ante su consideración la información necesaria para determinar cuántos participantes habrían de acogerse a retiro en los próximos años. El estudio actuarial preparado por Milliman para el 30 de junio de 2012 incluye varias tablas que detallan las características de los participantes activos y retirados del Sistema de Retiro

para Maestros, incluyendo los años de edad y los años de servicio de cada uno. Informe de Milliman, págs. 38-44. El hecho de que el legislador contó con el beneficio de esta información al momento de ejercer sus prerrogativas legislativas queda demostrado en varias disposiciones de la Ley Núm. 160. Ahora bien, no sabemos si fueron analizadas por el doctor Pérez Díaz en su Opinión Actuarial y por la parte demandante al aseverar que el retiro de 7,000 maestros agravaría la crisis actuarial del Sistema de Retiro para Maestros. Veamos.

El artículo 3.9 de la Ley Núm. 160 contempla los diversos escenarios que pueden darse con relación a los requisitos de edad de retiro y años de servicio. En específico, dispone lo siguiente:

> (a) Aquellos participantes que a la fecha de efectividad de esta ley tenían derecho a retirarse y recibir algún tipo de pensión bajo la Ley 91-2004, según enmendada, por haber cumplido con los requisitos de años de servicio y edad correspondientes, podrán retirarse en cualquier fecha posterior a la fecha de efectividad de esta ley.
>
> (b) Aquellos participantes que al 31 de julio de 2014 tengan derecho a retirarse y recibir algún tipo de pensión bajo las disposiciones de la Ley 91-2004, según enmendada, o tengan derecho a retirarse bajo las disposiciones de esta ley por haber cumplido con los requisitos de años de servicio y edad correspondientes, podrán retirarse en cualquier fecha posterior al 1ro de agosto de 2014.
>
> (c) A partir del 1ro de agosto de 2014, cualquier participante activo al 31 de julio de 2014 podrá solicitar el retiro cuando:
>
> (1) cumpla cincuenta y cinco (55) años de edad y complete por lo menos treinta (30) años de servicio; o
>
> (2) cumpla sesenta (60) años de edad y complete por lo menos cinco (5) años

de servicio.

> (d) Cualquier participante en servicio activo que haya ingresado al Sistema a partir del 1ro de agosto de 2014 podrá solicitar el retiro cuando:
>
> > (1) cumpla sesenta y dos (62) años de edad y complete al menos cinco (5) años de servicio; y
> >
> > (2) haya hecho aportaciones individuales de diez mil dólares ($10,000) o más.

Artículo 3.9 de la Ley Núm. 160.

Como puede apreciarse, este Artículo reconoce los distintos escenarios de retiro, de acuerdo al cumplimiento de requisitos para ello en las distintas fechas de aplicación de la ley. En primer lugar, respeta el derecho adquirido de los participantes que al 24 de diciembre de 2013, fecha de efectividad de la ley, ya cumplían con los requisitos para retirarse con alguna pensión bajo la Ley Núm. 91 de 29 de marzo de 2004 (Ley Núm. 91), 18 L.P.R.A. sec. 391 *et seq*. Incluso, dispone que estos participantes podrán retirarse en cualquier momento posterior a la efectividad de la ley sin que su pensión se vea afectada. Siendo así, sería infundada la aseveración de que la Ley Núm. 160 propicia el retiro repentino y temprano de estos participantes, por su temor a quedar en peor posición. Después de todo, podrían decidir acogerse a retiro y recibir la pensión a la que tendrían derecho al amparo de la Ley Núm. 91.

En segundo lugar, el inciso (b) de este Artículo reconoce y respeta el derecho adquirido de los participantes que al 31 de julio de 2014 tengan derecho a retirarse y recibir alguna pensión al amparo de la Ley Núm. 91 de la Ley Núm. 160. Al igual que el inciso

anterior, les permite retirarse en cualquier fecha posterior. Consecuentemente, también sería infundada la aseveración de que la Ley Núm. 160 propicia el retiro repentino y temprano de estos participantes.

En tercer lugar, el inciso (c) del Artículo citado atiende el escenario de aquellos participantes que, al 31 de julio de 2014, no cualificarán para retirarse. Naturalmente, no podemos aseverar que la Reforma impugnada provocaría el retiro temprano de estos participantes, pues no cualifican para ello. Con la Ley Núm. 160, estos podrán retirarse cuando cumplan 55 años de edad y completen por lo menos treinta 30 años de servicio; o cumplan 60 años de edad y completen por lo menos 5 años de servicio.

El cuarto y último escenario contemplado por el Artículo 3.9 es el de aquellos participantes que ingresen al Sistema de Retiro para Maestros a partir del 1 de agosto de 2014, quienes podrán solicitar el retiro cuando cumplan 62 años de edad y 5 de servicio, y hayan hecho aportaciones individuales de $10,000. Estos, lógicamente, tampoco pueden retirarse repentinamente.

Finalmente, el artículo 4.4(a), titulado "Grandfather Provision", es la única disposición que permite el retiro temprano de maestros bajo las siguientes condiciones:

Aquellos participantes que, de no haberse aprobado esta Ley, hubiesen tenido derecho a retirarse con una pensión bajo el Artículo 40 (b)(1) y (b)(2) de la Ley 91-2004, según enmendada, por cumplir treinta (30) años de servicio acreditados entre el 1 de agosto de 2014 y el 30 de junio de 2016, podrá hacerlo bajo los siguientes términos:

(a) Para aquel participante que hubiera completado treinta (30) o más años de servicios acreditados durante dicho periodo pero no haya cumplido cincuenta y cinco (55) o más años de edad en o antes de la efectividad de esta Ley, se le concederá el setenta por ciento (70%) del salario promedio de dicho participante a la fecha de efectividad de esta ley. Para beneficiarse de esta disposición el participante estará obligado a retirarse efectivo el 31 de julio de 2014 y deberá continuar aportando al Sistema con la aportación individual establecida en el Artículo 4.4(d) de esta Ley hasta que cumpla 55 años de edad. De igual manera, el patrono deberá continuar al Sistema con la aportación patronal establecida en el Artículo 4.4(d) de esta ley hasta que el participante cumpla cincuenta y cinco (55) años de edad.

(b) Para aquel participante que hubiera completado treinta (30) o más años de servicios acreditados durante dicho periodo y cumplido cincuenta y cinco (55) o más años de edad en o antes de la efectividad de esta ley, se le concederá el setenta por ciento (70%) del salario promedio de dicho participante a la fecha de efectividad de esta Ley. Para beneficiarse de esta disposición el participante estará obligado a retirarse efectivo el 31 de julio de 2014.

Aquellos participantes en el servicio activo que cumplan con los requisitos para recibir una pensión bajo este artículo y deseen acogerse a la disposición de esta sección, estarán obligados a notificar dicha renuncia, final y firme, al Departamento de Educación con copia al Sistema de Retiro de Maestros en o antes del 31 de marzo de 2014.
Artículo 4.4(a) de la Ley Núm. 160.

Aunque esta disposición de la Ley Núm. 160 sí fomenta que un grupo de maestros se acoja a los beneficios de retiro hasta con dos años de anticipación, igualmente tenemos que reiterar que el legislador contó con el estudio actuarial de Milliman, del cual se puede conocer fácilmente cuántos participantes cualificarían para este retiro temprano. De hecho, la propia Opinión mayoritaria pudo detallar cuántos participantes se retirarían, gracias a la información en las tablas de este informe y que estuvieron disponibles para el legislador al momento de aprobar la Reforma en cuestión. No tenemos por qué inferir que la Rama Legislativa no tomó el impacto de esta disposición en consideración.

También es meritorio destacar que la Ley Núm. 160 no afecta retroactivamente las pensiones de aquellos participantes que, al 31 de julio de 2014, serían elegibles para recibir alguna pensión bajo la Ley Núm. 91. Aquellos que decidan mantenerse en el magisterio y posponer su retiro, mantendrán su pensión adquirida mediante la ley anterior. Así lo dispone claramente el artículo 4.4 sobre Pensión por Edad y Años de Servicio al establecer que: "[s]e preservan los derechos de aquellos participantes en servicio activo que al 31 de julio de 2014, contaban con los requisitos indicados en este Artículo. Se dispone que hasta el 31 de julio de 2014 los participantes acumularán los años de servicio y el Salario Promedio aplicable hasta dicha fecha". Acto seguido, el artículo 4.4 establece que cada participante -que pudo haberse retirado para el 31 de julio de 2014 pero optó por quedarse en el magisterio- retendrá la pensión a la que

tiene derecho bajo la Ley Núm. 91, en adición a la pensión que acumule a partir del 1 de agosto de 2014 según dispone el Capítulo 5 de la Ley Núm. 160. Por consiguiente, no hay espacio para argumentar que la Ley Núm. 160 incentiva a estos participantes a retirarse este verano para que sus derechos adquiridos al amparo de la Ley Núm. 91 no se vean afectados inconstitucionalmente.

En cuanto al resto de los participantes que no cualifican para retirarse para el próximo verano al amparo de la ley anterior o del "Grandfather Provision", es un sinsentido argumentar que se retirarán repentinamente en masa, pues no han cumplido los requisitos para ello. De hecho, estos participantes tendrían dos opciones: (1) renunciar al magisterio sujeto a los requisitos estatuidos en la Ley Núm. 160 para retirar sus aportaciones al Sistema de Retiro para Maestros;[114] o (2) quedarse en el

---

[114] El Art. 3.4 de la Ley Núm. 160-2013 dispone lo siguiente:

   (a)  A partir del 1ro de agosto de 2014, todo participante del Sistema que dejare de ser elegible como participante y (i) tuviese cotizado menos de cinco (5) años de servicio, o (ii) hubiese aportado menos de diez mil dólares ($10,000) tendrá derecho a que se le devuelva el importe de todas las aportaciones individuales que haya contribuido, más los intereses compuestos hasta que reciba el reembolso de aportaciones o hasta seis (6) meses después de la fecha de separación del servicio, lo que ocurra primero. A dichas aportaciones se le deducirá cualquier deuda que tuviere el participante con el Sistema.

   (b)  A partir del 1ro de agosto de 2014, aquellos participantes con cinco (5) años o más de servicio y que hubiesen aportado diez mil dólares ($10,000) o más al Sistema, no podrán retirar sus aportaciones individuales al separarse del servicio y serán acreedores de la

magisterio, en cuyo caso aplicaría la pensión mínima estatuida en el artículo 3.11 de la Ley Núm. 160.[115] Según el inciso (c) de este Artículo, el Sistema de Retiro para Maestros solicitará un estudio actuarial cada cuatro años para evaluar el aumento de dicha pensión mínima. Si el estudio favorece que esta se aumente, dicho aumento sería obligatorio para la Junta de Síndicos del Sistema.

---

pensión correspondiente cuando cumplan la edad de retiro establecida en esta Ley.
(c)

[115] El Art. 3.11 de la Ley Núm. 160-2013 dispone lo siguiente:

(a) Todo participante activo al 31 de julio de 2014 que no era elegible a retirarse a esa fecha con una pensión cuyo beneficio sea igual o mayor al 65% del Salario Promedio, y posteriormente solicite el retiro al cumplir treinta (30) años de servicio y cincuenta y cinco (55) años de edad, tendrá derecho a una pensión mínima de mil seiscientos veinticinco dólares ($1,625) mensuales. Se garantizará la pensión mínima de mil seiscientos veinticinco dólares ($1,625) para los maestros que se integren al Sistema a partir del 1 de agosto de 2014, al cumplir los requisitos de edad y años de servicio según dispuesto en el Artículo 3.9 (d).

(b) Se fija una pensión mínima de quinientos dólares ($500) mensuales para los participantes que se retiraron en o antes del 31 de julio de 2014. Todo pensionado que esté recibiendo una pensión menor de quinientos dólares ($500) mensuales recibirá, a partir del 1ro de agosto de 2014, el aumento necesario para que su pensión sea de quinientos dólares ($500) mensuales.

(c) Cada cuatro (4) años, el Sistema solicitará un estudio actuarial en el cual se evalúe el impacto de realizar un aumento en la pensión mínima establecida en este Artículo. En el caso de que el actuario favorezca un aumento en la pensión mínima, la Junta de Síndicos del Sistema se verá obligada a adoptarlo al comenzar el siguiente año fiscal.

(d)

Por otro lado, el informe actuarial de 2012 preparado por Milliman retrató la salud fiscal del SRM bajo los términos de la Ley Núm. 91, ley que deroga la Ley Núm. 160. Aquellos maestros que decidan retirarse al amparo de la ventana que provee la Ley Núm. 160 se retiran *en las mismas condiciones y bajo los mismos beneficios* de aquellos que se retiraron conforme a los beneficios que analizó este informe actuarial. Artículo 4.4 de la Ley Núm. 160. Además, durante las vistas públicas del proyecto que en su día se convertiría en la Ley Núm. 160, la Asociación, otros representantes del gremio magisterial y el propio SRM expresaron inquietud ante la posibilidad que la Ley Núm. 160 propiciara un retiro masivo y su posible impacto sobre las finanzas del SRM. Informe Positivo de la Cámara de Representantes, 21 de diciembre de 2013. Consecuentemente, y en vista de la deferencia que merece el legislador, no tenemos por qué presumir que éste no consideró el retiro de los participantes al aprobar la Ley Núm. 160. Resulta diáfano que la Asamblea Legislativa estaba consciente de las preocupaciones expresadas sobre la ventana de retiro, contaba con información relevante al respecto y ejerció sus prerrogativas legislativas según corresponde en un sistema republicano de gobierno.

Al conceder una ventana de retiro, la Asamblea Legislativa tomó una decisión de política pública para conceder un beneficio a aquellos maestros que más se verían afectados por los menoscabos legislados en la Ley Núm. 160. En vista de ello, asumió mayor

responsabilidad por la salud fiscal del SRM: aumentó su contribución patronal a un 20.53%, estableció una Aportación Uniforme para la Justicia Magisterial, comenzando en $30 millones y ascendiendo hasta $60 millones; estableció una Aportación Adicional Anual, donde aportará la cantidad necesaria para evitar que los activos brutos proyectados del Sistema nunca sea menos de $300 millones; y estableció una aportación adicional del Fondo General de $1,675.00 por cada pensionado, independientemente de cuándo se haya retirado. Artículo 4.9 de la Ley Núm. 160.. Como señaló en su declaración jurada la Secretaria de Hacienda, Hon. Melba Acosta Febo:

> Debemos notar, que, aun con los cambios al sistema propuestos por la Ley 160-2013, se va a requerir una aportación adicional del Fondo General que comenzará en $30 millones y luego aumentará a $60 millones anuales. Esto quiere decir que, aun con todos los cambios, el Fondo General tiene que aportar más fondos para este sistema, para resolver el déficit. Sin embargo, no estamos hablando de los $562 millones que serían necesarios si no hacemos nada y que el Fondo General no puede asumir, en cuyo caso se acabarían los activos.

Declaración Jurada de la Secretaria de Hacienda, Hon. Melba Acosta Febo, en la pág. 12.

Tras evaluar la credibilidad de estos informes periciales, resulta manifiestamente especulativo intentar calcular cuántos maestros se retirarán a consecuencia de las disposiciones de esta ley. Igual de especulativo resulta impartirle mayor credibilidad a estas opiniones periciales que a la prueba presentada por la Asamblea Legislativa y los testimonios de funcionarios económicos del Estado, particularmente de la propia Secretaria de Hacienda.

En otras ocasiones, los miembros de este Tribunal que hoy suscriben el análisis desacertado de la Opinión mayoritaria han reconocido el peligro de ignorar la deferencia que le debemos a la Asamblea Legislativa en cuanto a sus decisiones sobre asuntos de política pública en legislación socioeconómica. A modo de ejemplo, en *Trinidad Hernández* este Tribunal expresó lo siguiente:

> En fin, si el menoscabo surge como consecuencia de una modificación razonable y necesaria dirigida a adelantar un interés público, se sostendrá su validez. Al respecto, en *Domínguez Castro*, establecimos que debemos dar deferencia a la determinación de la Asamblea Legislativa respecto a la necesidad y razonabilidad de la medida.

*Trinidad Hernández*, 188 D.P.R. en la pág. 835 (Citas omitidas).

De igual forma, algunos de los jueces que estuvieron conformes con la Opinión mayoritaria en *Domínguez Castro*, estuvieron de acuerdo con las siguientes expresiones:

> Sin embargo, esto no significa que el foro judicial no deba dar alguna deferencia a la determinación de necesidad y razonabilidad que hizo el legislador en el ejercicio de su poder constitucional, especialmente cuando se trata de regulaciones socioeconómicas.
>
> A modo ilustrativo, es meritorio referirnos a la interpretación que se ha hecho en los circuitos apelativos respecto al grado de deferencia que se le debe dar a la determinación legislativa sobre la necesidad y razonabilidad de la medida. En Local Div. 589, etc. v. Comm. of Mass., el Tribunal Federal de Apelaciones para el Primer Circuito señaló lo siguiente:
>> [D]etermining the "reasonableness and necessity" of a particular statute is a task far better suited to legislators than to judges. Thus, in the case before us, where economic or social legislation is at issue, some

> deference to the legislature's judgment is surely called for.

De igual modo se manifestó el Tribunal Federal de Apelaciones para el Segundo Circuito, en *Buffalo Teachers Federation v. Tobe*, 464 F.3d. 362, 370 (2do Cir. 2006), al enunciar lo siguiente:

> We hasten to point out that less deference does not imply no deference. ... Relatedly, we agree with the First Circuit that U.S. Trust Co. does not require courts to reexamine all of the factors underlying the legislation at issue to make a de novo determination whether another alternative would have constituated a better statutory solution to a given problem.

> En síntesis, al enfrentarnos a la impugnación de la legislación según la cláusula del menoscabo de obligaciones contractuales del Estado, debemos dar alguna deferencia a la determinación del legislador respecto a la necesidad y razonabilidad de la medida.

*Domínguez Castro*, 178 D.P.R. en las págs 85-86 (Op. mayoritaria del Juez Asociado señor Kolthoff Caraballo).

Luego, en la secuela *Domínguez Castro*, algunos miembros de esta mayoría se expresaron conformes con las siguientes expresiones en el Voto particular del Juez Asociado señor Rivera Pérez:

> El legislador justificó en su extensa Exposición de Motivos, incluida en la Ley Núm. 7, la razonabilidad y necesidad de las medidas alternas que ha tomado la Rama Ejecutiva para atender con carácter de urgencia la crisis que nos afecta. Eso no son meras alegaciones. Es la política pública establecida por ley. Sólo luego de ese análisis es que resolvimos, dándole a la determinación de necesidad y razonabilidad que hizo el legislador, el grado de deferencia que ella merece en un estado de emergencia fiscal declarado legislativamente, en un sistema republicano de gobierno. En nuestro sistema constitucional, no es permisible que un juez celebre un juicio *de novo* para revisar la necesidad y sabiduría de una ley fiscal.

> ....

Lo único que la normativa de [*U.S. Trust Co. of New York*, 431 U.S. 1 (1937)] exige es que el Estado demuestre la necesidad y razonabilidad de la medida, dándole deferencia a la determinación del legislador por imperativo del principio y doctrina de la separación de poderes. Esto no quiere decir que la normativa federal obligue a la celebración de una vista evidenciaria como único mecanismo para que el Estado demuestre la necesidad y razonabilidad de la medida. En el caso ante nos, el Estado demostró mediante los hechos y datos que surgen de la Exposición de Motivos de la Ley Núm. 7, que las medidas impugnadas eran razonables y necesarias. Se atendió de esa forma, como cuestión de derecho, el planteamiento sobre inconstitucionalidad del referido estatuto.

Con tal deferencia no estamos abdicando a nuestro rol constitucional. Todo lo contrario. No podemos, como pretenden los disidentes, "abdicar a nuestra función judicial" de salvaguardar el mandato constitucional de separación de poderes para convertirnos en un SUPER GOBIERNO. Nuestra Constitución nos lo prohíbe.

*Domínguez Castro et al. v. E.L.A. et al.*, 178 D.P.R. 375, 427-29 (2010) (Voto particular del Juez Asociado señor Rivera Pérez, al que se unieron los Jueces Asociados señores Martínez Torres y Kolthoff Caraballo, y la Jueza Asociada señora Pabón Charneco)

Finalmente, en *Ex parte A.A.R.*, la mayoría de este Tribunal expresó lo siguiente en cuanto a la doctrina de separación de poderes:

es incuestionable que la Doctrina de Separación de Poderes es parte esencial del sistema de gobierno que hemos adoptado como comunidad política. Como Tribunal de última instancia, no podemos ceder a la tentación de obviar ese sagrado principio, o utilizarlo a la ligera como un estribillo jurídico. Debemos ser siempre conscientes de las delicadas fronteras constitucionales que existen entre las tres (3) ramas del gobierno. Es nuestra obligación velar por el rol de la Rama Judicial en aras de evitar trastocar los principios de la separación de poderes y echar al suelo el entendimiento básico de quienes concibieron a esta rama como la menos peligrosa de las tres (3). Debemos ser conscientes que, al igual que las ramas hermanas, la Rama Judicial no está exenta de

violaciones a los principios de separación de poderes.

*Ex parte A.A.R.,* 187 D.P.R. 835, 855 (2013).

No se puede colegir cómo la mayoría logra conciliar sus expresiones anteriores sobre la deferencia que le debemos a la Asamblea Legislativa en cuanto a determinaciones de política pública con lo que hoy decide la mayoría. Al proceder de forma inconsistente, hoy algunos miembros de este Tribunal asumen un rol de *supralegislatura* que no tiene cabida alguna dentro de nuestro ordenamiento jurídico y constitucional.

La Ley Núm. 3 de 4 de abril de 2013, cuya constitucionalidad sostuvimos en *Trinidad Hernández*, contenía disposiciones idénticas a las que hoy una mayoría de este Tribunal utiliza de escudo para justificar su proceder. En la Ley Núm. 3 se eliminaron los beneficios adicionales a la pensión de retiro para aquellos empleados públicos que no se retiraran antes de su fecha de efectividad. Ante lo anterior, no entendemos cómo los miembros de esta mayoría distinguen una controversia de la otra.

En *Trinidad Hernández* y *Domínguez Castro*, determinamos que los menoscabos contractuales legislados eran razonables y necesarios en base de la deferencia que debemos otorgar a la determinación al respecto que tomó la Asamblea Legislativa y *evidenció mediante la exposición de motivos de las respectivas leyes*. Ahora, una mayoría de este Tribunal resuelve que para merecer esa deferencia no basta lo consignado en

la expresión de motivos, sino que la Asamblea Legislativa tiene el peso de probar la razonabilidad y necesidad del menoscabo a través de mecanismos probatorios adicionales a los disponibles en este pleito: la exposición de motivos de la ley, estudios actuariales, informes de comisiones legislativas y prueba testifical presentada por funcionarios públicos con suficiente *expertise* como para liderar el quehacer económico y fiscal del pueblo.

En fin, este desmantelamiento del análisis de los argumentos de la mayoría demuestra que las razones para declarar la inconstitucionalidad de esta Ley, *vis à vis* las razones para declarar la constitucionalidad de la Ley Núm. 3, escapa la comprensión del derecho. El trámite obtuso abona a esta conclusión. En qué consiste el nuevo estándar adjudicativo aplicable a este tipo de controversia resulta ininteligible en estos momentos.

V

Por todo lo anterior, disiento. En vez, reconocería la constitucionalidad de la Ley Núm. 160 por entender que constituye un menoscabo razonable y necesario de las obligaciones contractuales del Estado con los participantes del Sistema de Retiro de Maestros y que los demandantes no demostraron que existen alternativas menos onerosas para garantizar la solvencia del Sistema de Retiro de Maestros.

Anabelle Rodríguez Rodríguez
Juez Asociada